Derrick Talerico (State Bar No. 223763)
dtalerico@wztslaw.com
Paige T. Rolfe (State Bar No. 331096)
prolfe@wztslaw.com
WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 Wilshire Boulevard, Suite 730
Los Angeles, CA 90025
Telephone:  (424) 500-8552

[Proposed] Attorneys for Fu Bang
Group Corp, USA, Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA – RIVERSIDE DIVISION**

In re:

FU BANG GROUP CORP, USA,

                Debtor and
                Debtor in Possession.

Case No. 6:25-bk-13004-SY

Chapter 11

**DECLARATION OF DERRICK TALERICO IN SUPPORT OF DEBTOR'S OMNIBUS OPPOSITION TO (1) MOTION FOR RELIEF FROM THE AUTOMATIC STAY AND FOR RELIEF FROM TURNOVER FILED BY FIRST CREDIT BANK, AND (2) MOTION FOR RELIEF FROM THE AUTOMATIC STAY FILED BY SPARKNEST, LLC**

Hearing:
Date:        June 12, 2025
Time:       1:30 p.m.
Crtrm:     302
             3420 Twelfth Street
             Riverside, CA 92501

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

-1-
DECLARATION OF DERRICK TALERICO IN SUPPORT OF OMNI OPPOSITION

I, Derrick Talerico, hereby declare as follows:

1.    I am an attorney duly admitted to practice law in the state of California and am admitted inter alia to the United States District Court for the Central District of California, and therefore to practice in the United States Bankruptcy Court for the Central District of California.  I have personal knowledge of the facts stated herein and knowledge based on business records of my law practice and of my law firm Weintraub Zolkin Talerico & Selth LLP (the "Firm"). All documents attached to this declaration are true and correct copies of such documents as they are maintained in the Firm's records.

2.    I am the proposed general bankruptcy counsel for Fu Bang Group Corp, USA, the debtor and debtor in possession in the above-indicated chapter 11 bankruptcy case.

3.    On May 29, 2025, I received the attached email (the "Eviction Email") from the office of Receiver Mark Adams, informing me of the Receiver's intent to commence eviction proceedings and to obtain one or more judgments and writs of execution – all without seeking approval from this Court. The Eviction Email is attached as **Exhibit 1**.

4.    On May 29, 2025, I printed the attached pages from Receiver Mark Adams website (the "Website Captures"), identifying him and his firm, California Receivers Group, as a "health and safety" receiver and differentiating a "health and safety" receiver from the "traditional concept of a financial receiver." Adams claims his brand of "health and safety" receivership is, "…appropriate for perpetually hazardous properties…[and] is a powerful remedy and should not to (*sic*) be used to abate simple problems." *See FAQs*. The Website Captures are attached as **Exhibit 2**.

5.    On May 29, 2025, I printed the attached publicly available articles (the "Adams Articles") discussing Mark Adams' "checkered history" and highlighting certain failures and shortcomings as determined by judges and the LA City Council including: failure to produce reports expected of a financial receiver; sending eviction notices without authority to do so; lack of transparency; loss of confidence; padded staffing; inflated fees; and "feeding frenzy" billing practices. The Adams Articles are attached as **Exhibit 3**.

DECLARATION OF DERRICK TALERICO IN SUPPORT OF OMNI OPPOSITION

WEINTRAUB **ZOLKIN** TALERICO & **SELTH** LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 30th day of May, 2025, at Los Angeles, California.


　　　　　　　　　　　　　　　　　　　*/s/ Derrick Talerico*　　　　　　　　
　　　　　　　　　　　　　　　　　　　Derrick Talerico

DECLARATION OF DERRICK TALERICO IN SUPPORT OF OMNI OPPOSITION

**WEINTRAUB ZOLKIN TALERICO & SELTH LLP**
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

# Talerico Decl. - EXHIBIT 1

# Eviction E-Mail

## Outlook

---

## Fu Bang - Troy Property

---

**From** Adena Mosesian <amosesian@calreceivers.com>

**Date** Thu 5/29/2025 12:34 PM

**To** Derrick Talerico <dtalerico@wztslaw.com>

**Cc** Mark Adams <madams@calreceivers.com>


Hi Mr. Talerico,

As a courtesy, we are letting your office know that we are proceeding with evictions of non-paying units. Once we obtain the judgment and writ of execution, we will wait to execute on it until (when and if) the bankruptcy stay has been lifted.

Thanks,

Adena

--

**Adena Mosesian**

Attorney

amosesian@calreceivers.com

(310) 471-8181

(310) 471-8180

**www.calreceivers.com**

 California Receivership Group, Est. 1999

YouTube  Twitter  linkedin

Learn more about **Health and Safety Receiverships >**  |  Join Our **Mailing List >**

This electronic transmission, and any documents attached hereto, may contain confidential and/or legally privileged information. If you have received this electronic message in error, please notify me immediately and delete this electronic message. Any disclosure, copying, distribution, or use of the contents of information received in error is strictly prohibited.

# TALERICO DECL. - EXHIBIT 2

# Website Captures





*Before*

California Receivership Group is a health and safety receiver of distressed properties statewide. A receivership under the Health and Safety Code **is an alternative to an enforcement agency taking on the financial and physical responsibility** of managing the nuisance abatement process. By leveraging the statutory authority and equitable discretion of the courts, health and safety receiverships can **break stalemates in nuisance abatement cases at no cost to taxpayers.**

## *Our Impact*

| 343 | 184 | 131 | 36 |
|---|---|---|---|
| Receiverships | Judges | Cities | Counties |

## *Sample Uses*



*Revamping California neighborhoods,*

*one nuisance property at a time.*

## Our Mission

To promote the use of receivership as a nuisance abatement remedy for problem properties where traditional strategies have been unsuccessful. To bring relief to California communities who suffer from the negative effects of nuisance properties. To find unique solutions that prioritize the people at the heart of each case. To exemplify how receivership can be a reliable abatement remedy for communities in need of a solution to nuisance properties.

