| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Derrick Talerico - Bar # 223763<br>WEINTRAUB ZOLKIN TALERICO & SELTH LLP<br>11766 Wilshire Blvd., Suite 730<br>Los Angeles, CA 90025<br>Telephone:  424-500-8552<br>Email:  dtalerico@wztslaw.com | |
| ☐ *Debtor(s) appearing without an attorney*<br>☒ *Attorney for:* Fu Bang Group Corp, USA | |

## UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA - RIVERSIDE DIVISION

| | |
|---|---|
| In re:<br>FU BANG GROUP CORP, USA<br>_____ | CASE NO.: 6:25-bk-13004-SY<br><br>CHAPTER: 11 |
| In re:<br>DOS LAGOS CENTER 2, LLC<br>_____<br>___ Affects all Debtors<br>___ Affects Fu Bang Group Corp, USA<br>___ Affects Dos Lagos Center 2, LLC | **NOTICE OF OPPORTUNITY TO REQUEST A HEARING ON MOTION**<br><br>**[LBR 9013-1(o)]** |
| Debtor(s). | [No hearing unless requested in writing] |

## TO THE U.S. TRUSTEE AND ALL PARTIES ENTITLED TO NOTICE, PLEASE TAKE NOTICE THAT:

1.  Movant(s) Fu Bang Group Corp, USA                                                                                      ,
    filed a motion or application (Motion) entitled Motion for Entry of an Order (I) Authorizing the Debtor to Retain Sares
    Regis Management, L.P. as Property Manager, and (II) Approving the Management Agreement...                         .

2.  Movant(s) is requesting that the court grant the Motion without a hearing as provided for in LBR 9013-1(o), unless a party in interest timely files and serves a written opposition to the Motion and requests a hearing.

3.  The Motion is based upon the legal and factual grounds set forth in the Motion.  (*Check appropriate box below*):

    ☒  The full Motion is attached to this notice; or

    ☐  The full Motion was filed with the court as docket entry # _____, and a detailed description of the relief sought is attached to this notice.

4.  **DEADLINE FOR FILING AND SERVING OPPOSITION PAPERS AND REQUEST FOR A HEARING:**  Pursuant to LBR 9013-1(o), any party who opposes the Motion may request a hearing on the Motion.  The deadline to file and serve a written opposition and request for a hearing is 14 days after the date of service of this notice, plus 3 additional days if you were served by mail or pursuant to F.R.Civ.P. 5(b)(2)(D) or (F).

---

This form is optional.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2016*                          Page 1                          **F 9013-1.2.OPPORTUNITY.HEARING.NOTICE**

a.  If you timely file and serve a written opposition and request for a hearing, movant will file and serve a notice of hearing at least 14 days in advance of the hearing. [LBR 9013-1(o)(4)]

b.  If you fail to comply with this deadline:

   (1)  Movant will file a declaration to indicate: (1) the Motion was properly served, (2) the response period elapsed, and (3) no party filed and served a written opposition and request for a hearing within 14 days after the date of service of the notice [LBR 9013-1(o)(3)];

   (2)  Movant will lodge an order that the court may use to grant the Motion; and

   (3)  The court may treat your failure as a waiver of your right to oppose the Motion and may grant the Motion without further hearing and notice. [LBR 9013-1(h)]

Respectfully submitted,

Date: _____

/s/ Derrick Talerico
_____
Signature of Movant or attorney for Movant

Derrick Talerico
_____
Printed name of Movant or attorney for Movant

This form is optional.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2016*                               Page 2                    **F 9013-1.2.OPPORTUNITY.HEARING.NOTICE**

Derrick Talerico (State Bar No. 223763)
dtalerico@wztslaw.com
Paige T. Rolfe (State Bar No. 331096)
prolfe@wztslaw.com
WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 Wilshire Boulevard, Suite 730
Los Angeles, CA 90025
Telephone:  (424) 500-8552

Attorneys for Fu Bang Group Corp, USA, and
Dos Lagos Center 2, LLC,
Debtors and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA – RIVERSIDE DIVISION

| | |
|---|---|
| In re:<br><br>FU BANG GROUP CORP (USA),<br><br>Debtor. | Lead Case No. 6:25-bk-13004-SY<br><br>Chapter 11 |
| In re:<br><br>DOS LAGOS CENTER 2, LLC,<br><br>Debtor. | Jointly Administered with:<br>Case No. 6:25-bk-13642-SY |
| ☐ Affects All Debtors.<br>☒ Affects Fu Bang Group Corp (USA)<br>    Case No. 6:25-bk-13004-SY.<br>☐ Affects Dos Lagos Center 2, LLC<br>    Case No. 6:25-bk-13642-SY.<br><br>Debtors. | **MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTOR TO RETAIN SARES REGIS MANAGEMENT COMPANY, L.P. AS PROPERTY MANAGER; (II) APPROVING THE MANAGEMENT AGREEMENT; AND (III) GRANTING RELATED RELIEF; DECLARATIONS OF NICHOLAS RUBIN AND JEFF BAILEY IN SUPPORT THEREOF**<br><br>[No Hearing Set Pursuant to Local Bankruptcy Rules 2014-1(b) and 9013-1(o)] |

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

-1-
MOTION TO RETAIN SARES REGIS MANAGEMENT COMPANY L.P.

Fu Bang Group Corp, USA, debtor and debtor in possession herein ("Fu Bang"), hereby submits this *Motion for Entry of an Order (I) Authorizing the Debtor to Retain Sares Regis Management Company L.P.; (II) Approving the Management Agreement; and (III) Granting Related Relief* (the "Motion"). A copy of the terms and conditions of the Management Agreement (the "Management Agreement") between the Fu Bang and Sares Regis Management Company, L.P. ("Sares Regis," or "Manager") to provide Fu Bang with property management services is attached hereto as **Exhibit 1**. A proposed form of order granting the relief requested herein (the "Proposed Order") is attached hereto as **Exhibit 3**.

In support of this Motion, Fu Bang submits the following memorandum of points and authorities and the attached declarations of Nicholas Rubin (the "Rubin Declaration") and Jeff Bailey (the "Bailey Declaration").

## I.    INTRODUCTION

### A.    The Bankruptcy Case

On May 7, 2025 (the "Petition Date"), Fu Bang filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Fu Bang owns real property in Corona, California (APN 279-460-064, the "Fu Bang Property"). Dos Lagos Center 2, LLC ("DLC2," together with Fu Bang, the "Debtors"), an affiliated company with common but not identical ownership to Fu Bang, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on May 30, 2025. DLC2 owns an undeveloped parcel of real property adjacent to the Fu Bang Property (APN 279-460-063, the "Dos Lagos Property," and collectively with the Fu Bang Property, the "Property").

Nicholas Rubin and Force Ten Partners were retained as Chief Restructuring Officer of the Debtors effective as of their respective petition dates by orders of the Court entered on August 5, 2025 [Dkt. 86].

### B.    The Debtors' Business

The Fu Bang Property was planned for 94 mixed-use housing units and a common area swimming pool. Construction of the first 51 units in phases 1 and 2 of the development and the swimming pool was completed in 2016. The 43 units intended for phase 3 development had not begun as of the Fu Bang bankruptcy filing. As of the Petition Date, 36 units were rented to third

MOTION TO RETAIN SARES REGIS MANAGEMENT COMPANY L.P.

parties at various market rates, 8 units are rented to EB5 investors for nominal rates, and one unit is provided rent-free to a religious organization for use as a temple. One unit is used by Fu Bang as an office and one unit is a community center. The Dos Lagos Property was intended to be developed as part of a larger development with the Fu Bang Property, but the Dos Lagos Property remains undeveloped.

Fu Bang acquired the Fu Bang Property in 2013 for $7.3 million. In 2016, Fu Bang closed on a loan with First Credit Bank ("FCB") for $12 million that consolidated earlier loans from FCB (a 2013 loan for $4,175,000) and one or more other lenders. FCB holds a first priority lien on the Fu Bang Property with a current balanced calculated by FCB to be $10,873,592.52. Fu Bang also financed construction and development through EB5 investment, taking in multiple tranches of loans through non-debtor Dos Lagos Regional Center and associated limited partnerships ("EB5 Center").

Fu Bang had not made loan payments to FCB beginning in January 2025. FCB brought suit on its loan and for appointment of a receiver. In April 2025, a receiver (the "Receiver") was appointed and took possession of the Fu Bang Property. FCB filed a motion to excuse the Receiver from his obligation to turn over the Fu Bang Property to Fu Bang [Dkt. 12]. That motion was denied by the Bankruptcy Court [Dkt. 67] and Fu Bang regained possession of the Fu Bang Property by the end of June 2025. The CRO began managing the Debtors in July 2025.

### C.    The Debtors' Restructure and Fu Bang Property Management

Upon assuming his role as CRO, Mr. Rubin familiarized himself with the Debtors' Property, operations, and history. Mr. Rubin determined that the joint administration of the Debtors' cases was in the best interests of the Debtors as they are expected to address common issues and propose a joint plan of reorganization. Joint administration of the Debtors' cases was ordered on August 26, 2025 [Dkt. 97].

In consultation with Bo Don (Fu Bang's CEO and Authorized Representative of DLC2), Debtors' bankruptcy counsel, and Force Ten, Mr. Rubin analyzed the best means of returning value to the Debtors' creditors including immediate sale, short term management, and long-term hold. Mr. Rubin concluded that the optimal means of managing the Debtors' estates for the benefit of all

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

MOTION TO RETAIN SARES REGIS MANAGEMENT COMPANY L.P.

interest holders – creditors and equity alike – is to obtain a targeted amount of funding (DIP or exit financing) to take out certain allowed secured claims, stabilize and optimize leasing operations, ensure compliance with all state and local real property regulations, and prepare the Debtors' Property for a market sale in twelve to eighteen months.[1]

To obtain financing and position the Property for sale, the Fu Bang Property requires the immediate engagement of specialized professional property management to demonstrate the viability of the asset for lenders in the short term and to begin the process of stabilizing and optimizing the Fu Bang Property and its operations. To that end, Mr. Rubin interviewed property management firms qualified to operate the Fu Bang leasing operation and manage daily maintenance of the Fu Bang Property. Several potential property managers were brought on site and made proposals. Ultimately Mr. Rubin selected Sares Regis. Following extensive negotiations on the Management Agreement, Sare Regis came on to the Fu Bang Property in August to begin management in anticipation of this Motion and an order authorizing the Management Agreement.

## II.    **THE PROPOSED RETENTION OF SARES REGIS**

### A.    **Services to be Provided** [2]

As set forth in the Management Agreement attached hereto as **Exhibit 1**, Sares Regis will be employed to provide comprehensive property management services customary and appropriate for a leasing operation of the size and nature of the Fu Bang Property. The Debtor seeks the Court's authorization to retain Sare Regis as Fu Bang's property manager on the same terms as set forth in the Management Agreement, effective as of August 8, 2025.

The duties of Sares Regis are proposed to be, without limitation as to what is required or contemplated per the terms of the Management Agreement, the management, operation, supervision, servicing, securing, and maintenance of the Fu Bang Property, including:

---

[1] A property sale may involve dividing parcels and may ultimately include all or a portion of the Debtors' Property as determined to be in the best interests of all creditors and interest holders.

[2] The description of the services to be provided herein is a summary. The full description of the services is provided in the Management Agreement attached as **Exhibit 1**.

MOTION TO RETAIN SARES REGIS MANAGEMENT COMPANY L.P.

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

(a)    Leasing - To use all reasonable efforts to let the apartment units comprising the Fu Bang Property to desirable tenants and, in connection therewith, to place advertisements, rental signs, prepare circulars and engage in other forms of advertising. Manager may also negotiate, sign, renew, modify and cancel rental agreements and leases with tenants of the Fu Bang Property for such rentals and on such terms as Manager deems appropriate;

(b)    Collection of Income – To bill tenants for rent and use its reasonable efforts to collect the rents and all other income derived from the operation, maintenance and management of the Fu Bang Property promptly when such amounts become due;

(c)    Maintenance and Operation - To oversee the day-to-day management of the Fu Bang Property, use its diligent skill and efforts to serve tenants of the Fu Bang Property and, subject to the terms hereof, including, without limitation, the Approved Budget (defined below), purchase necessary furniture, fixtures, equipment, tools, appliances, materials, fuel and supplies, make contracts for or otherwise furnish electricity, gas water, telephone, window cleaning, refuse disposal, pest control and any other utilities or services required for the operation of the Fu Bang Property and make or cause to be made and supervised, necessary repairs, cleaning, painting, alterations, decorations, replacements and improvements;

(d)    Contractors - To engage, discharge, supervise and pay on behalf of Fu Bang all contractors, agents or such other persons necessary or convenient for the efficient operation and maintenance of the Fu Bang Property and, subject to the Approved Budget;

(e)    Termination of Tenancies - To sign and serve such notices on delinquent tenants as Manager or Fu Bang may deem necessary or proper, to engage counsel (subject to approval by the Bankruptcy Court for so long as the Bankruptcy Case is pending) and, in Fu Bang's name, to (i) sue for and

recover any rents which are past due; (ii) attach, garnish and levy upon the property of any delinquent tenant and recover possession of any part of the Fu Bang Property there from; and (iii) settle, compromise and adjust any such actions, suits or proceedings and the matters involved therein;

(f)     Books and Records - To keep full, detailed and adequate accounts and records of all receipts, expenses and disbursements relating to the Fu Bang Property, and to permit Fu Bang and its representatives to examine the same at any time during Manager's regular business hours after providing written notice to Manager. All original reports, documents and leases are to be retained by Manager, but shall remain and be the property of Fu Bang. Copies will be delivered promptly to Fu Bang upon Fu Bang's written request;

(g)     Budgets – Prepare annual budgets for operation of the Fu Bang Property on or before November 1 of each year;

(h)     Monthly Reports - To prepare and submit a detailed statement of all receipts, expenses and disbursements relating to the Fu Bang Property for the preceding calendar month, or portion thereof, to be delivered to Fu Bang within fifteen (15) days after the end of each calendar month. For so long as the Bankruptcy Case is pending, the Monthly Repot shall be delivered to Fu Bang within twelve (12) days after the end of each calendar month;

(h)     Employees – Manager shall provide employees and staff sufficient for Manager to properly, adequately, safely and economically manage, operate and maintain the Fu Bang Property in accordance with the requirements of the Management Agreement.