## Our History

C.R.G. pioneered the use of receivership under the Health and Safety Code for dangerous and perpetually noncompliant nuisance properties. Our 25 years of experience proves that receivership is an effective remedy that can be applied to a wide variety of cases with dramatic results.

baby's death, Mark Adams, Founder and President of California Receivership Group, became the first receiver ever to be appointed under the California Health and Safety Code to remedy the deplorable conditions at that building.

Although receivership was an available remedy, listed in California's Health and Safety Code to address substandard properties, this marked the first time it was used to tackle a nuisance abatement issue. On learning of the remedy from a local professor in the early 1990s, Receiver Mark Adams felt that this was the answer for nuisance properties where no other code enforcement strategies had been successful.

Frustrated with the number of dilapidated properties in his community, Adams established California Receivership Group to be a complete turn-key solution to abate dangerous properties. C.R.G. was founded with the goal of providing relief to the community surrounding a problem property, who have to live with the ripple effects that it causes every single day.

Prior to establishing C.R.G., Mark was a driving force behind and served on, Mayor Riordan's Blue Ribbon Committee on Slum Housing. This experience combined with his decades-long career in real estate finance provided the backbone for his initial receivership work. Over the past twenty years, Adams has helped C.R.G. hone their approach to health and safety receivership work, gaining vast experience managing the financial, political, social, and economic intricacies that accompany this extraordinarily unique enforcement tool.

Since that first appointment, C.R.G. has become the most experienced health and safety receiver in the state, working on over 250 projects throughout California and mentoring or training many of the other receivers working in this field. Receivership projects have included single and multi-family buildings, hotels, motels, mobile home parks, and commercial buildings. With our dedicated team of legal, operations, public safety, construction, and real estate professionals in every corner of the state of California, C.R.G. is able to handle all aspects of the receivership process from start to finish.

**TALERICO DECL. - EXHIBIT 2 - Page 9** 2/4



Historically used to assist with bankruptcy and the management of assets, receivership is an innovative solution that can quickly remedy pressing dangers. Not only can a receivership ensure the remediation of health and safety code violations, but a receiver can develop a long-term plan to secure the future of a property. This is the solution to the problem with dozens of different causes, made more complicated by the human factors that each case presents.

## *Nuisance conditions do not end at the property line, they play out in property values, crime rates, and public health.*

Nuisance abatement is important because the negative impact of a nuisance property does not end at the property line. One nuisance property can depress property values for those surrounding it. The New York Times reported that homes adjacent to dilapidated properties can depreciate by 5-10%. And there are other adverse effects that can lead blight to spread across an entire block: A nuisance property may increase crime in the surrounding area. In a previous case, C.R.G. found that remedying code violations and nuisance conditions at a southern California hotel reduced crime on its block by 55%. A 2016 study by researchers at the University of Pennsylvania found that there was a 39% reduction in gun violence from addressing abandoned buildings and vacant lots. A 2015 study published in the American Journal of Public Health found that "remediating neighborhood blight may reduce stress and improve health." The body's stress response was activated when study participants walked past nuisance properties in their community. Over time, repeated activation of this stress response has been found to cause disease.

Moreover, dilapidated properties increase costs for local governments as they end up spending more time and resources responding to calls for service in the area. Some agencies may even decide to cover the maintenance costs of the private property, reducing their ability to invest in community programs. Even placing a lien on the property to cover the costs can be problematic as it is not always straightforward or timely to recover these costs. Research and experience show that the existence of a nuisance property impacts its surroundings and can turn deadly if left unchecked.

**TALERICO DECL. - EXHIBIT 2 - Page 10** 3/4



*Each receivership property should pay its own costs of repair. Abatement costs should **not** be the responsibility of the taxpayers in the surrounding community.*





Legal Disclaimer | Privacy Policy | About | Testimonials | FAQs | Subscribe | Submit an Address

Copyright © 1999-2025 California Receivership Group, B.C.,
All rights reserved.

**TALERICO DECL. - EXHIBIT 2 - Page 11** 4/4

# Receivership for Commercial Nuisance Properties

The health and safety receivership remedy can be used on properties of all shapes and sizes including commercial properties such as stores, restaurants, motels, and hotels. Receivership can be used in conjunction with other remedies, including tax foreclosure sales, as well as abating the issues through redevelopment financing.

**How Can Receivership Help Commercial Nuisance Properties?**

- Receivership can be a catalyst for the long term abatement of nuisance conditions at a commercial property.

- Where the use of a property for a specific purpose has declined, receivership can be the first step to creating a space that better serves the surrounding community.

- Through receivership, a property pays its own repair costs, meaning that these are not the responsibility of the taxpayers in the surrounding community.

- The property can be secured on day one of the receivership. This is also when the process to assess and clear the dangers starts.

- The enforcement agency can take a step back into a monitoring role as the receiver works on the day to day issues onsite.

- Depending on the situation, the receivership could either secure financing to abate the issues or could clean out and sell the property to a

**TALERICO DECL. - EXHIBIT 2 - Page 12**



### Historic Motor Inn on California's Coast Highway Restored to Original Glory



### Receivership Property Survives California's Deadliest Wildfire



### A Historic Run-Down Hotel Becomes A Community Hub



### Upscale to Unsafe: Once Popular Hotel is Declared A Public Nuisance



### Turning Around a Deadly Commercial Property



### Property is Intentionally Burned to Increase Public Safety



### Nuisance Abatement Provides Valuable Training for Southern California Firefighters



### Court Appointed Receivership Proves to be a Solution to Tackling Lawless Mobile Home Park



### Ramshackle Motel Becomes Days Inn by Wyndham Microtel



### Historic Hotel in the Heart of a City is Closed for Business for 20+ Years



### Little Value, but a Big Community Issue: Remediating a Blighted, Low-value Motel and Family Home



### Despite Tragic Past, Property Becomes a Successful Local Business

**TALERICO DECL. - EXHIBIT 2 - Page 13**



NEXT





Legal Disclaimer  |  Privacy Policy  |  About  |  Testimonials  |  FAQs  |

Subscribe  |  Submit an Address

Copyright © 1999-2025 California Receivership Group, B.C.,
All rights reserved.