Sare Regis will also carry property, commercial, auto, and umbrella insurance coverage as set forth in the Management Agreement, which meet or exceed customary insurance coverage for the services Sares Regis will provide pursuant to the Management Agreement

MOTION TO RETAIN SARES REGIS MANAGEMENT COMPANY L.P.

**WEINTRAUB ZOLKIN TALERICO & SELTH LLP**
**11766 WILSHIRE BLVD., SUITE 730**
**LOS ANGELES, CA 90025**

**B.     Professional Compensation**

As set forth in the Management Agreement, Sares Regis will be compensated as follows:

- Monthly Fee - Equal to 5% of gross revenue, not less than $9,000 per month;

- Construction Management Fee - For material improvements or renovations in excess of $10,000 project cost equal to 5% of the total hard and soft costs of such project;

- Disposition Fee – If the Fu Bang Property is sold to a third party that does not retain Sare Regis as property manager, Fu Bang may terminate the Management Agreement and Sares Regis shall be due a $30,000 disposition fee;

- Termination Fee – If Fu Bang terminates Sares Regis without cause (with notice), Sares Regis shall be due a termination fee equal to three times the prior months' management fee;

- Reimbursement – Sares Regis shall be reimbursed for the cost of the employees and staff provided to Fu Bang and for the operating expenses of the Fu Bang Property. These reimbursement amounts are reflected in the Approved Budget and in-part on Exhibit B of the Management Agreement.[3]

**C.     No Duplication of Services**

The Management Agreement has been structured to assign to Sares Regis those responsibilities and duties that can be most effectively and efficiently performed by Sares Regis as opposed to any of Fu Bang's other professionals, including the CRO, Force Ten, and legal counsel. Sares Regis will report to the CRO. Sares Regis and Force Ten will work cooperatively with, and not duplicate the services of, each other and any other of Fu Bang's professionals. Force Ten will utilize the Sares Regis personnel to the greatest extent of the Management Agreement in order to limit its hourly fees.

---

[3] The Approved Budget is a monthly cash collateral budget approved by senior secured lenders First Credit Bank and Sparknest. The Approved Budget incorporates the expenses set forth in Exhibit B of the Management Agreement. The Approved Budget is attached hereto as **Exhibit 2**.

MOTION TO RETAIN SARES REGIS MANAGEMENT COMPANY L.P.

### D.    Indemnification

The Management Agreement contains reciprocal indemnification provisions that require Fu Bang and Sares Regis to indemnify and hold harmless each other, together with their officers, members, partners, directors, employees and agents (each an "Indemnified Party"), from and against any "Claims" (as defined in the Management Agreement) that result from the Indemnified Parties' bad acts as set forth in the Management Agreement (Section 10, Page 12).

### III.    THE QUALIFICATIONS OF SARES REGIS

Mr. Rubin is familiar with the professional standing and excellent reputation of Sares Regis, and Sares Regis is well-qualified to provide the services as outlined in the Management Agreement and this Motion in light of, among other things, their extensive knowledge and expertise with respect to chapter 11 proceedings.

Sares Regis manages over 185 properties with over 40,000 units across the western United States. Sares Regis has extensive experience managing class A properties and manages dozens of class B and C properties. Sares Regis has properties of all sizes, similar to, smaller, and larger than the Fu Bang Property.

Sares Regis has served as a property manager to debtors in bankruptcy proceedings. Sares Regis is familiar with debtor-in-possession bank accounts and monthly operating reports. Sares Regis will operate the Fu Bang Property through debtor-in-possession accounts and timely provide Fu Bang's professionals with the financial information needed to complete monthly operating reports.

Sares Regis has selected a highly qualified team of employees and staff to work on the Fu Bang Property. These personnel include those set forth on **Exhibit 4**, although Sares Regis reserves the right to replace, diminish, or increase staff as it deems appropriate as set forth in the Management Agreement.

Sares Regis has analyzed and diligenced the Fu Bang Property and has worked with Mr. Rubin and Force Ten to create the Approved Budget, which is a realistic and specific projection of the expenses expected to operate the Fu Bang Property as determined by the CRO to be in the best interest of the Fu Bang estate.

MOTION TO RETAIN SARES REGIS MANAGEMENT COMPANY L.P.

## IV.   DISINTERESTEDNESS OF SARES REGIS

To the best of the Fu Bang's knowledge, information, and belief, and except to the extent disclosed herein and in the Bailey Declaration, Sares Regis: (i) does not hold or represent an interest adverse to Fu Bang's estate; and (ii) has no connection to Fu Bang, its creditors, or other parties in interest, or the attorneys or accountants of any of the foregoing, or the U.S. Trustee or any person employed by the U.S. Trustee.

Although the Debtor submits that the retention of Sares Regis is not governed by section 327(a) of the Bankruptcy Code, Fu Bang attaches the Bailey Declaration, which discloses, among other things, any relationship that Sares Regis has with the Debtors, significant creditors, or other significant parties in interest known to Sares Regis.  As set forth in the Rubin Declaration and the Bailey Declaration, Fu Bang and Sares Regis does not believe that Sares Regis has any conflicts of interest or a material adverse interest to Fu Bang.

From time to time, Force Ten and Sares Regis may have referred work to each other and may do so in the future.

In addition, as set forth in the Bailey Declaration, if any new material facts or relationships are discovered or arise, Sares Regis will provide the Court with a supplemental declaration.

## V.   LEGAL AUTHORITY

Section 363 of the Bankruptcy Code provides, in relevant part, that a debtor in possession "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate[.]" 11 U.S.C. § 363(b)(1).  Under applicable case law, courts will approve a debtor's proposed use of its assets under section 363(b)(1) of the Bankruptcy Code if it represents a sound business purpose on the part of the debtor. *See, e.g., Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19–20 (B.A.P. 9th Cir. 1988); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (Bankr. D. Del. 1999) ("In evaluating whether a sound business purpose justifies the use, sale or lease of property under Section 363(b), courts consider a variety of factors, which essentially represent a 'business judgment test.'"); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (courts defer to a trustee's judgment concerning use of property under section 363(b) when there is a legitimate business justification).

MOTION TO RETAIN SARES REGIS MANAGEMENT COMPANY L.P.

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

Bankruptcy courts have determined that the retention of corporate restructuring officers and advisors under section 363 of the Bankruptcy Code is an appropriate exercise of a debtor's business judgment. *See e.g., In re Nine W. Holdings, Inc.*, 588 B.R. 678, 688, 691 (Bankr. S.D.N.Y. 2018); *In re Copenhaver, Inc.*, 506 B.R. 757, 764 (Bankr. C.D. Ill. 2014).

### A. The Retention and Employment of Sares Regis is a Sound Exercise of Fu Bang's Business Judgment.

Sares Regis' services are necessary and essential to Fu Bang's restructuring efforts. Sares Regis has extensive experience providing property management services to projects similar to the Fu Bang Property which are necessary and cannot be obtained, at a lower cost or at all, from the CRO, Force Ten, or any other professional retained by Fu Bang. Fu Bang is seeking to employ Sares Regis to stabilize and maximize its most significant asset to create value for the estate and its creditors and spearhead the restructuring of Fu Bang's business and the prosecution of this case.

### B. Retention of Sares Regis is Critical to Fu Bang's Success.

Fu Bang believes retaining Sares Regis as property manager is in the best interests of the estate and all creditors. Sares Regis can stabilize and maximize the rental income generated by the Fu Bang Property which will increase value. In the short-term, these efforts will allow Fu Bang to acquire more advantageous financing and in the mid-term, Sares Regis' efforts will enable and support the marketing and sale of the Fu Bang Property for a maximum fair market value.

Denying the relief requested herein would deprive Fu Bang of the needed assistance of a highly qualified property manager and serve to disadvantage Fu Bang and all parties-in-interest by cutting short the value the Fu Bang Property can produce. Accordingly, Fu Bang respectfully submits that the services provided by Sares Regis are critical to the success of this case and requests that the Court approve the Management Agreement.

### VI. WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

To implement the foregoing successfully, Fu Bang seeks a waiver of the notice requirements under Rule 6004(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**VII.    CONCLUSION**

Fu Bang respectfully requests that the Court enter the Proposed Order, granting the requested relief in this Motion and granting such other and further relief as is appropriate under the circumstances.

Dated: September 8, 2025        **WEINTRAUB ZOLKIN TALERICO & SELTH LLP**

By _/s/ Derrick Talerico_
     Derrick Talerico
Counsel to Fu Bang Group Corp, USA,
Debtor and Debtor in Possession

MOTION TO RETAIN SARES REGIS MANAGEMENT COMPANY L.P.

**DECLARATION OF NICHOLAS RUBIN**

I, Nicholas Rubin, declare as follows:

1.    I am a partner with Force Ten Partners, LLC ("Force Ten"), which is a financial advisory firm with its principal office located at 5271 California Avenue, Suite 270, Irvine, California, 92617. Force Ten also has offices in the Los Angeles, Dallas, and Las Vegas metro areas. I know each of the following facts to be true of my own personal knowledge, except as otherwise stated and, if called as a witness, I could and would competently testify with respect thereto. I make this declaration in support of the *Motion for Entry of an Order (I) Authorizing the Debtor to Retain Sares Regis Management Company L.P.; (II) Approving the Management Agreement; and (III) Granting Related Relief* (the "Motion").[4]

2.    In consultation with Bo Don (Fu Bang's CEO and Authorized Representative of DLC2), Debtors' bankruptcy counsel, and Force Ten, I analyzed the best means of returning value to the Debtors' creditors including immediate sale, short term management, and long-term hold. I concluded that the optimal means of managing the Debtors' estates for the benefit of all interest holders – creditors and equity alike – is to obtain a targeted amount of funding (DIP or exit financing) to take out certain allowed secured claims, stabilize and optimize leasing operations, ensure compliance with all state and local real property regulations, and prepare the Debtors' Property for a market sale in twelve to eighteen months.[5]

3.    To obtain financing and position the Property for sale, the Fu Bang Property requires the immediate engagement of a specialized professional property management to demonstrate the viability of the asset for lenders in the short term and to begin the process of stabilizing and optimizing the Fu Bang Property and its operations. To that end, I interviewed property management firms qualified to operate the Fu Bang leasing operation and manage daily maintenance of the Fu Bang Property. Several potential property managers were brought on site

[4] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

[5] A property sale may involve dividing parcels and may ultimately include all or a portion of the Debtors' Property as determined to be in the best interests of all creditors and interest holders.

MOTION TO RETAIN SARES REGIS MANAGEMENT COMPANY L.P.

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

and made proposals. Ultimately, I selected Sares Regis. Following extensive negotiations on the Management Agreement, Sare Regis came on to the Fu Bang Property in August to begin management in anticipation of this Motion and an order authorizing the Management Agreement.

4.      These reimbursement amounts are reflected in the Approved Budget and in-part on Exhibit B of the Management Agreement. The Approved Budget is a monthly cash collateral budget approved by senior secured lenders First Credit Bank and Sparknest. The Approved Budget incorporates the expenses set forth in Exhibit B of the Management Agreement. The Approved Budget is attached hereto as **Exhibit 2**.

5.      The Management Agreement has been structured to assign to Sares Regis those responsibilities and duties that can be most effectively and efficiently performed by Sares Regis as opposed to any of Fu Bang's other professionals, including myself, Force Ten, and legal counsel. Sares Regis will report to me. Sares Regis and Force Ten will work cooperatively with, and not duplicate the services of, each other and any other of Fu Bang's professionals. Force Ten will utilize the Sares Regis personnel to the greatest extent of the Management Agreement in order to limit its hourly fees.

6.      I am familiar with the professional standing and excellent reputation of Sares Regis. Sares Regis is well-qualified to provide the services as outlined in the Management Agreement and this Motion.

7.      I worked with Force Ten and Sares Regis to create the Approved Budget, which is a realistic and specific projection of the expenses expected to operate the Fu Bang Property as I have determined to be in the best interest of the Fu Bang estate.

8.      To the best of my knowledge, information, and belief, and except to the extent disclosed herein and in the Bailey Declaration, Sares Regis: (i) does not hold or represent an interest adverse to Fu Bang's estate; and (ii) has no connection to Fu Bang, its creditors, or other parties in interest, or the attorneys or accountants of any of the foregoing, or the U.S. Trustee or any person employed by the U.S. Trustee.

9.      From time to time, Force Ten and Sares Regis may have referred work to each other and may do so in the future.

MOTION TO RETAIN SARES REGIS MANAGEMENT COMPANY L.P.