# Mark Adams

## President



Mark pioneered the use of the health and safety receivership remedy in California over the last 20 years and remains the most experienced health and safety receiver working in the state. He has been appointed as receiver by 136 different judges (state and federal) to rehabilitate over 250 properties in 34 counties and 112 different cities. Mark has mentored or trained most of the other health and safety receivers operating in California. Mark is a sought-after speaker at state and national housing conferences. He submitted an amicus curiae brief in the California Supreme Court's landmark ruling in support of the health and safety receivership remedy, *City of Santa Monica v. Gonzalez* 43 Cal. 4th 905 (2008).

Mark is a magna cum laude graduate of Loyola Marymount University and of Georgetown University Law Center. He has worked in real estate finance most of his 35-year career-in the private sector (Callie Mae from 1983 to 1988 and Fannie Mae from 1992-1996) as well as the public sector (Governor's Office of Planning and Research 1978-1982). He served on and was a driving force behind, Mayor Riordan's Blue Ribbon Committee on Slum Housing from 1998-2000. He innovated the funding of super-priority receivership certificates and, over the last 20 years, has funded over $44 million in health and safety receivership financings.

Learn more about Mark on his blog: receivermarkadams.com
Mark's longer bio is available via downloadable .pdf file

# Representative Cases:

- *County of Sonoma v. U.S. Bank N.A. as Trustee*, --- Cal.Rptr.3d ---, A155837, A15724, 2020 WL 5949655, 10/8/2020, Cal.App. 1 Dist.
- *City of Chula Vista v. Gutierrez* (2012) 207 CaL.App. 4th 681
- *City of Whittier v. Southland Display Company* (Cal. Ct. App., Feb. 25, 2015, No. B250819) 2015 WL 800059, as modified on denial of reh'g (Mar. 16, 2015) (unpublished)
- *City of Dana Point v. Finnegan* (Cal. Ct. App., Mar. 22, 2019, No. G055124) 2019 WL 1303854 (unpublished)
- *City of Santa Monica v. Gonzalez* (2008) 43 Cal.4th 905, 913 (amicus brief)
- *County of Mariposa v. JDC Land Company, LLC* (Cal. Ct. App., Aug. 25, 2020, No. F076310) 2020 WL 5015561, at *1, review filed (Oct. 2, 2020) (unpublished)
- *People ex rel. Lindgren v. McGuire* (Cal. Ct. App., Sept. 6, 2019, No. C086213) 2019 WL 4233144 (unpublished)
- *City of Stockton v. Singh* (Cal. Ct. App., Apr. 15, 2019, No. C084142) 2019 WL 1593635, review denied (June 26, 2019) (unpublished)

TALERICO DECL. - EXHIBIT 2 - Page 15

# *Frequently Asked Questions*

## What is a health and safety receiver?

Unlike the traditional concept of a financial receivership, a health and safety receiver is appointed to remedy the state and municipal code violations at a nuisance property. A receiver is a neutral third party appointed by a judge and given the authority to remedy the issues onsite. Since a receiver can start work immediately after an appointment is granted, receivership can be a quick and effective way to handle emergency situations. Receivership is used primarily for abandoned and substandard properties where the owner has a history of non-compliance with local enforcement agency orders to abate, or when a property's condition presents a serious threat to its occupants or the surrounding public.

## Why health and safety receivership?

A health and safety receivership is a dramatic, immediate, comprehensive, and systematic tool that can end the issues with a nuisance property without any costs to the referring agency or government. Receivership is an effective mechanism to communicate to neighbors and surrounding communities that the city/county/agency is taking concrete steps to remedy the problem property they have lived with, and will remedy the dangerous conditions created by absentee or recalcitrant owners.

## Who can nominate a receiver?

A receiver can be nominated by a local enforcement agency (such as a city, county, or fire protection district), a tenant, or a tenant association or organization (California Health and Safety Code § 17980.7(c)).

## How can I tell if a nuisance property is right

**TALERICO DECL. - EXHIBIT 2 - Page 16** 1/4

or organization (California Health and Safety Code § 17980.7(c)).

## How can I tell if a nuisance property is right for receivership?

Receivership is appropriate for perpetually hazardous properties when other code enforcement remedies have been unsuccessful. It does not have to be the absolute last-ditch effort, but it is a powerful remedy and should not to be used to abate simple problems. A court can appoint a receiver on single-family homes, apartment buildings, hotels, motels, and other commercial properties. Depending on the underlying statute, the powers can be as broad or as limited as necessary. Receivership is a useful tool for pressing situations since the receiver can be—and C.R.G. always is—onsite making a difference immediately after appointment. Property-specific questions should be raised with C.R.G.

## What are the steps in the receivership process?

- **Step 1:** A community identifies a property in violation of state or local health and safety codes, as well as the property owner's failure to correct these violations;
- **Step 2:** The community nominates a receiver via petition to the court (the notice given to the property owner relies on the severity of the threat);
- **Step 3:** Once a receiver is appointed by the court, the property is under direct control of the court via the court-appointed receiver;
- **Step 4:** The receiver creates and carries out a rehabilitation plan for the property and obtains lien financing—all under direct authorization of the court;
- **Step 5:** The property owner, via the equity in the property, is responsible for paying the community's enforcement costs and legal fees, as well as the cost of the property's rehabilitation and receivership fees. In short, the property pays its own rehabilitation costs.

## I've never filed a receivership case before; where can I get help?

C.R.G. can provide useful pleading samples and explain the receivership process. Each case is different, and every owner and property present their own issues. So, while it is up to the community to file the papers, C.R.G. can explain the necessary requirements.

## What happens after the receiver is appointed?

Once the receivership application receives judicial approval, the bulk of the work lies with the receiver. The requesting party may provide comment, but the control lies with the court. The receiver should be onsite immediately following the appointment to inspect the property and determine the rehabilitation plan, which is then submitted to the court for review. The receiver must file reports to update the court and parties regarding the receivership status, as well as monthly accountings to show the money being spent to correct the violations. The receivership ends when the violations are abated. At the receivership discharge, all parties weigh in on the receiver's conduct and accomplishments.

## How is the receivership funded?

The receiver, under the authority and supervision of the appointing court, borrows against the property and uses those funds to pay for emergency owner/occupant relocation, property rehabilitation, demolition, or other work as authorized by the court in order to bring the property into compliance with local and state regulations. This becomes a lien on the property that, at the court's discretion, may have priority status for reimbursement.