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

10.    Sares Regis' services are necessary and essential to Fu Bang's restructuring efforts. Sares Regis has extensive experience providing property management services to projects similar to the Fu Bang Property which are necessary and cannot be obtained, at a lower cost or at all, from the CRO, Force Ten, or any other professional retained by Fu Bang. Fu Bang is seeking to employ Sares Regis to stabilize and maximize its most significant asset to create value for the estate and its creditors and spearhead the restructuring of Fu Bang's business and the prosecution of this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 8, 2025, at ___Irvine___, California.

Nicholas Rubin, Chief Restructuring Officer

MOTION TO RETAIN SARES REGIS MANAGEMENT COMPANY L.P.

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

**DECLARATION OF JEFF BAILEY**

I, Jeff Bailey, hereby declare as follows:

1.    I am a President at Sares Regis Group. I have been with SRG since 2017. I have over twenty years of experience managing multifamily properties. I am on the state board of the California Apartment Association, and am a Certified Property Manager with the Institute of Real Estate Management. I hold a Bachelor of Science degree from San Diego State University with an emphasis in Accounting.

2.    The Fu Bang management will be undertaken by Sares Regis Management Company, L.P., which is a limited partnership that operates as part of Sares Regis Group Management, Inc., for which I am a Vice President.

3.    I know each of the following facts to be true of my own personal knowledge, except as otherwise stated and, if called as a witness, I could and would competently testify with respect thereto. I make this declaration in support of the *Motion for Entry of an Order (I) Authorizing the Debtor to Retain Sares Regis Management Company L.P.; (II) Approving the Management Agreement; and (III) Granting Related Relief* (the "Motion").[6]

4.    I negotiated the terms of the Management Agreement with Nicholas Rubin. The executed Management Agreement is attached to the Motion as **Exhibit 1**.

5.    The duties of Sares Regis include the management, operation, supervision, servicing, securing, and maintenance of the Fu Bang Property, as set forth in the Management Agreement.

6.    Sare Regis will carry property, commercial, auto, and umbrella insurance coverage as set forth in the Management Agreement, which meet or exceed customary insurance coverage for the services Sares Regis will provide pursuant to the Management Agreement

7.    Sares Regis manages over 185 properties with over 40,000 units across the western United States. Sares Regis has extensive experience managing class A properties and manages

---

[6] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

MOTION TO RETAIN SARES REGIS MANAGEMENT COMPANY L.P.

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

dozens of class B and C properties. Sares Regis has properties of all sizes, similar to, smaller, and larger than the Fu Bang Property.

8.      Sares Regis has served as a property manager to debtors in bankruptcy proceedings. Sares Regis is familiar with debtor-in-possession bank accounts and monthly operating reports. Sares Regis will operate the Fu Bang Property through debtor-in-possession accounts and timely provide Fu Bang's professionals with the financial information needed to complete monthly operating reports.

9.      Sares Regis has selected a highly qualified team of employees and staff to work on the Fu Bang Property. These personnel include those set forth on **Exhibit 4**, although Sares Regis reserves the right to replace, diminish, or increase staff as it deems appropriate as set forth in the Management Agreement.

10.     Sares Regis has analyzed and diligenced the Fu Bang Property and has worked with Mr. Rubin and Force Ten to create the budget attached as Exhibit B to the Management Agreement.

11.     To the best of my knowledge, information, and belief, Sares Regis: (i) does not hold or represent an interest adverse to Fu Bang's estate; and (ii) has no connection to Fu Bang, its creditors, or other parties in interest, or the attorneys or accountants of any of the foregoing, or the U.S. Trustee or any person employed by the U.S. Trustee.

12.     From time to time, Force Ten and Sares Regis may have referred work to each other and may do so in the future.

13.     If any new material facts or relationships are discovered or arise, Sares Regis will provide the Court with a supplemental declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September _8th_, 2025, at _Newport Beach_, California.

_____
Jeff Bailey, President

-16-
MOTION TO RETAIN SARES REGIS MANAGEMENT COMPANY L.P.

# EXHIBIT 1

# Management
# Agreement

EXHIBIT 1 - Page 17

## MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT (this "**Agreement**"), made and entered into as of AUGUST 8, 2025 , by and between FU BANG GROUP CORP. USA ("**Owner**") and SARES REGIS MANAGEMENT COMPANY, L.P., a Delaware limited partnership ("**Manager**"), is made with reference to the following facts:

R E C I T A L S:

A.      Owner is the owner of a 51-unit apartment community known as "The Towns at Dos Lagos" located at 4621 Odyssey Drive Unit 117, Corona, CA 92883 (the "**Property**").

B.      On May 7, 2025 Owner filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing a bankruptcy case (the "Bankruptcy Case") before the United States Bankruptcy Court for the Central District of California (the "Court").

Owner desires to retain the services of Manager to manage the Property as a multifamily rental property on Owner's behalf, and Manager has agreed to so manage the Property.

C.      Manager holds, through an authorized officer, a real estate brokerage license as required by the laws of the State of California, DRE license number 01977865.

NOW THEREFORE, in consideration of the foregoing recitals and the mutual agreements hereinafter set forth, the parties hereto agree as follows:

1.      Engagement of Manager; Limitations on Authority of Manager.  Owner hereby appoints Manager as the exclusive manager to manage, operate, supervise, service, secure, and maintain the Property as more particularly set forth herein and in accordance with the terms of this Agreement (collectively, the "**Management Services**"), and Manager hereby accepts such appointment and undertakes and agrees to perform the Management Services and to comply with all of the provisions of this Agreement.  Without limiting the generality of the foregoing, the Management Services shall include, at the request of Owner, the following: strategic planning, economic feasibility analysis, financial modeling, leasing analysis, tenant and vendor credit reviews, market studies, and lease document review and summaries.

2.      Term.  The term of this Agreement shall commence as of August 11 , 2025 (the "**Commencement Date**"), and shall be for an initial term of [approximately] one (1) year, expiring on August 30, 2026 (the "**Initial Term**").  After the end of the Initial Term, this Agreement shall continue in effect for successive one (1) year terms (each, a "**Renewal Term**"; the Initial Term and any Renewal Terms are herein sometimes collectively referred to as the "**Term**") unless terminated sooner in accordance with the provisions hereinafter set forth including, without limitation, Paragraphs 12 and 13 below.

3.      Duties and Authority of Manager.  Manager's duties and authority shall consist of the following:

4817-1245-9491.9
297335.01101/8-8-25/bjw/bjw

**EXHIBIT 1 - Page 18**

(a)      Appointment.   Owner does hereby appoint Manager as the sole and exclusive agent to supervise the operation, management and maintenance of the Property on behalf of Owner, and Manager accepts such appointment, each upon the terms and conditions set forth in this Agreement.

(b)      Letting.  To use all reasonable efforts to let the apartment units comprising the Property to desirable tenants and, in connection therewith, to place advertisements, rental signs, prepare circulars and engage in other forms of advertising.  Manager may also negotiate, sign, renew, modify and cancel rental agreements and leases with tenants of the Property for such rentals and on such terms as Manager deems appropriate.

(c)      Collection of Income.  To bill tenants for rent in the name of Manager and/or Owner (as determined and directed from time to time by Owner), as agent for Owner, use its reasonable efforts to collect the rents and all other income derived from the operation, maintenance and management of the Property promptly when such amounts become due.

All money received by Manager for or on behalf of Owner shall be deposited in a separate bank account in trust for Owner (the "**Operating Account**") to be maintained by a financial institution selected/approved by Owner and Manager, subject to the approval of the United States Trustee or by order of the Bankruptcy Court, for so long as the Bankruptcy Case is pending.  Authorized employees of Manager shall be the sole signatories thereon with exclusive authority to draw on the Operating Account subject to the terms hereof.  All monies held in the Operating Account shall in no event be commingled with Manager's own funds or with funds held by Manager for the account of other parties.  Manager may withdraw funds from the Operating Account only to pay: (i) operating expenses or capital expenditures as permitted in this Agreement; (ii) the Management Fee and any other amounts payable or reimbursable to Manager pursuant to the express terms of this Agreement; (iii) amounts payable to Owner, including periodic distributions in excess of operating reserves as determined by Manager and approved by Owner at a frequency determined by Owner; (iv) security deposit refunds to residents/tenants vacating as required by law; (v) a specified amount to a payee which Owner may from time to time expressly authorize in writing.

Manager shall keep all security deposits in an account designated and approved by Owner accordance with applicable law and shall maintain detailed records of all such security deposits.  Such records will be available for inspection and audit by Owner's employees or appointees during Manager's regular business hours.  Manager shall in all circumstances comply, hold and return such security deposits in accordance with the terms and conditions of applicable laws and regulations (as may be modified from time to time).

(d)      Maintenance and Operation.  To oversee the day-to-day management of the Property, use its diligent skill and efforts to serve tenants of the Property and, subject to the terms hereof, including, without limitation, the Approved Budget, purchase necessary furniture, fixtures, equipment, tools, appliances, materials, fuel and supplies, make contracts for or otherwise furnish electricity, gas water, telephone, window cleaning, refuse disposal, pest control and any other utilities or services required for the operation of the

Property and make or cause to be made and supervised, necessary repairs, cleaning, painting, alterations, decorations, replacements and improvements.

(e)    Contractors.  Subject to Section 12(c), to engage, discharge, supervise and pay on behalf of Owner all servants, contractors, agents or such other persons necessary or convenient for the efficient operation and maintenance of the Property and, subject to the terms hereof, including, without limitation, the Approved Budget.  Manager shall not be liable to Owner for any act or omission on the part of any servant, contractor or agent if Manager has taken diligent care in its duties under this Agreement including, without limitation, its engagement and supervision of such persons.

(f)    Termination of Tenancies.  In the name of Owner and subject to the terms hereof including, without limitation, Subparagraph 3(s) below, to sign and serve such notices on delinquent tenants as Manager or Owner may deem necessary or proper, to engage counsel (subject to approval by the Bankruptcy Court for so long as the Bankruptcy Case is pending) and, in Owner's name, to (i) sue for and recover any rents which are past due; (ii) attach, garnish and levy upon the property of any delinquent tenant and recover possession of any part of the Property there from; and (iii) settle, compromise and adjust any such actions, suits or proceedings and the matters involved therein.

(g)    Payment of Expenses.  To pay at Owner's expense and on its behalf, all charges and operating expenses of the Property including, without limitation, the management fees and other compensation payable to Manager described in this Agreement.  Manager may also pay any other expense relating to the Property provided such liability is not a Material Expense.  The term "**Material Expense**" means any expense in excess of the amount provided for in the Applicable Budget provided the aggregate amount of such expenses paid in any twelve (12)-month period pursuant to this provision shall not exceed Two Thousand Five Hundred Dollars ($2,500).  Subject to the terms of this Agreement, including, without limitation, the Approved Budget, Owner shall also reimburse Manager for the salaries, and wages and benefits of all on-site laborers and employees of Manager in connection with the operation or maintenance of the Property and all related costs, including, without limitation, social security taxes, unemployment insurance, medical and life insurance, workers' compensation, matching pension contributions and federal and state withholding taxes and none of such amounts shall be paid by Manager from its compensation received under Paragraph 5.  In the event that Manager's laborers or employees are engaged to work in connection with other properties, wages, benefits and other expenses with respect to such work shall be equitably and reasonably allocated by Manager between properties. Owner agrees to pay costs related to operating the Property including but not limited to the system costs estimated in Exhibit "B" attached hereto.

(h)    Employees.  Notwithstanding anything to the contrary contained herein,

(i)    Manager shall have in its employ or shall have contracted for at all times a sufficient number of capable employees to enable it to properly, adequately, safely and economically manage, operate and maintain the Property in accordance with the requirements of this Agreement.  Except as otherwise provided herein, all

matters pertaining to the employment, supervision, compensation, promotion and discharge of such employees are the sole responsibility of Manager.  Manager shall be in all respects the employer of such employees, but Owner may require that any particular employee or employees be removed from duty with respect to the Property, if Owner deems, in its reasonable judgment, that such employee or employees is or are incompetent, careless or insubordinate or otherwise undesirable to the effective operation or management of the Property; provided, however, that Owner (as the case may be) shall notify Manager of the reasons or causes for which Owner (as the case may be) desires that Manager remove such employee or employees from duties with respect to the Property prior to Manager having any duty to so remove any employee or employees.  Upon expiration or termination of this Agreement, Owner shall have the right to offer employment to any on-site employees of Manager.

(ii)    Manager shall fully comply with all applicable laws and regulations having to do with workers' compensation, social security, unemployment insurance, hours of labor, wages, working conditions and other employer-employee related subjects.

(iii)    In the event that Manager's leasing or maintenance employees are engaged to work in connection with other properties, wages, benefits and other expenses with respect to such work shall be equitably and reasonably allocated by Manager between properties.  Owner will not be separately charged for the services of Manager's home office, administrative and supervisory employees, as the Manager's compensation hereunder covers these expenses.

(iv)    All employees will be subject to criminal background verification as a condition of their hire.

(i)    <u>Books of Account and Records</u>.  To keep full, detailed and adequate accounts and records of all receipts, expenses and disbursements relating to the Property, and to permit Owner and its representatives to examine the same at any time during Manager's regular business hours after providing at least five (5) business days prior written notice to Manager.  All original reports, documents and leases are to be retained by Manager, but shall remain and be the property of Owner.  Copies will be delivered promptly to Owner upon Owner's written request.

(j)    <u>Budgets</u>.