## What happens if the owner or occupants are living onsite?

In most cases, it is too dangerous for anyone living onsite to remain while violations are present and remediation work is ongoing. The receiver can provide financial and physical assistance to any occupants, including those who are not living there legally, to help them relocate

**TALERICO DECL. - EXHIBIT 2 - Page 17** 1/3

# TALERICO DECL. - EXHIBIT 3

# ADAMS ARTICLES

Case 6:25-bk-13004-SY    Doc 31    Filed 05/30/25    Entered 05/30/25 09:24:08    Desc
Main Document    Page 19 of 52

## Los Angeles Times

HOUSING & HOMELESSNESS

# Evictions, homelessness, debt: Skid Row Housing Trust receiver has checkered history



Patricia Shawn, 59, has lived in Fresno's La Hacienda Mobile Estates, previously known as Trails End, since 1997. She is among many residents who have received eviction notices from park owner Harmony Communities. (Irfan Khan/Los Angeles Times)

**By Liam Dillon and Doug Smith**

May 17, 2023 5 AM PT

**TALERICO DECL. - EXHIBIT 3 - Page 19**

The Trails End Mobile Home Park in Fresno was a shelter of last resort for many of its residents — single parents, retirees, day laborers, people struggling with disabilities or simply to get by. Then the city declared its conditions unsanitary and asked a judge to hand control to a receiver named Mark Adams to improve the property. Two years later, a third of the spots are vacant and the remaining tenants face eviction.

In the Coachella Valley, Adams acted as receiver over a community of 4,000, primarily migrant farmworkers. He saddled the receivership with $220,000 in debt, a judge removed him and the squalor remained years after he was gone.



Jackelyne Garcia, 47, has lived with four children in a single wide mobile home for last 13 years in Fresno's La Hacienda Mobile Estates, previously known as Trails End. (Irfan Khan/Los Angeles Times)

In East Los Angeles, Adams took control of a dilapidated triplex, sold it and tried to bill the estate $530,000 before an angry judge cut the amount by more than half. The

**TALERICO DECL. - EXHIBIT 3 - Page 20**

70-year-old property owner lost everything and has mostly lived in shelters and cheap hotels ever since.

Now the city of Los Angeles has put Adams in charge of his biggest job to date: overseeing 29 buildings in Skid Row with more than 1,500 formerly homeless tenants, many elderly and disabled.

Last month, at the request of Mayor Karen Bass and City Atty. Hydee Feldstein Soto, a Los Angeles Superior Court judge gave Adams and his California Receivership Group broad power to manage residential hotels and other homeless housing complexes operated by Skid Row Housing Trust, a nonprofit housing provider.

Before Adams' appointment, as the trust's finances collapsed, many tenants lived in fear amid squalid conditions. Three people died of drug overdoses in one day at a building last month.

The situation, city officials pleaded in court documents, had become an "impending humanitarian crisis." And Adams, they said, was singularly qualified for the receivership role because of his "wealth of knowledge and experience."

A Times review of court records and dozens of interviews with parties involved in Adams' past receiverships, however, raise concerns about his ability to manage the trust's beleaguered portfolio and care for the vulnerable tenants now under his control.

In two cases comparable in size and scope to the trust matter, Adams left years before they were resolved and, in court filings, omitted key facts about his involvement in them. In other cases involving Adams, tenants faced the risk of eviction and property owners lost their houses while his fees have risen as high as $465 an hour.

**TALERICO DECL. - EXHIBIT 3 - Page 21**



In foreground, Mark Adams holds a press conference in front of the Riverside U.S. District Court in April 2008 while serving as receiver at the Duroville mobile home park. (Los Angeles Times)

In multiple instances, judges and local governments have determined that Adams has padded staffing, increased his staff's rates without informing the judge and engaged in duplicative billing — inflating his fees by six-figure amounts. A judge in one case likened Adams' billing to a "feeding frenzy."

Patricia Shawn, who has lived at Trails End for nearly three decades, said she initially was hopeful that Adams would improve conditions. Instead, she said, he was disdainful of tenants' desire to remain in their homes and blamed him for their impending evictions.

"He's ruined a lot of people's lives here," said Shawn, 59.

**TALERICO DECL. - EXHIBIT 3 - Page 22**

In an interview with The Times, Adams defended his record — noting that he's taken on hard cases throughout his career, which makes criticism inevitable.

Adams argued that his firm has handled nearly 300 receiverships, more than anyone else in the state, and that cities and judges wouldn't keep putting him in charge if he wasn't getting results. He said he's the only one with the expertise in contracting, property management and financing needed to handle the magnitude of his current assignment.

"There is nobody other than me, in California or anywhere in the United States, that would even have a chance of solving the problem at Skid Row Housing Trust," Adams said.



**CALIFORNIA**

**All 29 Skid Row Housing Trust buildings placed under receivership**

April 7, 2023

An attorney who worked in mortgage finance, property management and public affairs, Adams was one of the leaders of a blue-ribbon committee that in the late 1990s examined slum housing in Los Angeles.

At the time, he came across an obscure state law that allows a judge to take over properties in deplorable circumstances where owners were unwilling or unable to make repairs. The court, through an appointed receiver, would have broad authority to fix the problems and abate any nuisances. The receiver generally finances the improvements — and his own fees — by borrowing off the property's value and receiving first priority, ahead of any mortgages or other loans, to get paid back.

Adams created the California Receivership Group and has since taken over troubled properties stretching the length of the state.

**TALERICO DECL. - EXHIBIT 3 - Page 23**

While abating a nuisance, receivers act as the arm of the court and their first duty is to carry out the court's orders. They typically also have fiduciary duties to the owners and creditors of the estate, and a responsibility to make the building habitable to tenants or find them housing elsewhere, said Richard Ormond, an attorney at Buchalter and former chair of the California Receivers Forum.

Receiverships can be messy affairs.

Some owners resist the idea of someone taking over their home or business and spending money on their behalf. Adams said he's gotten death threats, and has had judges issue restraining orders to protect him and his staff.