(i)    On or before November 1 of each year of the Term, Manager shall submit to Owner a proposed operating and capital improvement budget for the succeeding calendar year.  If Owner does not notify Manager in writing to the contrary within thirty (30) days of receipt of Manager's submission, such proposed operating and capital improvement budgets shall be deemed approved by Owner and shall become the approved budget for the succeeding calendar year (the "**Approved Budget**").  If Owner notifies Manager in writing of its disagreement with the proposed budget within such thirty (30) day period, Owner and Manager

shall use their diligent efforts to agree on the Approved Budget by December 15 (or with respect to the initial proposed budget, at least thirty (30) days prior to the completion of the Apartment Community).  Owner shall have the right to establish on its own the Approved Budget in the event Manager shall for any reason fail to submit a budget for Owner's approval on a timely basis, and Owner may, at any time, require reasonable modifications to a budget previously deemed to be an Approved Budget.  Any Approved Budget established by Owner shall include amounts deemed appropriate by Owner for all expense line items of the type normally included in the Approved Budget for the Property, taking into account the requirements of all tenant leases.  If an Approved Budget is not established or approved by Owner for a particular calendar year, Manager shall continue to manage, maintain, supervise, direct, and operate the Property in accordance with the Approved Budget for the previous calendar year except that the amount budgeted for Necessary Expenses shall be automatically increased (or decreased) to reflect the actual amount of such Necessary Expenses, until a new Approved Budget is approved.

(ii)    Notwithstanding anything to the contrary contained in this Agreement but subject to Subparagraph 3(q) below, the Approved Budget shall constitute an authorization from Owner for Manager to expend money at Owner's expense to operate and manage the Property in accordance with this Agreement and Manager may do so without further approval of Owner as long as Manager does not exceed the expenditures authorized and set forth in the Approved Budget (as may be adjusted under subparagraph 3(j) above); and, to the extent such expenditures are not authorized and set forth in the Approved Budget (as may be adjusted under subparagraph 3(j) above), Manager shall obtain the prior written approval of Owner for such expenditures.

(k)    Monthly Reports.  To prepare and submit a detailed statement of all receipts, expenses and disbursements relating to the Property for the preceding calendar month, or portion thereof, to be delivered to Owner within fifteen (15) days after the end of each calendar month during the term of this Agreement. For so long as the Bankruptcy Case is pending, the Monthly Report shall be delivered to Owner within twelve (12) days after the end of each calendar month.

(l)    Annual Reports.  Within forty-five (45) days of the end of each calendar year, Manager shall provide Owner an annual financial statement for the Property (including a balance sheet and income statement) for such fiscal year, prepared on both a tax and an accrual basis in accordance with generally accepted accounting principles, consistently applied (the "**Annual Report**").  In addition to the foregoing, within forty-five (45) days after the end of each calendar year, Manager shall furnish a current inventory of personal property and equipment used in connection with the Property.  At Owner's written request, the Annual Report shall be audited by an accounting firm designated by Owner, and the cost of such audit shall be paid by Owner.

(m)    Compliance with Leases and Mortgages.  Subject to the availability of funds from Owner and the inclusion of any required expenditures in the Approved Budget,

Manager shall be responsible for making timely payments under any lease, mortgage, deed to secure debt or other security interest instrument affecting or encumbering the Property of which Manager has actual knowledge.

(n)     Taxes.  Manager shall (and may hire an independent third-party consultant in connection therewith to) obtain, verify and review all bills for real estate and personal property taxes, improvement assessments and other like charges which are or may become liens against any portion of the Property.  Manager shall notify Owner promptly if Manager receives written notice of a proposed increase in the aforesaid taxes, whether such increase will be caused by an increase in the relevant millage rate, an increase in the assessment of the Property, or otherwise.  In the event Owner elects to contest and/or appeal any such real estate and personal property taxes, Manager shall cooperate with Owner in connection therewith including, without limitation, the timely filing of any and all documentation related thereto.  Subject to Owner's compliance with the terms of Paragraph 4, Manager shall pay such bills with Owner's funds in such time to permit Owner to avoid any penalties associated with such tax payments.

(o)     Compliance With Law.  Subject to the limitations contained in this Agreement, Manager shall take such action as may be necessary to assure full compliance with federal, state and municipal laws, ordinances, regulations and orders relative to the leasing, use, operation, repair and maintenance of the Property and with the rules, regulations or orders of the local Board of Fire Underwriters or other similar body (collectively, "**Laws**"), provided that funds are made available by Owner for the same. Upon learning of any violation of one or more of such Laws, Manager shall promptly give written notice thereof to Owner along with a proposed remedy for such violation to be undertaken at Owner's expense, and following approval by Owner, Manager shall undertake such corrective action.

(p)     Independent Contractors.  Manager shall require, and directly or by and through a retained independent third-party service provider (the "**Provider**"), verify that all contractors who enter the Property have insurance coverage, at the contractor's expense, in accordance with Section 12(c) and each contractor provide evidence of such insurance prior to performing any work.  All such policies shall be primary and noncontributory. Manager shall (or in the event Manager hires the Provider, Manager shall cause the Provider to) obtain and keep on file a certificate of insurance for each contractor which shows that such contractor is insured in accordance with Owner's standard practices. Manager shall (or in the event Manager hires the Provider, Manager shall cause the Provider to) use its commercially reasonable efforts to require that each independent contractor indemnifies and saves harmless Owner and the members of Owner and Manager and their respective officers, directors, shareholders, agents, employees, and subsidiaries from and against, and at the election of the aforesaid parties, that each such independent contractor defend all of the aforesaid parties against all liability, claims and demands on account of injury to persons (including death) and damage to property arising out of or resulting from the negligence of the independent contractor, or employees or agents of the independent contractor, in the performance of the contract or work by the independent contractor, its employees, or agents, or from the independent contractor's property. Manager shall also (or in the event Manager hires the Provider, Manager shall cause the

Provider to) use its commercially reasonable efforts to induce the independent contractor and such agents to agree that such independent contractor and such agents shall, at their expense, defend any and all suits or actions against Owner or a member of Owner and/or Manager brought as a result of any such negligence and shall pay all reasonable attorneys' fees and all other expenses in connection therewith, and promptly discharge any judgments arising therefrom.

(q)  <u>Capital Expenditures</u>.  Manager shall make no expenditures for alterations, capital improvements, renovations or replacements of furniture, fixtures or equipment, unless such expenditure is (i) contained in the Approved Budget, (ii) otherwise approved in writing by Owner, or (iii) necessary to protect the Property in the event of an emergency, and in the event of any such emergency, Manager shall give written notice thereof to Owner as expeditiously as possible under the circumstances.

(r)  <u>Service Contracts and Equipment Leases</u>.  Manager is authorized to make and enter into for the account of Owner all contracts and equipment leases as are required in the ordinary course of business for the operation, maintenance, and service of the Property and to pay the same when due; provided however, Manager shall be required to obtain the prior written consent of Owner before entering into any contract or equipment lease for the account of Owner in which (i) the total amount payable annually exceeds Five Thousand Dollars ($5,000), unless such contract or lease is made under circumstances which shall reasonably be considered to constitute an emergency or such contract or lease expenditure has been approved in the Annual Budget, or (ii) the term exceeds one (1) year, unless such contract or lease has been approved in the Annual Budget.  Notwithstanding anything to the contrary, Manager shall not enter into any service contract or equipment lease that does not allow for a thirty (30) day termination right, with or without cause, and without the payment of any termination fee or penalty, without the prior written consent and approval of Owner.

(s)  <u>Enforcement of Leases</u>.

(i)  Manager shall use its commercially reasonable efforts to enforce the terms of all tenant leases and to collect all rents and other charges which may become due at any time from any tenant or from others for services provided in connection with or for the use of the Property, or any portion thereof.  Manager shall collect and identify any income due Owner from miscellaneous services provided to tenants.

(ii)  Manager may, in the event of a default by a tenant under any tenant lease, to the extent permitted by applicable Laws, terminate any such lease, lock out the tenant under such lease, institute any legal proceedings for the collection of rent with respect to such tenant, or institute proceedings for recovery of possession of the space leased under the lease in question, using Manager's commercially reasonable business judgment to enhance the value and quality of the Property.  In connection with such suits or legal proceedings, legal counsel as recommended by Manager and approved by Owner shall be retained subject to approval by the Bankruptcy Court for so long as the Bankruptcy Case is pending.  Additionally,

Manager shall, in the event of a default by a tenant under any tenant lease, to the extent permitted by applicable Laws, terminate any such lease, lock out the tenant under such lease, institute any legal proceedings for the collection of rent with respect to such space leased under the lease in question, if Owner directs Manager to do so in writing.  In connection with the enforcement of any tenant lease, Manager may settle, compromise and release any action or suit and reinstate any tenancy subject to obtaining the prior written consent of Owner for the expenditure or forgiveness of more than (i) Two Thousand Dollars ($2,000) in any one matter or (ii) Ten Thousand Dollars ($10,000) in the aggregate in any twelve (12) month period.  Manager shall notify Owner on a routine basis of all legal actions taken against tenants.

(t)    Additional Duties.  In addition to the foregoing but subject to the terms of this Agreement, Manager shall perform all services which are reasonably necessary for, and shall use due diligence in the operation, maintenance and management of the Property, and from and after completion of construction of the Apartment Community, shall report to Owner promptly any conditions at, on or about the Property which may materially or adversely affect the terms of this Agreement or the Property, or which otherwise, in the reasonable opinion of Manager, require the attention of Owner.

4.    Funding by Owner.  On the first day of each calendar month during the term hereof, to the extent not available from rents and other revenues, at the request of Manager by providing Owner no less than ten (10) business days' prior written notice thereof, Owner shall pay to Manager such amounts as may be necessary for Manager to pay all expenses incurred in connection with the operation, management and maintenance of the Property, including, without limitation, any and all expenses which Manager has incurred in providing the services set forth in Paragraph 3 of this Agreement and which are set forth in the Approved Budget or have otherwise been approved in writing by Owner (or are otherwise authorized to be paid by Manager under this Agreement).  Such payments shall be made directly to Manager or by depositing the same in the account referred to in subparagraph 3(c) and promptly notifying Manager of such deposit.  If Owner fails to pay such amount, Manager shall apply the rents and other revenues of the Property in the following order: (i) to the payment of Manager's compensation under Paragraph 5; (ii) to the payment of charges and operating expenses of the Property pursuant to subparagraph 3(g) and, (iii) to the payment of other expenses payable by Manager hereunder.

5.    Compensation.

(a)    Management Fee.  As monthly compensation for the services to be rendered by Manager pursuant to this Agreement, commencing on the Commencement Date and continuing during the Term, Owner shall pay to Manager a monthly fee of an amount equal to FIVE PERCENT (5.00%) of the Gross Revenue (as defined below) derived from the operation of the Property for each such month, but in no event less than NINE THOUSAND Dollars ($ 9,000) per month (the "**Management Fee**").  Such compensation shall be payable monthly in arrears on the last day of each calendar month (or portion thereof) during the Term (and prorated for any partial calendar month during the Term), with the first such monthly payment being payable on the last day of the calendar month in which the Commencement Date occurs.  If the Term of this Agreement commences or

expires or if this Agreement is terminated during a calendar month, then the Gross Revenue for such calendar month shall be prorated as of the date thereof.

(b)    Construction Management Fee.  If Manager is requested to supervise any improvement project related to material renovations to the Property (i.e., improvements to the Property that do not relate to or arise from ordinary or customary maintenance, repairs or replacements) (collectively, the "**Improvement Project**") following the issuance of the last certificate of occupancy for the Property, then Owner shall also pay to Manager a construction supervision fee (the "**Construction Management Fee**") in an amount equal to five percent (5.00%) of the total hard and soft costs incurred in connection with any such Improvement Project, provided the aggregate cost of any such Improvement Project exceeds or equals Ten Thousand Dollars ($10,000).  If the aggregate cost of such Improvement Project is less than Ten Thousand Dollars ($10,000), then Owner shall pay to Manager a negotiated market fee to be reasonably agreed upon by Owner and Manager prior to the commencement of such Improvement Project.  Notwithstanding the foregoing, Manager is only eligible to receive the Construction Management Fee for improvement projects that are approved by Owner in writing prior to the commencement of such Improvement Project.

(c)    Gross Revenue.  For purpose of this Agreement, the term "**Gross Revenue**" shall mean the entire amount of all receipts received with respect to the Property including, without limitation, rent, charges made for the rendition of services of any kind whatsoever, and insurance proceeds arising out of business loss or similar coverage related to unpaid rent, but excluding the following items:

(i)    security and other deposits received from tenants at the Property that have not been forfeited;

(ii)    interest income;

(iii)    the proceeds of any taking by condemnation or eminent domain and any awards from suits not related to the collections of rent and related charges including proceeds from any life or casualty insurance policies;

(iv)    proceeds, gains or losses arising from the sale or other disposition of capital assets or all or any portion of the Property;

(v)    uncollectible accounts receivable accrued during the term of this Agreement;

(vi)    any reversal or accrual of any contingency or tax reserve;

(vii)    abatements or refunds of taxes and other refunds on account of expenses previously paid;

(viii)    any loans to Owner, whether or not secured by all or any part of the Property; and

(ix)     any capital contribution received by Owner.

6.     Insurance.

(a)     Owner's Insurance.  Owner shall provide, pay for and maintain in full force and effect throughout the term of this Agreement, property insurance and commercial general liability insurance with coverages, deductibles and liability limits as are set forth on Exhibit "A" attached hereto (or as may be agreed to from time to time by Owner and Manager).  The commercial general liability policy shall name Manager as an additional insured.  All coverages maintained by Owner shall be primary and non-contributory to any insurance or self-insurance program carried by Manager.