And the tenants in troubled properties often face precarious living situations.

Following two fires, one fatal, at the Trails End Mobile Home Park and the formation of a large homeless encampment on its grounds in 2021, Fresno city officials asked a court to appoint Adams as receiver to clean things up.

From the start, Shawn said, Adams showed contempt for the roughly 150 people living there.

One time, he walked up to Shawn's trailer and told her in front of his employees that her cluttered yard was a disgrace, and she should be ashamed.

"He said he was like a god here, he was like police … what he said is what goes," Shawn said.

Adams denied making that statement to Shawn. He added that he regretted his brusqueness with her and other residents but needed rapid action to address fire risks and other dangers.

TALERICO DECL. - EXHIBIT 3 - Page 24



Patricia Shawn, 59, stands outside her mobile home in Fresno's La Hacienda Mobile Estates, previously known as Trails End.  (Irfan Khan/Los Angeles Times)

Ultimately, Shawn perceived that Adams was indifferent to whether residents could stay. They pleaded with him not to sell the property to Harmony Communities, a large mobile home park operator accused in the past of raising rents and squeezing low-income residents. Trails End tenants even tried to line up financing to purchase the park themselves.

But Adams recommended Harmony buy the property, and even brought in its contractors before the $1.7-million deal became official last May. Residents said in court declarations that Adams' and Harmony's employees together pushed them to accept buyouts and leave the park, warning that their trailers would likely be destroyed.

TALERICO DECL. - EXHIBIT 3 - Page 25

Since Harmony took over, it's filed about a dozen eviction lawsuits and is threatening more, according to Mariah Thompson, an attorney with California Rural Legal Assistance, a nonprofit that is representing Shawn and other park residents. Last month, Harmony told residents the park would close next April.

"I don't know where I'm going to go," Shawn said. "I don't have any family left. I planned on being here until I passed away — in my own little corner where I wasn't bothering anybody."

Adams' firm received more than $500,000 in fees from the Fresno case, court filings show.

Adams said he would have entertained offers from tenants or nonprofits to purchase the property but nothing official ever came.

As far as tenants now facing eviction, Adams said he was convinced that local laws would prevent large rent increases and that, regardless, he's not responsible for what happens after he leaves.

The park's owner wanted to sell, Adams said, and he's required to abate the nuisance while getting the best deal for the owner.

"My assignment there was to get that property remediated," he said. "It was a filthy mess. I accomplished that."

Some owners who have opposed Adams ended up destitute.

For years, neighbors in East L.A. complained about violence, drugs and gang activity on an 11,000-square foot lot with ramshackle dwellings and an auto repair shop located across the street from an elementary school. In 2018, L.A. County pursued a

TALERICO DECL. - EXHIBIT 3 - Page 26

receivership, with Adams taking over the property owned by Mary Jacobs, her husband and a third party.



Mary Jacobs sits on her sofa inside her single-room occupancy unit in the Madison Hotel in Skid Row.  (Francine Orr/Los Angeles Times)

Jacobs, 73, has had a troubled life. She has bipolar disorder and uses methamphetamine. She fought Adams' actions in court, mostly representing herself. Ultimately some of the buildings on the site were demolished, one of the homes was cleaned out and Adams sold the property for $550,000 in early 2020.

For his work, Adams billed $530,000 — nearly the entire amount from the sale — on top of the $275,000 he paid contractors to remediate the problems.

In a scathing November 2020 ruling, L.A. Superior Court Judge William F. Fahey upbraided Adams for repeatedly racking up more in fees than the judge had

authorized.

Yes, Fahey wrote, Jacobs' property was decrepit and dangerous, but she did not have the resources to fix the problems the way Adams did. Instead, Fahey found that Adams' billing practices violated his responsibilities to Jacobs — with devastating consequences.

"The only reasonable conclusion is that the Receiver has put his financial interests first and expects that his request for additional fees will be rubber stamped," Fahey wrote, noting that Jacobs had become homeless as a result of the case. Fahey denied more than $300,000 of Adams' fees.

Jacobs, who lives in a residential hotel in Skid Row, blames Adams for her current circumstances.

"I would not have been homeless if not for him," Jacobs said. "Anything I had of value has been taken from me. I have nothing."

TALERICO DECL. - EXHIBIT 3 - Page 28



Mary Jacobs arrives at her single-room occupancy unit in the Madison Hotel in Skid Row.  (Francine Orr/Los Angeles Times)

Adams denies he's responsible for Jacobs' problems, pointing out that she was ordered to vacate the property at the time he was appointed receiver.

Adams declined to comment on Fahey's order, other than to disagree with the finding that he violated his duty to Jacobs and say he'll never work with the judge again.

"It was a drug-infested den that had crooked contractors involved and now that's all gone," Adams said. "Even though [it] was just a very challenging case with the judge, it did have a happy ending."

In the trust case, Adams is overseeing many tenants who have been homeless and suffer from mental health and drug problems. He will have significant sway over whether they will remain in the buildings.

**TALERICO DECL. - EXHIBIT 3 - Page 29**

Aside from the tenants' vulnerability, the trust case presents complications beyond normal receiverships.



**CALIFORNIA**

**Bad bets, dysfunction: Inside the collapse of the Skid Row Housing Trust**

March 26, 2023

The properties have a series of covenants and other rules ensuring they remain low-income housing, leaving little ability to increase their market value.

The city has proposed transferring the buildings to other nonprofits that have the resources to manage them properly. But many trust properties are more than a century old, and 15% of the nearly 2,000 units cannot be rented due to code violations. It could take years and millions of dollars to restore the entire portfolio.

When the cost of repairs and the receiver's fees exceed the value of the property, the law holds the property owner responsible for the difference.

The trust, however, is on the brink of insolvency. Unable to make payroll, it laid off all its property management staff in the last two months.

Los Angeles housing officials have acknowledged that the city probably will end up paying some of the still-unknown cost.

So far, Adams has received authority to borrow $1.8 million to finance security and repairs at trust properties. Adams is expected to request additional funding at an L.A. Superior Court hearing scheduled for Wednesday.

The final cost will include payments to Adams and California Receivership Group, which staffs attorneys, paralegals and property managers. Adams has assigned 17 employees, including himself, to the trust matter, with hourly rates starting at $151.