(b)     Manager's Insurance. Manager shall maintain, at its expense, insurance coverages in the following amounts:

(i)     Workmen's Compensation – Coverage A:  statutory amount;

Coverage B:  Employer's Liability Insurance:

(1)     $500,000 Each Accident;

(2)     $500,000 Disease; Policy Limits; and

(3)     $500,000 Disease, Each Employee.

(ii)     Worker's Compensation policy shall include a waiver of all rights of subrogation against Owner for injuries sustained by Manager's employees while working at the Property;

(iii)     Commercial General Liability, on an occurrence basis, including Bodily Injury and Property Damage Liability, Personal and Advertising Injury Liability for the following limits:

| | | |
|---|---|---|
| (1) | General Aggregate | $ 2,000,000; |
| (2) | Products - Completed Operations Aggregate | $ 2,000,000; |
| (3) | Each Occurrence | $ 1,000,000; and |
| (4) | Personal and Advertising Injury Liability | $ 1,000,000. |

(iv)     Manager's Commercial General Liability policy shall include Real Estate Property Managed Endorsement:  CG 22 70 11 85 or equivalent form and coverage;

(v)    Owned, Hired and Non-Owned Business Automobile liability insurance in an amount no less than One Million Dollars ($1,000,000) per occurrence Combine Single Limit for bodily injury and property damage;

(vi)    Manager's Errors & Omissions Insurance in an amount not less than One Million Dollars ($1,000,000) per loss, aggregate;

(vii)    Employee Theft Insurance in an amount not less than the greater of (a) One Million Five Hundred Thousand Dollars ($1,500,000) and (b) an amount equal to sixty (60) days' rental income from the Property.  Employee Theft Insurance shall be endorsed to name Owner as a loss payee and to provide coverage for theft of Owner's money, securities and other property by employees of Manager;

(viii)    Property Insurance coverage for personal property of Property Manager; and

(c)    Tenants', Contractors', Subcontractors', and Vendors' Insurance.  SEE ATTACHED EXHIBIT "C".

(d)    Neither Owner nor Manager shall knowingly permit any activities that would violate in any material respect any insurance policy relating to the Property.

7.    <u>Use of Manager's Own Funds</u>.  Except as otherwise provided herein, Manager shall not be obligated to use or advance any of its own funds or to incur any obligations on its own behalf with respect to any of the expenses or obligations in connection with the Property or its services hereunder.  If, however, any such expenses are paid out of Manager's own funds with respect to expenses that are to be paid by or on behalf of Owner, and have not been so paid five (5) business days after written notice from Owner to Manager in accordance with the provisions of Paragraph 4 hereof, Manager shall be entitled to reimbursement from Owner therefor, together with interest thereon at the per annum rate which is three percent (3%) in excess of the prime rate announced from time to time by Wells Fargo Bank of California for corporate borrowers of the highest credit standing for short-term, unsecured loans, but not to exceed the maximum non-usurious rate permitted by law, from the date of such payment to the date of such reimbursement, and may apply the next receipts derived from the operation of the Property to the payment thereof. Notwithstanding anything to the contrary contained herein, in no event and under no circumstances shall Manager pay or obligate Owner to pay, or otherwise incur any liability of any kind or nature for, any cost or expense other than those expressly provided for and authorized under the terms of this Agreement.

8.    <u>Exclusivity of Agency</u>.  During the term of this Agreement, Owner shall not authorize any other person, firm or corporation to act as manager or leasing agent with respect to the Property or to perform any of the other duties of Manager hereunder and shall not permit any person, firm or corporation other than Manager to have or maintain any rental or "for rent" signs in or about the Property.  Manager shall have the right to display on the Property suitable signs indicating that Manager is the exclusive managing agent of the Property.

9.      Mutual Waiver.  To the maximum extent permitted by law, Owner and Manager each release and waive any right of recovery against the other (and against the other's respective officers, directors, shareholders, partners, members, employees, subsidiaries, agents, affiliates, contractors, lenders, trustees, beneficiaries, licensees, successors and assigns), for any bodily injury, property damage, or loss covered by any policy of insurance required by this Agreement, or which would have been covered had the party carried the insurance it was required to carry by this Agreement, or within any deductible in such policy.  No insurance policy required by this Agreement shall prohibit such release and waiver.  In addition, the insurance policies required of Owner and Manager by this Agreement shall contain a waiver of claims against the other by the insurer, whether by subrogation or otherwise (and against the other's respective officers, directors, shareholders, partners, members, employees, subsidiaries, agents, affiliates, contractors, lenders, trustees, beneficiaries, licensees, successors, and assigns).  If any insurance policy required by this Agreement provides that a waiver of subrogation may only be granted by endorsement, Owner or Manager, as the case may be, shall secure an endorsement providing the waiver of subrogation.

10.      Indemnity.

(a)      Manager's Indemnity.  Manager shall indemnify and hold Owner, the members of Owner and their respective officers, directors, shareholders, partners, members, employees, subsidiaries, agents, affiliates, contractors, lenders, trustees, beneficiaries, licensees, investment advisors, successors and assigns harmless in respect of, and at Owner's election defend, any and all losses, claims, demands, causes of action, debts, liabilities, judgments, damages and expense, including without limitation costs and reasonable attorneys' fees and any costs and reasonable attorneys' fees incurred in connection with the enforcement of this indemnity (collectively the "**Claims**") which may be incurred by or made against Owner to the extent arising out of (i) the gross negligence, misconduct or fraud of Manager or its employees, or (ii) a breach by Manager or its employees of any material provision of this Agreement; provided however, that Manager and its employees shall not be liable for, and shall not be required to indemnify Owner from, any Claims to the extent (A) Owner is reimbursed for any such Claim under any insurance policy, or (B) Owner would have been reimbursed for any such Claim if Owner carried the insurance it was required to carry under this Agreement.

(b)      Owner's Indemnity.  Owner shall indemnify and hold Manager harmless in respect of, and at Manager's election defend, any and all Claims which may be incurred by or made against Manager to the extent arising out of (i) Owner's failure or refusal to comply with or abide by any applicable law or regulation, which are due to the condition of the Property, (ii) the gross negligence, misconduct or fraud of Owner or its employees (iii) a breach by Owner or its employees of any material provision of this Agreement, or (iv) Manager's performance of its obligations under this Agreement which are within the scope of its authority under this Agreement or otherwise authorized by Owner, and for which Manager is not required to indemnify Owner under Paragraph 10(a) above; provided however, that Owner and its employees shall not be liable for, and shall not be required to indemnify Manager from, any Claims to the extent (A) Manager is reimbursed for any such Claim under any insurance policy, or (B) Manager would have been reimbursed for any such Claim by insurance if Manager carried the insurance it was required to carry under this Agreement.

(c)    Survivability.   The obligations of Owner and Manager under this Paragraph 10 shall survive the expiration or termination of this Agreement.

11.    Default.  If either party hereto defaults in the performance of any of its obligations hereunder at any time during the term of this Agreement, the other party, in addition to any other rights or remedies it may have under this Agreement (including, without limitation, the rights or remedies set forth in Paragraphs 12 and 13 below), shall be entitled to exercise any and all other remedies at law or in equity.

12.    Termination by Owner.

(a)    Termination for Cause.  This Agreement may be immediately terminated by Owner upon the occurrence of any of the following events during the Term:  (i) the gross negligence, misconduct or fraud of Manager or its employees; (ii) Manager fails to perform any of its obligations hereunder and if such failure shall continue for thirty (30) days after written notice from Owner to Manager designating such failure; or (iii) a petition for bankruptcy, reorganization or rearrangement is filed under state or federal insolvency statutes by Manager, or any such petition is filed against Manager and not removed or discharged within ninety (90) days thereafter.

(b)    Termination by Mortgagee.  The holder or holders of any indebtedness of Owner secured by a first lien mortgage or deed of trust encumbering the Property (a "**Mortgagee**") shall have the right to terminate this Agreement upon ten (10) days prior written notice to Manager in the event such Mortgagee forecloses its lien on the Property, or accepts a deed in lieu of foreclosure from Owner, or secures an order or decree appointing a receiver or custodian for the Property, or otherwise becomes a mortgagee in possession of the Property.

(c)    Termination Upon Sale or Transfer.  If Owner's interest in the Property is sold or transferred to a party which is not an affiliate of Owner or any of the members of Owner, and the new owner does not retain the services of Manager, then Owner may terminate this Agreement by giving Manager written notice at least thirty (30) days prior to such sale or transfer, and such termination shall be effective upon the effective date of such sale or transfer.  If Owner elects to terminate this Agreement pursuant to this Paragraph 12(c), then Owner shall pay a disposition fee (the "**Disposition Fee**") in an amount equal to Thirty Thousand Dollars ($30,000) to be paid from escrow upon the completion of the sale or transfer.

(d)    Termination Without Cause.  Notwithstanding anything to the contrary contained in this Agreement, Owner may terminate this Agreement for any reason or no reason (in Owner's sole and absolute discretion) upon ninety (90) days' prior written notice to Manager during the Initial Term, or upon thirty (30) days' prior written notice to Manager during any Renewal Term.  If Owner elects to terminate this Agreement pursuant to this Paragraph 12(d), and as of the effective date of such termination, then Owner shall pay to Manager a termination fee (the "**Termination Fee**") in an amount equal to three times the Management Fee for the month prior to the effective date of the termination.

13. <u>Termination by Manager</u>.

(a) <u>Termination for Cause</u>. This Agreement may be immediately terminated by Manager upon the occurrence of any of the following events during the Term: (i) the gross negligence, misconduct or fraud of Owner or its employees; (ii) Owner fails to perform any of its obligations hereunder and if such failure shall continue for thirty (30) days after written notice from Manager to Owner designating such failure; or (iii) a petition for bankruptcy, reorganization or rearrangement is filed under state or federal insolvency statutes by Owner, or any such petition is filed against Owner and not removed or discharged within ninety (90) days thereafter (a "Bankruptcy Termination"). However, the Bankruptcy Case is not a Bankruptcy Termination and no Bankruptcy Termination shall be cause to terminate for so long as the Bankruptcy Case is pending.

(b) <u>Termination Without Cause</u>. Notwithstanding anything to the contrary contained in this Agreement, Manager may terminate this Agreement for any reason or no reason (in Manager's sole and absolute discretion) upon ninety (90) days' prior written notice to Owner during the Initial Term, or upon thirty (30) days' prior written notice to Owner during any Renewal Term.

14. <u>Obligations Upon Termination</u>.

(a) <u>Payment of Fees</u>. Upon any termination of this Agreement, each party shall continue to be fully liable for its respective obligations that have accrued up to and including the termination date and shall promptly pay to the other all amounts due the other party under the terms of this Agreement, including, without limitation, the Success Fee (if applicable pursuant to Paragraph 12(e) above). Such payment shall be made as soon after the effective date of the termination as such amounts are determinable. Upon such payment, neither party shall have any further claim or right against the other, except as expressly provided herein.

(b) <u>Transition of Manager</u>. In addition to any and all other rights, liabilities and obligations under this Agreement and as provided by law, upon termination of this Agreement for whatever cause, Manager shall, not later than the effective date of termination, deliver to Owner the originals of all books, permits, plans, records, leases, licenses, contracts and other documents pertaining to the Property and its operation, all insurance policies, bills of sale or other documents evidencing title or rights of Owner, and any and all inventories, records or documents, whether or not enumerated herein, which are reasonably necessary or desirable for the ownership and operation of the Property, and, to the extent in Manager's possession or control, shall also deliver the foregoing to Owner in electronic format. All personal property (including, but not limited to, capital equipment, hardware, trade and non-trade fixtures, materials and supplies) acquired pursuant to this Agreement, whether paid for directly by Owner or by way of reimbursement to Manager, is and shall remain the property of Owner and shall remain in the Property after the termination of this Agreement in accordance with its terms, unless Owner shall request Manager in writing to remove said property. All such personal property shall be delivered to Owner free of any liens or other encumbrances (other than those liens or encumbrances previously consented to by Owner), but otherwise in its "as

is" condition without any warranty or representation to Owner as to the fitness of such personal property. Any and all funds of Owner on hand or in any bank account, including all security deposits of tenants, if not previously delivered to Owner, will be transferred to Owner. Manager shall also deliver to Owner, as received, any funds due to Owner under this Agreement but received after such termination. Manager further agrees to do all other things reasonably necessary to cause an orderly transition of the management of the Property without detriment to the rights of Owner or to the continued management of the Property. Without limitation of the foregoing, within sixty (60) days following the date of such termination, Manager shall deliver to Owner a final accounting, in writing, with respect to operations of the Property through the date this Agreement is terminated. Manager shall also, for a period of ninety (90) days after such termination, make itself available to consult with and advise Owner, or such other person or persons designated by Owner, regarding the operation and maintenance of the Property.