**TALERICO DECL. - EXHIBIT 3 - Page 30**

In a declaration to the judge in the case, Adams said he was offering a 25% discount to the city on his fees. He told The Times he was still deciding if that would apply to his entire staff or just his own $465 an hour rate. He may reduce his own payments further, he said.

Judges in prior matters have noted California Receivership Group's size allows it to deal with cases efficiently, but its fees can stack up quickly with little oversight.

"Because all of its administrative and legal services billings are 'in house' it gets to effectively bill itself for its legal and administrative expenditures and it gets to set the billing rates for all of its employees. What could go wrong with that?" wrote Robert F. Moody, a judge presiding over an Adams receivership in Mariposa County, in a 2022 ruling.

Moody found "accounting and billing irregularities" by Adams in the case, which stretched for 13 years, though the judge did not determine specific violations. Ultimately, Moody reduced Adams' fees and costs by more than $300,000, according to court filings and attorneys for Mariposa County.

That ruling came after attorneys for the county, which had requested the receivership, objected to Adams' accounting. In recent years, lawyers representing the cities of Duarte and Palmdale and L.A. County — in Jacobs' case — have done the same.

The cases share common issues: Adams assigns a dozen or more employees work on a case, bills for multiple employees on the same task (including weekly internal meetings) and raises staffers' rates without notifying the judge.

The judge in the Palmdale case rejected the city's argument and approved Adams' billings. But in the Duarte case, which involved a 28-unit apartment complex, Adams' fees were reduced by over $100,000.

TALERICO DECL. - EXHIBIT 3 - Page 31

Adams maintains there was no wrongdoing in his accounting and all the firm's activities were justifiable. But Adams said his firm no longer bills multiple people for the same task and he returns to the judge for approval prior to incurring expenses or raising individual staffer's rates.

"We don't need to be subject to that kind of criticism, so we've changed our practice," Adams said.

Adams said he often forgoes fees to see receiverships through, sharing an internal spreadsheet saying that he is out $2.4 million in the seven cases highlighted by The Times. But he did not break down how much of that amount was billing that judges rejected.

Adams' primary argument for his appointment in the trust matter was his experience.

"I served as a receiver on a large 26-building portfolio in Eureka, California, described as having 'slumlord' conditions," Adams wrote in a March 29 sworn declaration to L.A. Superior Court Judge Mitchell L. Beckloff, who is presiding over the trust case. "I have the ability and resources to handle large, complex receiverships."

Adams was named receiver in Eureka in 2011. He told The Times that he served in that role for three years.

But for nearly that entire period, court orders put the case on hold. In fact, Adams' active appointment lasted just 20 days in total and a judge only approved Adams' payment for receivership duties for those three weeks, court records show.

Adams removed himself from consideration for further work, he said in a court declaration, after the judge turned down some of his fees and while an ultimately

**TALERICO DECL. - EXHIBIT 3 - Page 32**

unsuccessful trespassing lawsuit against him filed by the property owner was pending.

Adams said his reference to the Eureka receivership in the trust case was fair. He had done preliminary assessments of all 26 properties at issue and filled five filing cabinets with documents detailing needed repairs.

"We did the initial work [on Eureka], which is exactly what I'm doing right now," he said.

Jeff Smith, the receiver who replaced Adams in Eureka, said Adams never turned over those documents and the work needed to be redone.

When asked by The Times, Los Angeles officials said they were unaware of concerns about Adams' performance.

Feldstein Soto said that the trust's failure demanded immediate action, and Adams was widely regarded as the most qualified receiver they could find. None of the public agencies, nonprofit interests, lenders and others involved in the case have raised issues about him, she said.

"He's the only receiver in California, as far as I know, that has done anything remotely comparable in terms of his experience," Feldstein Soto said. "He was the obvious choice."

But, she said, her office didn't formally vet his resume before recommending his appointment. Feldstein Soto said she wasn't surprised that Adams had made enemies given the nature of his role. She said that the city planned to monitor his work.

"We're watching him, having regular meetings with him," she said. "We will hold Mark and everyone else in this case accountable."

**TALERICO DECL. - EXHIBIT 3 - Page 33**

Perhaps the most consequential matter Adams was involved in was a 2007 case involving a sprawling migrant farmworker camp on Native American lands in the eastern Coachella Valley. He cites the case among the "notable achievements" on his resume.



Under the shade of an awning Martha Carrillo baby-sits the children of farmworkers at her mobile home in Duroville in 2012.  (Irfan Khan/Los Angeles Times)

The camp, named Duroville, housed thousands of indigenous people from Mexico and other indigent laborers in dirty, overcrowded slums in the desert. The smell of raw sewage permeated the property, packs of wild dogs roamed, makeshift electrical systems led to fires that destroyed residents' trailers, drinking water was contaminated and a toxic waste dump sat next door.

U.S. District Judge Stephen Larson appointed Adams as Duroville's receiver and assigned him to work with Pierre-Richard Prosper, a former senior diplomat in

**TALERICO DECL. - EXHIBIT 3 - Page 34**

President George W. Bush's administration, and Jack Shine, a local developer, to put together a plan for the park's future.

CALIFORNIA

## Desert slum gets a 'new sheriff'

March 9, 2008

Larson authorized the spending of $220,000 for the work of Adams, Prosper and Shine, and Adams personally secured a loan to that effect. But when Larson inspected Adams' books, he found that while Adams had received his court-authorized amount, Shine was still owed $5,000 and Prosper $46,000.

Larson booted Adams from the job.

In court papers, Adams admitted that rather than paying Shine and Prosper, he had used $52,000 from the loan to reimburse himself for other work that the court had not yet approved.

Prosper declined to comment and Shine is deceased.

Adams told The Times that despite the court order he determined that Prosper and Shine were "worthless" and that money from the loan was needed for his work in Duroville instead.

"Did I think that I was entitled to get paid and they didn't because they didn't do anything? Yeah, that is what I thought," Adams said.

By contrast, Adams described his efforts while receiver, which included securing the financing and making initial repairs to the sewage system, as "the heavy lifting" in the case.