15.    Notices. All notices or other communications required or permitted hereunder (collectively, the "**Notices**") shall be in writing and shall be delivered or sent, as the case may be, by any of the following methods: (a) personal delivery with signed receipt; (b) nationally recognized overnight commercial carrier or delivery service providing a receipt of delivery; (c) registered or certified mail (with postage prepaid and return receipt requested); or (d) by facsimile transmission, provided that confirmation of delivery thereof is received and a confirmation copy is delivered within one (1) Business Day thereafter by one of the methods set forth in clauses (a), (b) or (c) of this Paragraph 15. The effective date (the "**Notice Date**") of any such notice or other communication shall be deemed to be the earlier of (i) if personally delivered, the date of delivery to the address of the party to receive such notice; (ii) if delivered by overnight commercial carrier or delivery service, one (1) Business Day following the receipt of such communication by such carrier or service from the sender, as shown on the sender's delivery invoice from such carrier or service, as the case may be; (iii) if mailed, three (3) Business Days after the date of posting as shown on the sender's registry or certification receipt; or (iv) if delivered by facsimile, upon the date of receipt of confirmation of delivery thereof, provided such additional notice is given as described in clause (d) of this Paragraph 15. Any reference herein to the date of receipt, delivery, or giving, as the case may be, of any notice or other communication shall refer to the date such communication becomes effective under the terms of this Paragraph 15. The addresses for purposes of the giving of notices hereunder are:

To Owner:        Fu Bang Group Corp, USA
                 c/o Nicholas Rubin, Chief Restructuring Officer
                 5271 California Ave., Suite 270
                 Irvine, CA 92617
                 Email: nrubin@force10partners.com

                 with copy to:

                 Derrick Talerico, Esq.
                 Weintraub Zolkin Talerico & Selth LLP
                 11766 Wilshire Blvd., Suite 730
                 Los Angeles, CA 90025
                 Email: dtalerico@wztslaw.com

To Manager:        Sares Regis Management Company
3501 Jamboree Rd, Suite 3000
Newport Beach, CA 92660
Attn:  Jeffrey M. Bailey
Email: jbailey@sares-regis.com

Notice of change of address shall be given by written notice in the manner detailed in this Paragraph 15.  Rejection or other refusal to accept, or the inability to deliver, because of a changed address of which no notice was given shall be deemed to constitute receipt of the notice or other communication sent.

16.      <u>Relationship of the Parties</u>.  Manager is an independent contractor hired by Owner pursuant to the terms hereof.  Nothing contained in this Agreement, nor any acts of the parties hereto, shall be deemed or construed by the parties hereto, or either of them, or any third party, to create the relationship of principal and agent, or a partnership or a joint venture, between the parties hereto.

17.      <u>Time is of the Essence</u>.  Punctual performance is an essential requirement of this contract.

18.      <u>Advertising; Trademarks</u>.  No publication, announcement or other public advertisement of Owner's name in connection with the Property shall be made by Manager, except in connection with leases entered into in Owner's name as expressly provided for herein, as may be required by applicable law, or as approved by Owner, such approval not to be unreasonably withheld or delayed by Owner.  Manager shall have no right to use the trademark, trade name or logotype of Owner, or any affiliate or subsidiary thereof, in connection with any product, promotion or publication, without the prior written approval of Owner.

19.      <u>Attorneys' Fees</u>.  If any proceeding is commenced between or among the parties or their representatives concerning any provision of this Agreement or the rights and duties of any person or entity in relation thereto, then the party prevailing in such proceeding shall be entitled, in addition to such other relief as may be granted, to a reasonable sum as and for attorneys' fees and costs reasonably incurred in such proceeding, including, without limitation, expert witness' fees.

20.      <u>Successors and Assigns</u>.  Owner shall have the right at any time in its sole discretion, to assign its rights and obligations hereunder to a third party acquiring the Property subject to Manager's right to terminate pursuant to Paragraph 13.  Manager shall not have the right to assign its interest in this Agreement, without the prior written consent of Owner.  Subject to the foregoing restrictions, this Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assigns of the parties hereto.

21.      <u>Third Party Beneficiaries</u>.  None of the obligations and duties of either party hereunder shall in any way or in any manner be deemed to create any obligation of such party to, or any rights in, any person or entity, including tenants under the tenant leases, other than the other party.

22.     Severability.  Every provision of this Agreement is intended to be severable.  If any term or provision hereof is illegal for any reason whatsoever, such provision shall be severed from the Agreement and shall not affect the validity of the remainder of this Agreement.

23.     No Interest in Condemnation or Insurance Proceeds.  Manager shall not have any interest in or claim to any condemnation proceeds for the Property awarded to Owner or any insurance proceeds paid to Owner with respect to any casualty to the Property; provided, however, that nothing contained herein shall prevent or be deemed to prevent Manager from pursuing or seeking an award separate from Owner's award in any condemnation proceeding or a separate claim under any insurance policy; provided that in no event shall any such separate claim or claims by Manager diminish or limit in any manner any award which would otherwise be payable to Owner as owner of the Property.

24.     Mutual Waiver.  The failure by any party to exercise any right or power given herein or by law, or to insist upon strict compliance by any other party with any obligation imposed hereunder, shall in no event constitute a waiver of such party's right to demand full and complete compliance with each and every provision hereof or to exercise and enforce all available powers and remedies.

25.     Equal Employment Opportunity.  There are incorporated into this Agreement the provisions of Executive Order 11246 (as amended) of the President of the United States on Equal Employment Opportunities and the rules and regulations issued pursuant thereto, with which Manager represents it will comply, unless exempted.

26.     OSHA.  Manager agrees that for the purpose of compliance with the requirements of the Occupational Safety and Health Act ("**OSHA**") of 1970 (as amended), work performed under this Agreement for Owner shall be deemed entirely within Manager's responsibility. Manager will notify Owner promptly, in writing, if a charge of non-compliance with OSHA has been filed against Manager in connection with Manager's work being performed on the Property.

27.     Safety.  Manager shall take reasonable precautions for the safety of Manager's employees, its independent contractors' personnel and Owner's representatives while such persons are located on the Property.

28.     Owner's Operating Procedures.  Manager shall comply with such reasonable rules and regulations governing operations of the Property as Owner shall from time to time establish and make known to Manager.

29.     Subordination.  This Agreement shall be subject and subordinate to any existing or future loan which Owner may place upon the Property.  Manager agrees to execute any and all documents reasonably necessary or appropriate to evidence the same.

30.     Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.

31.     Judicial Reference.  Manager and Owner acknowledge and agree that any controversy or claim arising out of or relating to this Agreement, or the breach thereof, be resolved by the Bankruptcy Court for so long as the Bankruptcy Case is pending, and thereafter by a referee

appointed by the Superior Court for the County of Orange, California ("**Superior Court**") in accordance with the provisions of Section 638 et seq. of the California Code of Civil Procedure. In this regard, in the event Manager and Owner are unable agree upon a resolution to any such question, either party shall have the right to serve a written demand for judicial reference of such claim or controversy on the other party. Manager and Owner shall then negotiate in good faith for a mutually acceptable referee. In the event that Manager and Owner have not agreed upon a referee within ten (10) business days after written demand for such reference has been made, each party shall submit to the Superior Court the names of up to three nominees for appointment as referee, in accordance with the provisions of Section 640 of the California Code of Civil Procedure. The referee, once agreed upon by the parties or appointed by the Superior Court, shall have full and complete authority to hear and determine any and all of the issues in an action or proceeding, whether of fact or of law, and to report a statement of decision. In connection with such reference procedure, the parties shall have all rights and powers afforded to a civil litigant in the Superior Court, including the ability to conduct full discovery. The referee shall be governed by the rules of civil procedure for actions filed in California superior courts as set forth in the California Code of Civil Procedure, except to the extent the parties stipulate the referee may deviate therefrom. The parties shall evenly divide the cost of the referee's fees. The referee shall have the power, as part of any award, to include these fees as an element of recovery. The decision of the referee upon the whole issue shall stand as the decision of the Superior Court, and upon the filing of the statement of decision with the clerk of the Superior Court, judgment may be entered thereon in the same manner as if the action had been tried by the Superior Court. Except as set forth in Section 645 of the California Code of Civil Procedure, the referee's award shall be considered final, and not subject to appeal or collateral attack.

32.    Liens. This Agreement shall not create an interest in real property and it shall not be recorded in the public records of any jurisdiction. Notwithstanding anything to the contrary contained herein, neither Manager nor any officer, shareholder, representative or agent thereof shall be entitled to place, file nor record a lien upon the Property on account of any sums alleged to be due and payable to Manager.

33.    Paragraph Headings. The headings of the several paragraphs and subparagraphs of this Agreement are inserted solely for convenience of reference, and are not a part of and are not intended to govern, limits or aid in the construction of any term or provision hereof.

34.    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

4817-1245-9491.9
297335.01101/8-8-25/bjw/bjw

-18-

**EXHIBIT 1 - Page 35**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first written above.


"**OWNER**"                                    **FU BANG GROUP CORP, USA**

By: *Nicholas D. Rubin*

                                             Nicholas Rubin
                                             Chief Restructuring Officer


"**MANAGER**"                                  **SARES REGIS MANAGEMENT COMPANY, L.P.**, a Delaware limited partnership

By: Sares Regis Group Residential, Inc.,
      a California corporation
      Its:  General Partner


By: _____
       Jeffrey M. Bailey
       Vice President

**EXHIBIT A**

OWNER'S INSURANCE REQUIREMENTS

1.      Property Insurance.

Owner shall obtain and keep in full force and effect during the term of this Agreement either Builder's Risk Insurance or the following insurance:  (a) All Risk Insurance against loss by fire, lightning and risk customarily covered by standard special form with extended coverage endorsement, including, but not limited to, the cost of debris removal, together with a vandalism and malicious mischief endorsement, or all perils endorsements, all in the amount of not less than the full replacement cost of the improvements, and together with an agreed-amount endorsement, a replacement cost endorsement and a waiver of subrogation endorsement; (b) Broad Form Boiler and Machinery Insurance on all applicable equipment and pressure fired vehicles or apparatus situated on the Property, and providing for full repair and replacement cost coverage; (c) Flood Insurance in the maximum amount available at any time during the term of this Agreement unless evidence is provided that the Property is not within a flood plain as defined by the Federal Insurance Administration; (d) Business Income and Extra Expense Coverage including loss of Rental Insurance covering risk of loss due to the occurrence of any hazards insured against under the policies required hereunder in an amount equal to:  (i) rental for a twelve (12) month period, plus (ii) real estate taxes, special assessments, insurance premiums and other additional expenses required.

2.      Commercial General Liability.

Owner will maintain commercial general liability insurance on an occurrence basis including, but not limited to, coverage for (a) premises & operations; (b) contractual liability; (c) bodily injury; (d) property damage; (e) personal injury; Manager shall be named as additional insured; (f) severability of interest provision; (g) cross liability endorsement; and a waiver of subrogation against all parties listed as additional insured.

     (a)      Such insurance will have the following minimum limits:

          (i)      One Million Dollars ($1,000,000) each occurrence;

          (ii)      Two Million Dollars ($2,000,000) general aggregate with dedicated limits per project site; and

          (iii)      Two Million Dollars ($2,000,000) products and completed operations aggregate.

3.      Automobile Liability.

     (a)      Owner will maintain auto liability insurance covering liability arising out of any auto (including owned, if any, hired and non-owned autos).

     (b)      Such insurance will have the following minimum limits:

One Million Dollars ($1,000,000) combined single limit each accident

(c)      Coverages:

Additional insured endorsement.

4.      <u>Umbrella Liability</u>.

(a)      Owner will maintain umbrella liability insurance on an occurrence basis in excess of the underlying insurance described herein.  The amounts of insurance required herein may be satisfied by Owner purchasing coverage for the limits specified or by any combination of underlying and umbrella limits, so long as the total amount of insurance is not less than each of the limits specified herein.  The amounts of insurance required herein will be provided with a per location or per jobsite endorsement that ensures that such liability coverage limit is not shared among any other project or projects.

(b)      Such insurance will have the following minimum limits:

Ten Million Dollars ($10,000,000) combined single limit and aggregate limit

(c)      Coverages:

(i)      Additional insured endorsement;

(ii)      Pay on behalf of wording;

(iii)      Blanket contractual liability;

(iv)      Punitive damages coverages (where not prohibited by law); and

(v)      Aggregates apply where applicable in Primary.

# **EXHIBIT B**

## 2024 OWNER AUTHORIZATION FORM

 **SRG RESIDENTIAL**

### 2025 OWNER AUTHORIZATION FORM

| Property: | ABC Property | Phone: | XXX-XXX-XXXX |
|---|---|---|---|
| Address: | 1250 Beach Blvd | Website: | property.com |
| City: | Anytown | Residential Apartment Units: | 250 |
| State: | CA | Commercial Square Feet: | 0 |
| Zip: | 90000 | Number of Employees: | 5 |

This acknowledgement and authorization, dated 1/1/2025 is between Property (hereinafter "Client") and Sares Regis Management Company, L.P., a Delaware limited partnership (hereinafter "SRG").

By virtue of the signature of its authorized agent below, Client hereby acknowledges the "SRG Suite of Programs" that will be implemented and included in the community budget. Costs listed may change without notice. Client authorizes SRG to sign on Client's behalf any agreement required for these programs unless noted and release information as outlined below. Optional items are noted as such.

**SRG SUITE OF SERVICES:**

**REQUIRED**

The below listing provides you the required software and vendor partnerships that are deemed necessary by SRG Residential to optimally operate your asset(s). The cost savings that have been previously negotiated on your behalf will automatically be passed to the property.