**TALERICO DECL. - EXHIBIT 3 - Page 35**

Adams said he did not believe his administration of the loan resulted in his replacement, and that the judge simply wanted a change in leadership.

"It was a little bruising to me to have a judge say, 'Well, we need to go in a different direction.' But that's what happened."

Hard work continued at Duroville long after Adams had departed. In the four years after Adams' removal, his successor — Tom Flynn — overhauled the entire electrical system, repaired constant sewer and water pipe breaks and faced regular threats of fire, disease and collapsed infrastructure, Flynn wrote in his final report.

Flynn and others also cobbled together the $28 million in federal, state, local and private funds to build the replacement housing for Duroville's residents. Only when the new mobile home park opened in 2013 did Duroville shut down.

Adams "did some 'heavy lifting' in the beginning, but over the course of the project that was limited," said Chris Hilton, a property manager at Duroville who worked under Adams and Flynn.

Larson later denied Adams' request for another $239,000 in the case.

TALERICO DECL. - EXHIBIT 3 - Page 36



A view of Mountain View Estates Mobile Home Park in 2012, which was the replacement housing for residents of Duroville.  (Irfan Khan/Los Angeles Times)

Yet the ramifications of Adams' decisions at Duroville remained. The loan he had taken out, which carried an 8.5% interest rate, still needed to be repaid. The judge ordered the amount — ultimately $2,200 a month — come out of the funds that the property was earning largely through the farmworkers' rents.

Adams said he regretted that the loan weighed on the property's ledger while massive upgrades at Duroville were still required.

The circumstances caused a rift between Adams and the lender, Orange County-based Clearinghouse CDFI.

The U.S. Treasury Department-backed financial institution makes subsidized community improvement loans, and previously had provided Adams with a $2-

TALERICO DECL. - EXHIBIT 3 - Page 37

million line of credit for work on numerous receiverships, said Douglas J. Bystry, the organization's president and CEO.

But it wrote off nearly $200,000 for the Duroville loan, and had to do the same for two other loans that Adams also failed to repay around that time, Bystry said.

The organization hasn't worked with Adams since.

"I'm disappointed that in previous loans to him and his company we weren't made whole," Bystry said.

Adams told The Times, however, that he's now close to securing a loan with Clearinghouse CDFI for $5 million to finance upgrades to the trust properties.

"They're 70% to 80% certain that they're going to make that loan," Adams said. "I am extremely proud of that."

Bystry confirmed that his organization was considering such a loan, motivated by its mission to serve low-income communities. The firm is undergoing due diligence, including deciding if it is willing to do business with Adams again.

## More to Read

### Two workers fired from LAHSA had accused top executive of improper behavior

May 22, 2025



### Failure of Skid Row landlord 'canary in the coal mine' for other homeless housing in Los Angeles, report says

May 21, 2025



TALERICO DECL. - EXHIBIT 3 - Page 38



### 'I'm going to resist': Protesters who seized state-owned homes five years ago prepare for eviction battle

April 11, 2025



**Liam Dillon**

Liam Dillon covers the issues of housing affordability and neighborhood change across California for the Los Angeles Times.



**Doug Smith**

Los Angeles Times senior writer Doug Smith scouts Los Angeles for the ragged edges where public policy meets real people, combining data analysis and gumshoe reporting to tell L.A. stories through his more than 50 years of experience covering the city.

Copyright © 2025, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information



*A photo illustration of California Receivership Group's Mark Adams and Los Angeles' Skid Row neighborhood (Getty,*

TALERICO DECL. - EXHIBIT 3 - Page 40

And Adams, they said, was singularly qualified for the receivership role because of his "wealth of knowledge and experience."

But a Times review of court records and dozens of interviews with those involved in Adams' past receiverships raise questions about his ability to manage the trust's beleaguered portfolio and to care for the tenants under his control.

In two cases comparable to the Skid Row Housing Trust case, Adams left years before they were resolved. In court filings, he also omitted key facts about his involvement.

**TALERICO DECL. - EXHIBIT 3 - Page 41**

Enter Your Email

SIGN UP

In multiple instances, judges and local governments have determined that Adams has padded staffing, increased his staff's rates without informing the judge and engaged in duplicative billing — inflating his fees by six-figure amounts, according to the Times investigation.

A judge in one case likened Adams' billing to a "feeding frenzy."

In East Los Angeles, Adams took control of a dilapidated triplex, sold it and tried to bill the estate $530,000 before an angry judge cut the amount by more than

https://therealdeal.com/la/2023/05/17/receiver-brings-checkered-history-to-oversee-29-buildings-in-dtla/

In an interview with The Times, Adams defended his record, saying he has taken on hard cases throughout his career, which makes criticism inevitable.

**READ MORE**



LOS ANGELES

**Skid Row Housing Trust struggles to divest 29 buildings**



LOS ANGELES

**City of LA to take over Skid Row Housing Trust inventory**



LOS ANGELES

**Skid Row Housing Trust diversifies into the distressed mortgage business**

TALERICO DECL. - EXHIBIT 3 - Page 43

— *Dana Bartholomew*

TAGS

| California Receivership Group | Mark Adams | Skid Row | Skid Row Housing Trust |

Top stories delivered to your inbox

https://www.westsidecurrent.com/news/la-council-seeks-removal-of-receiver-for-skid-row-housing-trust/article_834b5948-152b-11ee-9b8a-2f5aee0326e4.html

FEATURED

# LA Council Seeks Removal of Receiver for Skid Row Housing Trust

CNS

Jun 27, 2023



LOS ANGELES - The City Council Tuesday approved a recommendation to seek the removal of Mark Adams, the receiver appointed to oversee 29 dilapidated buildings in the Skid Row area that house approximately 1,500 low- income tenants.

**TALERICO DECL. - EXHIBIT 3 - Page 45**

The council also approved a related recommendation to authorize a $10 million loan to maintain and repair buildings under receivership. Both recommendations were OK'd in a 12-0 vote, with council members Monica Rodriguez and Curren Price absent from Tuesday's meeting, and with no prior discussion.

The council's Budget, Finance and Innovation previously greenlighted both recommendations. Councilman Bob Blumenfield, who chairs the committee, said during Monday's meeting the city had to intervene to ensure the safety of residents within the Skid Row Housing Trust.