**OPERATIONS**

| DESCRIPTION | PER UNIT/ MONTH | ANNUAL | SET UP |
|---|---|---|---|
| Yardi Voyager 7S accounting platform (Choose Residential or Affordable) | | | |
| *Exclusive of Commercial/Retail and Budget/Forecasting* | | | |
| ☑ Residential Voyager $1.99 + Rent Café $1.14 + CRM $1.14+ Document Management $0.28 = $4.55 | $4.55 | $13,650 | |
| ☐ Affordable Voyager $1.67 + Rent Café $1.67 + CRM $1.14 + Document Management $0.28 = $4.76 | | | |
| Yardi Procure to Pay (PayScan, Marketplace and Vendor Café) – Cost: $0.94/unit/month | $0.94 | $2,823 | |
| Yardi eLearning/Training: $0.37/unit/month (see SRG Academy) | $0.37 | $1,103 | |
| Technology Setup Fee: $1,000 Residential/Commercial | | | $1,000 |
| If applicable Commercial/Retail Yardi Cost: $.0009 per square foot/year | $0.0009 | $0 | |
| SRG Technology Package: $145/month Anti-Virus, Internet Filtering, Firewall, Helpdesk, Adobe PDF | $145 | $1,740 | |
| Business Intelligence Platform (with client login/access): $0.84/unit/month | $0.84 | $2,520 | |
| Real Estate Business Analytics (REBA) Budget and Forecast Platform: $0.37/unit/month | $0.37 | $1,110 | |
| Microsoft Office 365: $38/user/month | $38 | $2,275 | |
| Yardi Screening: | | | |
| CA includes Fraud ID, Screening, Income Verify, ICRAA Compliance@ $1.36/unit/month | $1.36 | $4,080 | |
| AZ/TX/WA includes Fraud ID, Screening, and Income Verify @ $1.44/unit/month | | | |
| CO/NV includes Fraud ID, Screening, Supplemental Criminal Search, Income Verify @ $1.94/unit/month | | | |
| Collection Company (Collect Tech) | | TBD | |
| *35% to Collect Tech and 65% to the property.* | | | |
| Infor Recruiting Assessment Tool: $395/opening | | TBD | |
| SRG Recruiting: Cost varies $193-$581 based on position being filled | | TBD | |
| Sight Plan and Answer Pro | Price per Unit $1.40 Min Price up to 400 units $158 Max price up to 400 units $298 >400 Units add $1.00 per unit price above | $298 | $3,576 |

**BANKING**

| | | PER UNIT/ YEAR | ANNUAL | SET UP |
|---|---|---|---|---|
| Voyager Cash Management/Payment Processing – Cost: per transaction-see below | | | | |
| Paid by resident: | | | | |
| Online payments: ACH/credit cards – Cost: Visa/MC/Discover = 2.3% | | | TBD | |
| Online payments: ACH/credit cards – Cost: Amex = 3.1% | | | TBD | |
| Debit card payment $4.10/transaction | | | TBD | |
| Paid by property: | | | | |
| $0.52 per check scan | | | TBD | |
| $0.00 per ACH - no charge on Yardi platform | | | TBD | |
| Payee Positive Pay Cost: $62/month, depending on volume | | $62 | $744 | |
| Monthly Bank Fee: Averages $150/month, depending on volume and services selected | | $150 | $1,800 | |
| Check Scanner Hardware Cost: $845  (N/A if property has check scanner compatible with Property Management Software) | | | | $845 |
| ☑ Track/File Unclaimed Property on entity's behalf ($300 entity setup fee) | | | | $300 |
| ☑ Use Bank of America for property trust accounts | | | | |
| **Operating Bank Account** | | | | |
| ☐ SRG to open bank account. Establish initial working capital balance of : | | | | |
| ☐ Owner to open bank account. (N/A for properties located in CA) | | | | |

**MARKETING**

| | PER UNIT/ YEAR | ANNUAL | SET UP |
|---|---|---|---|
| Corporate Marketing – Cost: $0.35/unit/month | $0.35 | $1,050 | |
| Social Media – Lineups Social Publisher/Planner – $80/property/month | $80 | $960 | |
| Reputation Management – Cost: $225/property/month | $225 | $2,700 | |
| Yelp Reputation Management Subscription – $55/property/month | $55 | $660 | |
| Opiniion (Survey/Reputation Tool) – $0.57/unit/month ($65 minimum, $199 setup fee) | $0.57 | $1,710 | $199 |
| Lineups – Digital Asset Management, SRGLiving.com listing – Cost: $98/month | $98 | $1,176 | |
| Yext Listings Management – $18/month | $18 | $216 | |
| ApartmentIQ Market Survey – Cost: $0.42/unit/month | $0.42 | $1,260 | |

**TRAINING PROGRAM-SRG ACADEMY**

| | PER UNIT/ YEAR | ANNUAL | SET UP |
|---|---|---|---|
| Online technical training (Yardi eLearning) – included above in Operations | | | |
| Live Training (SRG):  $0.72/unit/month | $0.72 | $2,150 | |
| Leadership Council – Cost (choose one): | | | |
| ☑ SoCal Region $725/Comm. Manager, Maint. Supervisor Attendee | | $1,450 | |
| ☐ Non-SoCal Regions $1,295/Comm. Manager, Maint. Supervisor Attendee | | | |

**UTILITY MANAGEMENT (choose one)**

| | PER UNIT/ YEAR | ANNUAL | SET UP |
|---|---|---|---|
| ☑ Yardi Energy Services (YES) Utility Billing; includes Utility Bill Payment, Resident Statements, Energy Star upload | | | |
| Occupied Units – Cost: $4.15/mo (paid by resident) | | $0 | |
| One-time charge for Utility Bill Name and/or Tax ID Change with Local Provider (if applicable) | | | $500 |
| ☐ Conservice Utility Billing; includes Utility Bill Payment and Resident Statements | | | |
| Occupied Units – Cost: $4.25/mo (paid by resident) | | $0 | |
| Conservice Synergy Utility Monitoring Service (Sites without RUBS) – Cost: $0.99/unit/mo | | | |
| One-time charge for Utility Bill Name and/or Tax ID Change with Local Provider (if applicable) | | | |
| **Subtotal Required Services:** | | **$48,752** | **$2,844** |

## SRG SUITE OF SERVICES:
### OPTIONAL

The below listing provides you additional tools that SRG Residential has found beneficial to added success at the properties we manage. The cost savings that have been previously negotiated on your behalf will automatically be passed to the property. Please check the services that you are interested in retaining.

### REVENUE MANAGEMENT PRICING TOOL

| | | | | |
|---|---|---|---|---|
| | *If current Yieldstar client, uncheck Optimizer and check Transfer box* | | | |
| ☐ | Yieldstar Optimizer: (Annual License Fee $6,288 + $198 API)+ one-time $2,400 training & $3,000 setup | | | |
| ☐ | If a Yieldstar transfer property: $1,000 implementation, $500 transfer fee instead of the $3,000 setup | | | |
| | One-time $2,400 training fee | | | |
| ☐ | Yieldstar Pricing Advisory Services Cost*: $1.58/unit/month (Required with Optimizer) | | | |
| | *Setup fee and annual license fee are covered by the Yieldstar Optimizer Cost in first box above* | | | |
| ☐ | Yieldstar AIRM (Annual license cost $3.09/unit/month) + one time $1,400 consulting, $1,000 setup, $1,000 training | | | |
| | Yieldstar AIRM Pricing Advisory Services Cost: $1.87/unit/month (Required with AIRM) | | | |
| ☐ | REBA Rent (Annual license cost $2.20/unit/month) + $300 implementation | | | |
| | REBA Pricing Advisory Services Cost: $1.90/unit/month (Required with REBA Rent) | | | |

### ADDITIONAL OPTIONAL SERVICES

| | | | | |
|---|---|---|---|---|
| | Property Tax Consultation (Ryan LLC fka Marvin Poer): | | | |
| ☐ | $350/year for Real Estate Tax Services | | $350 | |
| | If Ryan LLC is not used, insert name of client's vendor here: | | | |
| ☐ | $350/year for Personal Property Tax Services | | $350 | |
| | If Ryan LLC is not used, insert name of client's vendor here: | | | |
| ☐ | Snappt – Software that detects fraud in bank statements and payroll stubs. Cost $1.50/unit/month | $1.50 | $4,500 | |

**Subtotal Optional Services:** $5,200  $0

**Total Services** $53,952  $2,844

The program(s) may be cancelled by either Client or SRG with a thirty (30) day written notice to the non-cancelling party with or without cause, and without penalty or premium. In the event Client sells or transfers the community, such service shall be terminable immediately upon delivery of notice to such effect from Client.

## EXHIBIT C

### MANAGEMENT OF TENANTS', CONTRACTORS', SUBCONTRACTORS AND/OR VENDORS INSURANCE

1.  **Obtaining Tenant's Certificates of Insurance**

    If tenants' leases require that they maintain any insurance coverage, Manager shall use commercially reasonable efforts to obtain insurance certificates annually from each tenant and review the certificates for compliance with the lease provisions.  Manager shall notify Owner as soon as practicable of any tenants which fail to provide necessary certificates to Manager.

2.  **Contractors, Subcontractor and/or Vendor Insurance** – Manager shall require from contractors, subcontractors and/or vendors hired to perform work at the property, the following minimum amounts of insurance:

    A.  Workers' Compensation
        Coverage A.    Statutory Benefits

        Coverage B.    Employers' Liability limits of not less than:

        | | |
        |---|---|
        | Bodily Injury by accident | $1,000,000 each accident |
        | Bodily Injury by disease limit | $1,000,000 policy |
        | Bodily Injury by disease | $1,000,000 each employee |

        Where applicable by law, coverage must include a waiver of subrogation endorsement in favor of and naming the Property Manager, Owner and its parent and its/their subsidiaries, partners, partnerships, affiliated companies, successors and assigns.

    B.  Commercial General Liability
        Commercial General Liability coverage (equivalent in coverage to ISO form CG 00 01) of not less than:

        | | |
        |---|---|
        | Each Occurrence Limit | $1,000,000 |
        | Personal Advertising Injury Limit | $1,000,000 |
        | Products/Completed Operations Aggregate Limit | $2,000,000 |
        | General Aggregate Limit | $2,000,000 |
        | Hired/Non Owned Automobile (if no owned vehicles) | $1,000,000 |

EXHIBIT C
-6-

4817-1245-9491.9
297335.01101/8-8-25/bjw/bjw

**EXHIBIT 1 - Page 42**

The policy must include:

a.) Premises and Operations coverage.

b.) Standard ISO CG0001 Contractual Liability coverage, or its equivalent, and a Separation of Insureds clause.

c.) An Additional Insured Endorsement providing completed operations coverage (equivalent to ISO form CG 20 10 10 01 and CG 20 37 0704) and naming as additional insured the Property Manager, Owner and its parent and its and their subsidiaries, partners, partnerships, affiliated companies, successors and assigns."

d.) Coverage must be on an "occurrence" form.  "Claims Made" and "Modified Occurrence" forms are not acceptable.

C.  Auto Liability

Automobile Liability coverage (equivalent in coverage to ISO form CA 00 01) of not less than $1,000,000 combined single limit, each accident, covering all owned, hired and non-owned autos.

All such policies shall be issued by insurers with a Best's rating of A-VII or higher as reported in the most recent Property & Casualty Reports Key Rating Guide edition.

If work involves hazardous materials or environmental abatement work, contractor, subcontractor and/or vendor will be required to provide evidence of Contractor's Pollution Liability, with Owner and Manager as Additional Insureds.  If the contractor's, subcontractor's and/or vendors work involves professional design or engineering, special evidence of design professional liability (also known as Errors & Omissions) coverage will also be required, with limits as determined by Owner.

Owner or Manager may require additional coverage and may waive certain limits or requirements on a case-by-case basis.  Manager shall require each contractor, subcontractor and/or vendor to submit certificates of insurance and endorsements in form and substance satisfactory to Owner or Manager as evidence of the coverages required.