"It's a humanitarian crisis that we know at the end of the day falls on our lap as a city -- even though the crisis is not our doing," Blumenfield said Monday. "But we need to be aware of it and we need to step up."



Councilwoman Katy Yaroslavsky, a member of the committee, agreed with Blumenfield, adding "I don't see how we cannot do this."

TALERICO DECL. - EXHIBIT 3 - Page 46

Housing Department General Manager Ann Sewill and City Attorney Hydee Feldstein Soto explained to the committee why they requested the loan, which is contingent on the appointment of a new receiver, Kevin Singer, who would replace Adams.

"From the perspective of my office and me specifically, this is a difficult ask," Feldstein Soto said Monday. "We would not be here if we weren't persuaded that it's absolutely necessary to preserve the housing and the services for 1,500 of our most vulnerable residents."

The council does not have the authority to fire Adams, who was appointed by a Los Angeles Superior Court judge at the city's request. The council would have to petition Judge Mitchell Beckloff to dismiss Adams and appoint a new receiver.



The buildings are owned in whole or in part by the Skid Row Housing Trust, which collapsed financially earlier this year.

TALERICO DECL. - EXHIBIT 3 - Page 47

Sewill released a report last week stating that some of the buildings could be irreparably damaged and should be demolished. In addition, the Los Angeles Times reported that many of the tenants suffer from "filth, clogged plumbing, pest infestations and constant intrusions by street people who use drugs, set off fire alarms and sleep in hallways."

Adams has drawn criticism for allegedly failing to make progress on rehabilitating the buildings and finding credit at good rates. Last spring, a firm he hired sent eviction notices to hundreds of tenants who were behind on rent.

Adams, whose appointment did not include the authority to evict tenants, said he did not authorize the notices and retracted them.



Adams told the Times that he would respond to the city's report in court, and cited Beckloff's previously stated support for him.

Feldstein Soto reiterated that with Adams there has been a lack of transparency, including the accounting of "approximately $3.5 million worth of rent" that her office estimates Adams has collected since he was appointed as receiver in April.

"So even as recently as last Friday, the proof is in the pudding. And even despite a court order requiring reporting, we still have not got the kind of report that one would expect from a financial fiduciary like a receiver," Feldstein Soto said.

"...We've lost confidence that this particular receiver can perform," she added.

**TALERICO DECL. - EXHIBIT 3 - Page 48**



High Rooftop Lounge at
HOTEL ERWIN

Featured in Forbes, TimeOut
Magazine & The Infatuation

In response to a question from Blumenfield on how Singer would be different from Adams, Feldstein Soto said that Singer, who is principal and CEO of Receivership Specialists, was vetted by the Housing Department and the City Attorney's Office.

"I've personally communicated with the city attorney for San Francisco, who gave him glowing reviews, and we have to the best of our ability done as diligent job as we can," Feldstein Soto said.

Sewill in her report indicated the loan will be repaid when the properties exit the receivership, either by the limited finance partners or by other housing from the Housing Department and possibly from other government partners.

The $10 million loan is expected to cover receivership costs and repayment of the Adams' expenses, for up to six months. Though there may be additional costs for repairs and other expenses that are not yet known by the city.

Ad removed. Details

**TALERICO DECL. - EXHIBIT 3 - Page 49**

Sewill indicated that the goal is to stabilize the trust properties as safe places to live until each property can be transferred to a replacement general partner or owner.

"We need to have confidence that what's going on with these buildings -- with these properties -- would be at the caliber of services that we would come to expect in the situation," Feldstein Soto said.

"And for all those reasons, it's very difficult to come and admit a mistake. But I do think part of our jobs is that if there's a mistake to correct it."

Feldstein Soto said the court is set to consider the city's request for a new receiver on Thursday.



DRE #01858429

PARDEE
—PROPERTIES—

Housewarming
PARDEE
starts here.

310.907.6517  |  pardeeproperties.com

**TALERICO DECL. - EXHIBIT 3 - Page 50**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
        11766 Wilshire Blvd, Suite 730, Los Angeles, CA 90025

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF DERRICK TALERICO IN SUPPORT OF DEBTORS OMNIBUS OPPOSITION TO (1) MOTION FOR RELIEF FROM THE AUTOMATIC STAY AND FOR RELIEF FROM TURNOVER FILED BY FIRST CREDIT BANK, AND (2) MOTION FOR RELIEF FROM THE AUTOMATIC STAY FILED BY SPARKNEST, LLC,** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) May 30, 2025, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:


See attached NEF service list


☐  Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*)_____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.


☐  Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _May 30, 2025_, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

The Honorable Scott Yun                              (via Priority Mail)
United States Bankruptcy Court
3420 Twelfth St., Suite 345
Riverside, CA 92501-3819

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| May 30, 2025 | Martha E. Araki | /s/ Martha E. Araki |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                    **F 9013-3.1.PROOF.SERVICE**

In re Fu Bang Group Corp, USA                                         Case No. 6:25-bk-13004-SY

**1**. <u>**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**</u>:

- <u>Attorneys for Debtor Fu Bang Group Corp, USA</u>: **Derrick Talerico**: dtalerico@wztslaw.com; maraki@wztslaw.com; sfritz@wztslaw.com; admin@wztslaw.com
- <u>Attorneys for Creditor Sparknest, LLC, a Delaware Limited Liability Company</u>: **Rika Kido**: rkido@shulmanbastian.com; avernon@shulmanbastian.com
- <u>Attorneys for Creditor First Credit Bank, and on behalf of Attorney Dennette A. Mulvaney</u>: **Dennette A Mulvaney**: dmulvaney@leechtishman.com; lmoya@leechtishman.com; narango@leechtishman.com; dbender@leechtishman.com
- <u>US Trustee's Office (RS)</u>: ustpregion16.la.ecf@usdoj.gov; **Abram Feuerstein, Everett L Green, Ali Matin, Cameron C Ridley**: abram.s.feuerstein@usdoj.gov; everett.l.green@usdoj.gov; wcvbees@gmail.com; ali.matin@usdoj.gov

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.