# EXHIBIT 2

# Budget

EXHIBIT 2 - Page 44

**FU BANG GROUP CORP, USA**
**INTERIM CASH FLOW**
updated:                                     **8/28/2025**

| | Aug-25 | Sep-25 | Oct-25 | Nov-25 | Dec-25 |
|---|---|---|---|---|---|
| | Mo.1 | Mo.2 | Mo.3 | Mo.4 | Mo.4 |
| **PROPERTY SALES** | | | | | |
| PROPERTY SALES RECEIPTS, NET | $0 | $0 | $0 | $0 | $0 |
| **MULTIFAMILY OPERATIONS** | | | | | |
| EFFECTIVE GROSS INCOME | 82,575 | 103,707 | 110,479 | 120,715 | 120,515 |
| Payroll | 11,103 | 16,478 | 16,858 | 16,858 | 16,522 |
| Marketing | 650 | 12,390 | 4,496 | 4,584 | 5,890 |
| Turnover Costs | | 0 | 0 | 0 | 0 |
| Repairs & Maintenance | 6,926 | 6,926 | 6,926 | 6,926 | 6,926 |
| Startup Costs for Property Manager | 32,977 | 11,507 | 0 | 0 | 0 |
| Capital Repairs & Replacements | | 5,720 | 12,675 | 11,040 | 0 |
| Utilities | 3,819 | 3,819 | 3,819 | 3,819 | 3,819 |
| General & Administrative | | 2,633 | 2,633 | 2,633 | 2,633 |
| Management Fee | 8,730 | 9,000 | 9,000 | 9,000 | 9,000 |
| TOTAL OPERATING EXPENSES | $64,205 | $68,473 | $56,407 | $54,860 | $44,790 |
| NET OPERATING INCOME (Cash from Operations) | $18,370 | $35,234 | $54,072 | $65,855 | $75,725 |
| **PROPERTY HOLDING COSTS** | | | | | |
| PROPERTY TAXES | | | | | |
| INSURANCE | 1,254 | 2,019 | 2,019 | 2,019 | 2,019 |
| TOTAL HOLDING COSTS | $1,254 | $2,019 | $2,019 | $2,019 | $2,019 |
| **MULTIFAMILY RENOVATION & ENTITLEMENT** | | | | | |
| TOTAL RENOVATION  & ENTITLEMENT COSTS | $0 | $0 | $0 | $0 | $0 |
| **PROFESSIONAL FEES** | | | | | |
| WEINTRAUB ZOLKIN TALERICO & SELTH LLP | | | | | |
| CRO | | | | | |
| Additional F10 Personnel | | | | | |
| Property Consultant | | 7,000 | 3,500 | 3,500 | 3,500 |
| Placeholder | | | | | |
| TOTAL PROFESSIONAL FEES | $0 | $7,000 | $3,500 | $3,500 | $3,500 |
| US TRUSTEE FEES | $0 | $0 | $1,098 | $0 | $0 |
| **DIP LOAN** | | | | | |
| TOTAL DIP LOAN COSTS | $0 | $0 | $0 | $0 | $0 |
| **CREDITOR PAYMENTS** | | | | | |
| FIRST CREDIT BANK | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| SPARKNEST | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| RIVERSIDE COUNTY TAX COLLECTOR | | | | | |
| Placeholder | | | | | |
| TOTAL CREDITOR PAYMENTS | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 |
| **EXPENSE SUMMARY** | | | | | |
| CASH DISBURSEMENTS | 85,459 | 97,492 | 83,024 | 80,379 | 70,309 |
| ACCRUED LOAN FEES | 0 | 0 | 0 | 0 | 0 |
| ACCRUED LOAN INTEREST | 0 | 0 | 0 | 0 | 0 |
| TOTAL EXPENSES | $85,459 | $97,492 | $83,024 | $80,379 | $70,309 |
| CUMULATIVE | $85,459 | $182,950 | $265,974 | $263,329 | $336,283 |
| **CASH SUMMARY** | | | | | |
| BEGINNING CASH | 197,952 | 195,068 | 201,284 | 228,739 | 269,076 |
| LOAN DRAWS | | | | | |
| NET CASH FLOW | (2,884) | 6,215 | 27,456 | 40,336 | 50,206 |
| ENDING CASH | 195,068 | 201,284 | 228,739 | 269,076 | 319,282 |
| NET SALE PROCEEDS | 0 | 0 | 0 | 0 | 0 |
| LOAN REPAYMENT | | | | | |
| TOTAL ENDING CASH | $195,068 | $201,284 | $228,739 | $269,076 | $319,282 |

**EXHIBIT 2 - Page 45**

# EXHIBIT 3

# Proposed Order

EXHIBIT 3 - Page 46

Derrick Talerico (State Bar No. 223763)
dtalerico@wztslaw.com
Paige T. Rolfe (State Bar No. 331096)
prolfe@wztslaw.com
WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 Wilshire Boulevard, Suite 730
Los Angeles, CA 90025
Telephone:  (424) 500-8552

Attorneys for Fu Bang Group Corp, USA, and
Dos Lagos Center 2, LLC,
Debtors and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – RIVERSIDE DIVISION

| | |
|---|---|
| In re:<br><br>FU BANG GROUP CORP (USA),<br><br>     Debtor. | Lead Case No. 6:25-bk-13004-SY<br><br>Chapter 11 |
| In re:<br><br>DOS LAGOS CENTER 2, LLC,<br><br>     Debtor. | Jointly Administered with:<br>Case No. 6:25-bk-13642-SY |
| ☐ Affects All Debtors.<br>☒ Affects Fu Bang Group Corp (USA)<br>  Case No. 6:25-bk-13004-SY.<br>☐ Affects Dos Lagos Center 2, LLC<br>  Case No. 6:25-bk-13642-SY.<br><br>     Debtors. | **ORDER GRANTING MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTOR TO RETAIN SARES REGIS MANAGEMENT COMPANY, L.P. AS PROPERTY MANAGER; AND (II) APPROVING THE MANAGEMENT AGREEMENT**<br><br>[No Hearing Required] |

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

-1-
ORDER GRANTING RETENTION OF SARES REGIS MANAGEMENT COMPANY L.P.

EXHIBIT 3 - Page 47

On September ___, 2025, Fu Bang Group Corp, USA, the above-captioned chapter 11 debtor and debtor in possession filed and served its *Motion for Entry of an Order (I) Authorizing the Debtor to Retain Sares Regis Management Company L.P.; (II) Approving the Management Agreement; and (III) Granting Related Relief* (the "Motion") [Dkt. ____] and *Notice of Opportunity to Request a Hearing on Motion* ("Notice") [Dkt. ____]. No opposition or request for hearing on the Notice or the Motion was filed with the Court or served upon the Debtor.

Having reviewed the Notice and the Motion and the papers filed in support thereof, service being proper, and good cause appearing therefrom,

**IT IS HEREBY ORDERED** that the Motion is approved and the Debtor is authorized to employ Sares Regis Management Company, L.P. as its property manager, with compensation pursuant to the terms set forth in the Motion and the Management Agreement attached as Exhibit 1 to the Motion, effective as of August 8, 2025.

### 

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

-2-
ORDER GRANTING RETENTION OF SARES REGIS MANAGEMENT COMPANY L.P.

EXHIBIT 3 - Page 48

# EXHIBIT 4

# SRG Staff

**EXHIBIT 4 - Page 49**



## PROPOSED STAFFING PLAN

**SANDY PEDERSEN**
Vice President, Operations

**DOUG GARDNER**
Sr. Director, Capital Projects

**BRITT WOOLIVER**
Sr. Regional Manager

**TONY COLLINS**
Regional Maintenance Manager

### DOS LAGOS

**PATRICK**
Community Manager

**MAINTENANCE TECHNICIAN**

EXHIBIT 4 - Page 50

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
 11766 Wilshire Blvd., Suite 730, Los Angeles, CA 90025


A true and correct copy of the foregoing document entitled: **NOTICE OF OPPORTUNITY TO REQUEST A HEARING ON MOTION [LBR 9013-1(o)]** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:


**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
 09/09/2025    , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

  See attached NEF service list


☒  Service information continued on attached page


**2.  SERVED BY UNITED STATES MAIL**:
On (*date*)  09/09/2025   , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

  See attached US Mail service list


☒  Service information continued on attached page


**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.


☐  Service information continued on attached page


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


| 09/09/2025 | Martha E. Araki | /s/ Martha E. Araki |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is optional.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

In re Fu Bang Group Corp, USA and Dos Lagos Center 2, LLC (Jointly Administered)   Lead Case No. 6:25-bk-13004-SY

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- Attorneys for Debtors Fu Bang Group Corp (USA) and Dos Lagos Center 2, LLC:  **Derrick Talerico**: dtalerico@wztslaw.com; maraki@wztslaw.com; sfritz@wztslaw.com; admin@wztslaw.com
- Attorneys for Creditor Sparknest, LLC, a Delaware limited liability company:  **David B Golubchik**:  dbg@lnbyg.com
- Attorneys for Creditor First Credit Bank and Attorney Dennette A Mulvaney:  **Dennette A Mulvaney**: dmulvaney@leechtishman.com; lmoya@leechtishman.com; narango@leechtishman.com; dbender@leechtishman.com
- Attorneys for Creditor Na Jiang:  **Jeffrey S Shinbrot**:  jeffrey@shinbrotfirm.com; sandra@shinbrotfirm.com; tanya@shinbrotfirm.com
- On behalf of the U.S. Trustee (RS):  **Abram Feuerstein, Everett L Green, Ali Matin**:  abram.s.feuerstein@usdoj.gov; everett.l.green@usdoj.gov; ali.matin@usdoj.gov
- US Trustee's Office (RS):  ustpregion16.rs.ecf@usdoj.gov

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* **F 9013-3.1.PROOF.SERVICE**

Debtor
Fu Bang Group Corp, USA
Attn Bo Don CEO
4261 Odyssey Dr Unit 117
Corona, CA 92883

Debtor
Dos Lagos Center 2, LLC
Attn Bo Don
4261 Odyssey Dr Unit 116
Corona, CA 92883

US Trustee
Office of the United States Trustee
Attn Everett L Green Attorney
3801 University Pl Ste 720
Riverside, CA 92501

Sparknest LLC
Assignee of Mingzhe Li
8 The Green Ste A
Dover, DE 19901

First Credit Bank
Attn Kam Ghassemieh
9255 Sunset Blvd
West Hollywood, CA 90069

Mingxia Lu, et al
Attn Chris C Han / Han LLP
515 S Flower St 18th FL
Los Angeles, CA 90071-2914

Riverside County Treasurer-Tax Collector
PO Box 12005
Riverside, CA 92502-2205

Xiaoyan Tang
Attn Richard Song
6230 Wilshire Blvd No 157
Los Angeles, CA 90048

Mingzhe Li
62 Crater
Irvine, CA 92618

CA Dept of Tax and Fee Admin
Account Info Group MIC29
PO Box 942879
Sacramento, CA 94279-0029

Employment Development Dept
Bankruptcy Group MIC 92E
PO Box 826880
Sacramento, CA 94280-0001

Franchise Tax Board
Bankruptcy Section MS A-340
PO Box 2952
Sacramento, CA 95812-2952

Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101-7346

First Credit Bank
c/o Leech Tishman Nelson Hardiman
Attn Ivan M Posey
1100 Glendon Ave FL 14
Los Angeles, CA 90024-3518

First American Title Insurance Co
Trustee for Sparknest LLC
9255 Town Center Dr Ste 200
San Diego, CA 92121

American Fence Company Inc
Attn Nichole Ball
1860 Goetz Rd
Perris, CA 92570-6272

Bank of America
PO Box 672050
Dallas, TX 75267-2050

California Receivership Group BC
Attn Mark S Adams
3435 Ocean Park Blvd Ste 107
Santa Monica, CA 90405-3320

Central Trading
Attn Zhang Lang
125 Vineland Ave
La Puente, CA 91746-2318

Chen Yu
2786 Evan Ln Unit 101
Corona, CA 92883-5605

Dos Lagos Center 1 LP
Attn Bo Don
4260 Odyssey Dr Unit 116
Corona, CA 92883

Dos Lagos Center 2 LP
Attn Bo Don
4260 Odyssey Dr Unit 116
Corona, CA 92883

Dos Lagos Center 3 LP
Attn Bo Don
4260 Odyssey Dr Unit 116
Corona, CA 92883

Dos Lagos Center 4 LP
Attn Bo Don
4260 Odyssey Dr Unit 116
Corona, CA 92883

Dos Lagos Center 5 LP
Attn Bo Don
4260 Odyssey Dr Unit 116
Corona, CA 92883

Dos Lagos Realty & Co (WFCMD)
Attn Yu Chen
2786 Evan Ln Unit 101
Corona, CA 92883-5605

First Federal Development & Co
Attn WeiCai Li
4280 Odyssey Dr Unit 103
Corona, CA 92883-5604

Grand United Builder Inc
Attn Danny Liwu He CEO
132 E Las Tunas Dr
San Gabriel, CA 91776-1402

Hua YiXu / Ge Shixuan
4260 Odyssey Dr Unit 116
Corona, CA 92883

JPMorgan Chase Bank NA
s/b/m/t Chase Bank USA NA
Robertson Anschutz Schneid & Crane LLP
6409 Congress Ave Suite 100
Boca Raton, FL 33487-2853

Micah Property LLC
Attn Lucy Seh
136 N Grand Ave Unit 235
West Covina, CA 91791-1728

Na Jiang
c/o Daisy Zhao Esq
DT Law Group
7700 Irvine Center Ste 800
Irvine, CA 92618

Richard H Huang
102 Summitridge Dr
Diamond Bar, CA 91765

Riverside County Treasurer-Tax Collector
4808 Lemon St 4th FL
Riverside, CA 92501

Twen Ma Architects
17200 Red Hill Ave
Irvine, CA 92614-5628

Yunyi Liang
4 Venture
Irvine CA 92618-3338

Mingxia Lu et al (11 Judgment Creditors)
Zheng Gao Esq
Reid & Wise LLC
One Penn Plaza Suite 2015
New York, NY 10119-2002

Peter Y Hong
150 North Santa Anita Ave
Suite 300
Arcadia, CA 91006-3116

Riverside County Sheriffs Office
4095 Lemon St 4th FL
Riverside, CA 92501-3688

SZ Properties LLC
Attn Anthony Zhang
125 Vineland Ave
La Puente, CA 91746-2318

US Discount Center Corp
Attn Anthony Zhang
125 Vineland Ave
La Puente, CA 91746-2318

Zhang Lang
125 Vineland Ave
La Puente, CA 91746-2318

Na Jiang
Attn Robert Harlan
Harlan Legal PC
2102 Business Center Dr #13 0PMB 1
Irvine, CA 92612-1001

RDD Freight International (LA) Inc
Attn Zhang Lang
125 Vineland Ave
La Puente, CA 91746-2318

Riverside County Treasurer-Tax Collector
PO Box 12005
Riverside, CA 92502-2205

Sierra Home Material Trade Inc
Attn Anthony Zhang
125 Vineland Ave
La Puente, CA 91746-2318

Xiaoyan Tang
Attn Richard Song
6230 Wilshire Blvd No 157
Los Angeles, CA 90048-5126

Force Ten Partners LLC
5271 California Ave Ste 270
Irvine, CA 92617-3222