Derrick Talerico (State Bar No. 223763)
dtalerico@wztslaw.com
Paige T. Rolfe (State Bar No. 331096)
prolfe@wztslaw.com
WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 Wilshire Boulevard, Suite 730
Los Angeles, CA 90025
Telephone: (424) 500-8552

Attorneys for Fu Bang Group Corp, USA and
Dos Lagos Center 2, LLC
Debtors and Debtors in Possession

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA – RIVERSIDE DIVISION**

In re:

FU BANG GROUP CORP (USA),

Debtor.

In re:

DOS LAGOS CENTER 2, LLC,

Debtor.

☒ Affects All Debtors.
☐ Affects Fu Bang Group Corp (USA) Case No. 6:25-bk-13004-SY.
☐ Affects Dos Lagos Center 2, LLC Case No. 6:25-bk-13642-SY.

Lead Case No. 6:25-bk-13004-SY

Chapter 11

Jointly Administered with:
Case No. 6:25-bk-13642-SY

**NOTICE OF MOTION AND MOTION FOR ORDER (1) AUTHORIZING PRIVATE SALE OF REAL PROPERTY TO REAL ESTATE INCOME FUND I LLC, NOT SUBJECT TO OVERBID, FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS; (2) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF LEASES AND CONTRACTS; (3) AUTHORIZING ENTRY INTO PLAN SUPPORT AND SUBORDINATION AGREEMENT AND ACCEPTANCE OF BACKSTOP COMMITMENT; (4) FINDING GOOD FAITH UNDER 11 U.S.C. § 363(m); AND (5) WAIVING 14-DAY STAYS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF NICHOLAS RUBIN IN SUPPORT THEREOF**

<u>Hearing</u>:
Date: November 5, 2026
Time: 1:30 p.m.
Crtrm: 302
3420 Twelfth Street
Riverside, CA 92501

TO THE HONORABLE SCOTT H. YUN, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, ALL CREDITORS, AND OTHER PARTIES IN INTEREST:

**PLEASE TAKE NOTICE** that on November 5, 2026, at 1:30 p.m., in Courtroom 302 of the United States Bankruptcy Court, 3420 Twelfth Street, Riverside, California 92501, Fu Bang Group Corp, USA ("**Fu Bang**") and Dos Lagos Center 2, LLC ("**DLC2**," and together with Fu Bang, the "**Debtors**"), the debtors and debtors in possession in the above-captioned jointly administered chapter 11 cases (the "**Cases**"), will and hereby do move (the "**Motion**") under 11 U.S.C. §§ 105(a), 363(b), (f), and (m), 365, and 510(a),[1] Rules 2002, 6004, 6006, and 9014, and Local Bankruptcy Rules ("**LBR**") 6004-1 and 9013-1, for entry of an order (the "**Sale Order**"):

(1) authorizing the Debtors to sell the real property described below to Real Estate Income Fund I LLC ("**REIF**" or "**Purchaser**") under the Purchase and Sale Agreement dated September 17, 2026 (the "**PSA**"), a true and correct copy of which is attached as **Exhibit 1 to the Declaration of Bernardo D. Cardoso II (the "Cardoso Declaration")**, for $20,750,000 in cash, by private sale and not subject to overbid;

(2) authorizing the sale free and clear of all liens, claims, encumbrances, and other interests under § 363(f), with those liens, claims, and interests attaching to the sale proceeds with the same validity, extent, and priority they held against the Property;

(3) authorizing the Debtors to pay from escrow at closing the undisputed secured claims identified below and to hold all remaining net proceeds in segregated accounts pending further order;

(4) authorizing the assumption and assignment to REIF of the leases and contracts listed on Schedules 1 and 2 to the PSA under § 365;

(5) finding that REIF is a good-faith purchaser entitled to the protections of § 363(m) and that the PSA was not the product of conduct prohibited by § 363(n);

(6) authorizing the Debtors to enter into and perform the Plan Support and Subordination Agreement attached as **Exhibit 4 to the Declaration of Brad J. Domitrovitsch (the "Domitrovitsch Declaration")** (the "**Support Agreement**") and to accept the backstop commitment of REIF attached as **Exhibit 3 to the Cardoso Declaration** (the "**Backstop Commitment**"), and providing that the Backstop Commitment is a binding obligation of REIF that survives closing, without approving any chapter 11 plan, classification, or solicitation; and

(7) waiving the 14-day stays under Rules 6004(h) and 6006(d).

[1] Unless otherwise stated, all section references are to the Bankruptcy Code, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure.

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

**PLEASE TAKE FURTHER NOTICE** that, as required by LBR 6004-1(c)(3), the material terms of the proposed sale are as follows:

(A) Hearing. November 5, 2026, at 1:30 p.m., Courtroom 302, 3420 Twelfth Street, Riverside, California 92501.

(B) Proposed Buyer. Real Estate Income Fund I LLC, a Delaware limited liability company, 8 The Green, Suite A, Dover, Delaware 19901, Attn: Bernardo D. Cardoso II, Managing Member.

(C) Property. The real property in Corona, California consisting of (i) Fu Bang's parcel, APN 279-460-064 (the "**Fu Bang Parcel**"), and (ii) DLC2's adjacent undeveloped parcel, APN 279-460-063 (the "**DLC2 Parcel**"), together with improvements, fixtures, appurtenances, the Debtors' personal property used exclusively at the real property, the Assumed Leases and Assumed Contracts, and transferable intangible property relating exclusively to the real property (collectively, the "**Property**"). *Cardoso Decl. Ex. 1* § 1.

(D) Price and Contingencies. $20,750,000, payable in cash at closing (the "**Purchase Price**"). REIF has already deposited $300,000 with the escrow agent (the "**Deposit**"), which becomes non-refundable upon entry of the Sale Order, except for Seller default. The **only** condition to REIF's obligation to close is entry of the Sale Order; the PSA contains no financing, inspection, title, environmental, appraisal, or diligence contingency. Under the PSA, as amended, closing occurs on a date designated by REIF that is no later than the later of December 31, 2026 and 15 business days after the Sale Order becomes final, and REIF may waive finality and close earlier. The sale is "as is, where is," without representations or warranties other than the Debtors' limited organizational and authority representations. Either party may terminate if the Sale Order is not entered by November 16, 2026. *Cardoso Decl. Ex. 1* §§ 2–4, 6(a), 7, 8(a).

(E) Free and Clear. The sale is free and clear of all liens, claims, encumbrances, and interests under § 363(f), subject only to the Permitted Exceptions defined in the PSA (including current, not-yet-due taxes and tenants' rights under the Assumed Leases). The liens and claims asserted against the Property, and their proposed treatment, are described in the table in Part II.C of the accompanying Memorandum of Points and Authorities, which is incorporated here. Each lien will attach to the sale proceeds with the same validity, extent, and priority as against the Property.

(F) Overbids. The sale is **not** subject to overbid. REIF's offer was made on the condition that it not be exposed to competitive bidding, and the Debtors have determined in their business judgment that accepting it is in the best interest of the estates for the reasons stated in the Memorandum.

(G) Consideration and Costs of Sale. The estates will receive the full $20,750,000 Purchase Price, adjusted only for customary prorations. REIF pays all closing costs, including title premiums, escrow fees, documentary transfer taxes, recording fees, and survey costs. No broker commission is payable by the estates, and REIF is responsible for its own broker's fees separately from the Purchase Price. No cure costs are payable under the Assumed Leases or Assumed Contracts. *Cardoso Decl. Ex. 1* §§ 3(a)(ii), 6(d)–(e), 11(e).

(H) Commission. The Debtors do not seek authority to pay any commission.

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

(I) Tax Consequences. Based on the Debtors' current estimate of their tax basis in the Property, the Debtors estimate that the sale will generate no material tax liability for Fu Bang or for DLC2. Any tax liability incurred by an estate as a result of the sale will be paid from that estate's share of the net proceeds as an administrative expense under § 503(b)(1)(B).

(J) Objection Deadline. Any response or opposition must be filed and served by **October 22, 2026** (14 days before the hearing), as described below.

(K) Buyer's Affiliates and Related Agreements. REIF's affiliate, Real Estate Income Fund III LLC, owns Dos Lagos Regional Center, LLC, the general partner of five EB-5 limited partnerships that hold $33,653,750 in scheduled claims against Fu Bang. Through their general partner, those partnerships have entered into the Support Agreement, under which their claims will be separately classified in any conforming plan and divided according to each investor's own election. An investor may share pro rata with general unsecured creditors and withdraw from the EB-5 program, with or without REIF's backstop, or may remain in the program and receive no distribution from the estates. An investor that makes no election shares pro rata, without the backstop, and its distributions are held for it until it withdraws from the program. Only an investor that personally elects the backstop or program retention, and signs a separate release, releases any claim against the REIF entities, Dos Lagos Regional Center, LLC, the partnerships, or their post-acquisition principals. No release extends to Ms. Don or any other prior principal of Dos Lagos Regional Center, LLC, or to any insider of the Debtors. Through the Backstop Commitment, REIF will backstop the recovery of allowed general unsecured claims, other than claims arising from EB-5 investments, and of the claims of EB-5 investors that elect the backstop, in both estates, up to $1,250,000. Ms. Don, Fu Bang's Chief Executive Officer, was a selling member of Dos Lagos Regional Center, LLC, and receives no consideration or benefit from any REIF entity other than her share of a $1.00 purchase price. These relationships and agreements are described in Parts II.G and II.H of the Memorandum. *Cardoso Decl. Ex. 3; Domitrovitsch Decl. Exs. 4–5.*

**PLEASE TAKE FURTHER NOTICE** that the Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Declaration of Nicholas Rubin filed with the Motion, the Cardoso Declaration and the Domitrovitsch Declaration and the exhibits to them, which will be filed separately in support of the Motion, the record in the Cases, and any evidence or argument presented at or before the hearing.

**PLEASE TAKE FURTHER NOTICE** that, under LBR 9013-1(f), any response or opposition must be a complete written statement of all reasons in opposition, with declarations and copies of all evidence on which the responding party intends to rely and any responding memorandum of points and authorities. It must be filed with the Court and served on (a) Debtors' counsel, Weintraub Zolkin Talerico & Selth LLP, Attn: Derrick Talerico (dtalerico@wztslaw.com), and (b) the Office of the United States Trustee no later than October 22, 2026. A judge's copy must be delivered to chambers in accordance with LBR 5005-2(d). Any reply is due no later than

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

October 29, 2026. Any objection to the Court's authority to enter a final order must be raised in the response. LBR 9013-1(f)(3).

**PLEASE TAKE FURTHER NOTICE** that any party may obtain copies of the Motion and exhibits by email request to Weintraub Zolkin Talerico & Selth LLP, Attn: Derrick Talerico (dtalerico@wztslaw.com) and Martha Araki (maraki@wztslaw.com).

**PLEASE TAKE FURTHER NOTICE** that, under LBR 9013-1(h), the failure to timely file and serve a response may be deemed consent to the relief requested.

Dated: October 15, 2026 **WEINTRAUB ZOLKIN TALERICO & SELTH LLP**

By *_/s/ Derrick Talerico_*

Derrick Talerico

Attorneys for Fu Bang Group Corp, USA and Dos Lagos Center 2, LLC
Debtors and Debtors in Possession

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

## TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 9

II. STATEMENT OF FACTS .......... 10

- A. Jurisdiction and Venue .......... 10
- B. The Cases and the Property .......... 10
- C. Liens and Claims Asserted Against the Property .......... 11
- D. The Property Has Been Thoroughly Exposed to the Market .......... 12
- E. The Offers .......... 12
- F. The PSA .......... 14
- G. REIF's Affiliates, DLRC, and the Partnerships .......... 14
- H. The Support Agreement and the Backstop Commitment .......... 16
- I. The Debtors' Business Judgment .......... 19

III. ARGUMENT .......... 20

- A. The Court May Approve a Private Sale Without Bidding Procedures or an Auction .......... 20
- B. The Sale Is a Sound Exercise of the Debtors' Business Judgment .......... 20
  1. The sale has a sound business purpose .......... 21
  2. The price is fair and reasonable because the Property has been tested by the market .......... 21
  3. REIF's offer is the highest and best offer, notwithstanding Blue Spring's higher emailed figure .......... 22
  4. The sale is proposed in good faith, at arm's length, and on adequate notice .......... 23
- C. LBR 6004-1(c)(2)(B) Is Satisfied or Should Be Waived .......... 24
- D. The Sale Should Be Free and Clear of Liens, Claims, and Interests Under § 363(f) .......... 24
- E. Assumption and Assignment of the Assumed Leases and Assumed Contracts Should Be Approved .......... 26
- F. REIF Is a Good-Faith Purchaser Entitled to the Protections of § 363(m) .......... 27
- G. The Court Should Authorize the Debtors to Enter Into the Support Agreement and Accept the Backstop Commitment .......... 28
- H. The Court Should Waive the Stays Under Rules 6004(h) and 6006(d) .......... 29

IV. CONCLUSION .......... 29

DECLARATION OF NICHOLAS RUBIN .......... 31

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 160 Royal Palm, LLC*, 600 B.R. 119 (S.D. Fla. 2019)....20

*240 N. Brand Partners, Ltd. v. Colony GFP Partners, L.P. (In re 240 N. Brand Partners, Ltd.)*, 200 B.R. 653 (B.A.P. 9th Cir. 1996)....20, 21, 23

*In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986)....27

*Agarwal v. Pomona Valley Med. Grp., Inc. (In re Pomona Valley Med. Grp., Inc.)*, 476 F.3d 665 (9th Cir. 2007)....26

*In re Bakalis*, 220 B.R. 525 (Bankr. E.D.N.Y. 1998)....20, 22, 23

*Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25 (B.A.P. 9th Cir. 2008)....24

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983)....21

*Ewell v. Diebert (In re Ewell)*, 958 F.2d 276 (9th Cir. 1992)....22, 27

*In re Filtercorp, Inc.*, 163 F.3d 570 (9th Cir. 1998)....27

*In re Gulf States Steel, Inc. of Ala.*, 285 B.R. 497 (Bankr. N.D. Ala. 2002)....24, 25

*Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024)....29

*In re Indianapolis Downs, LLC*, 486 B.R. 286 (Bankr. D. Del. 2013)....29

*In re Jolan, Inc.*, 403 B.R. 866 (Bankr. W.D. Wash. 2009)....25

*In re Mama's Original Foods, Inc.*, 234 B.R. 500 (Bankr. C.D. Cal. 1999)....21

*Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935 (5th Cir. 1983)....28

*In re Robotic Vision Sys., Inc.*, 322 B.R. 502 (Bankr. D.N.H. 2005)....25

*Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282 (B.A.P. 9th Cir. 2005)....20, 23

*Thomas v. Namba (In re Thomas)*, 287 B.R. 782 (B.A.P. 9th Cir. 2002)....27

*Union Planters Bank, N.A. v. Burns (In re Gaylord Grain L.L.C.)*, 306 B.R. 624 (B.A.P. 8th Cir. 2004)....25

*Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14 (B.A.P. 9th Cir. 1988)....21, 28

*In re Wilde Horse Enters., Inc.*, 136 B.R. 830 (Bankr. C.D. Cal. 1991)....21, 23, 24

**Statutes**

11 U.S.C. § 363(b)....20, 28

11 U.S.C. § 363(e)....24

11 U.S.C. § 363(f)....10, 24, 25, 26

11 U.S.C. § 363(m)....10, 27

11 U.S.C. § 363(n)....27

11 U.S.C. § 365....26

11 U.S.C. § 510(a)....28

11 U.S.C. § 510(b)....16, 26

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

11 U.S.C. § 1107 .......... 10, 20
11 U.S.C. § 1108 .......... 10
11 U.S.C. § 1122 .......... 29
11 U.S.C. § 1123 .......... 29
11 U.S.C. § 1125 .......... 29
11 U.S.C. § 1126 .......... 29
11 U.S.C. § 1129 .......... 29
28 U.S.C. § 157 .......... 10
28 U.S.C. § 1334 .......... 10
28 U.S.C. § 1408 .......... 10
28 U.S.C. § 1409 .......... 10
Cal. Civ. Code § 2924k .......... 26

**Rules**

Fed. R. Bankr. P. 2002 .......... 23
Fed. R. Bankr. P. 6004(f) .......... 20
Fed. R. Bankr. P. 6004(h) .......... 10, 29
Fed. R. Bankr. P. 6006(d) .......... 10, 29
LBR 1001-1(d) .......... 24
LBR 6004-1 .......... 23, 24

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The Debtors ask the Court to approve a private sale of their only significant assets, the adjacent Corona parcels, to REIF for $20,750,000 in cash. REIF's offer has one condition: entry of the Sale Order. It carries no financing, diligence, or inspection contingency, REIF's $300,000 Deposit is already in escrow, and REIF pays every closing cost. REIF made the offer on the condition that it not be exposed to an auction.

The Debtors are not asking the Court to approve a sale that has not been market-tested. The Property was exposed to the market for years before these Cases, and during the Cases the Debtors' financial advisor, Force Ten Partners ("**Force 10**"), ran a marketing process beginning in the first quarter of 2026 to identify buyers and stalking-horse bidders. That process produced three serious buyers: REIF, Blue Spring, and Citivest Commercial Investments, LLC ("**Citivest**"). The Debtors' Chief Restructuring Officer, Nicholas Rubin ("**CRO**"), in consultation with the Debtors' CEO, concluded that REIF's signed, fully committed agreement is the highest and best transaction available, including when compared with Blue Spring's most recent emailed proposal of $22,000,000.

The Debtors have also ensured that the $1,250,000 difference between REIF's price and Blue Spring's emailed figure does not fall on the holders of allowed general unsecured claims. REIF's affiliate, Real Estate Income Fund III LLC ("**REIF III**"), owns Dos Lagos Regional Center, LLC ("**DLRC**"), the general partner of five EB-5 limited partnerships that hold $33,653,750 of scheduled claims against Fu Bang. Acting through DLRC, those partnerships have agreed that, if the sale to REIF closes, their claims will be separately classified, and each of their investors may choose to share pro rata with general unsecured creditors and withdraw from the EB-5 program, with or without REIF's backstop, or to remain in the program and forgo any recovery from the estates. An investor that makes no choice shares pro rata, and its distributions are held for it until it withdraws from the program. Only an investor that personally elects the backstop or program retention gives a release, and that release does not extend to Ms. Don or any other prior principal of DLRC.

When REIF learned of Blue Spring's $22,000,000 figure, it agreed to backstop the recovery of allowed general unsecured claims, other than claims arising from EB-5 investments, in both estates, up to $1,250,000, and it has extended that backstop to the claims of EB-5 investors that elect pro rata treatment with the backstop. The result is that those creditors will do no worse under the REIF sale than under Blue Spring's figure, even assuming Blue Spring would have closed. The Debtors disclose these relationships and agreements in full below.

The Debtors therefore request an order authorizing the sale free and clear of liens under § 363(f), approving assumption and assignment of the leases and contracts REIF designates, authorizing the Debtors to enter into the Support Agreement and accept the Backstop Commitment, finding REIF a good-faith purchaser under § 363(m), and waiving the stays under Rules 6004(h) and 6006(d).

## II. STATEMENT OF FACTS

### A. Jurisdiction and Venue

The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (M), (N), and (O). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

### B. The Cases and the Property

Fu Bang filed its chapter 11 petition on May 7, 2025, and DLC2 filed its petition on May 30, 2025. The Cases are jointly administered under Lead Case No. 6:25-bk-13004-SY. Nicholas Rubin and Force 10 were retained as CRO effective as of the petition dates by order entered August 5, 2025. [Dkt. 86]. The Debtors continue to manage their property as debtors in possession under §§ 1107 and 1108. *Rubin Decl.* ¶¶ 2–3.

Fu Bang owns the Fu Bang Parcel, a mixed-use residential development planned for 94 units. The first 50 units and a common-area pool were completed between 2016 and 2018; the 43 units planned for phase 3 have not been built. DLC2 owns the adjacent, undeveloped DLC2 Parcel. *Rubin Decl.* ¶¶ 4–5. Fu Bang acquired its parcel in 2013 for $7.3 million. Before the Cases, First Credit Bank ("**FCB**") sued on its loan, and a receiver took possession of the Fu Bang Parcel in

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

April 2025. Fu Bang regained possession by the end of June 2025, and the CRO began managing the Debtors in July 2025.

### C. Liens and Claims Asserted Against the Property

The following secured claims have been asserted against the Property. Entries marked "DLC2" refer to the claims register and schedules in DLC2's case; all others refer to Fu Bang's. *Rubin Decl.* ¶ 20. The Debtors propose to pay at closing only the claims identified for payment and to hold all remaining net proceeds, by parcel, in segregated accounts pending further order.

| Claimant | POC / Sched. | Asserted Amount | Asserted Interest | Proposed Treatment |
|---|---|---|---|---|
| Riverside County Treasurer-Tax Collector | POC 2; Sched. D 2.3 | $1,127,283.53 | Property tax lien (Fu Bang Parcel) | Paid in full at closing |
| Riverside County Treasurer-Tax Collector | DLC2 POC 1; DLC2 Sched. D 2.2 | $141,550.11 | Property tax lien (DLC2 Parcel) | Paid in full at closing |
| First Credit Bank | POC 13; Sched. D 2.1 | $10,964,851.18 | Deed of trust (Fu Bang Parcel) | Undisputed amount paid at closing per payoff demand; any disputed amount held |
| First Credit Bank | DLC2 POC 4; DLC2 Sched. D 2.1 | $11,051,051.17 | Deed of trust (DLC2 Parcel), securing the same Fu Bang note | Same debt as POC 13; paid once at closing |
| Sparknest LLC | POC 14; Sched. D 2.4 | $2,729,525.19 | Deed of trust (Fu Bang Parcel) | Undisputed amount paid at closing per payoff demand; any disputed amount held |
| Mingxia Lu, et al. (11 judgment creditors) | POC 6; Sched. D 2.2 | $7,061,487.67 | Judgment lien (Fu Bang Parcel) | Lien attaches to proceeds; proceeds held |
| SZ Properties LLC | Am. POC 12; Sched. E/F 3.23 | $8,730,000.00 | Deed of trust (Fu Bang Parcel) (disputed) | Lien, if any, attaches to proceeds; proceeds held |
| US Discount Center Corp | Am. POC 11; Sched. E/F 3.25 | $962,248.59 | Deed of trust (Fu Bang Parcel) (disputed) | Lien, if any, attaches to proceeds; proceeds held |

| Claimant | POC / Sched. | Asserted Amount | Asserted Interest | Proposed Treatment |
|---|---|---|---|---|
| Riverside County Treasurer-Tax Collector | From County Tax Rolls | $173,869.37[2] | Potentially Fu Bang Parcel | Sale is free and clear of potential interest |
| Riverside County Treasurer-Tax Collector | From County Tax Rolls | $71,935.11[2] | Potentially DLC2 Parcel | Sale is free and clear of potential interest |

Fu Bang scheduled the SZ Properties LLC ("**SZ**") and US Discount Center Corp ("**USDC**") claims as general unsecured claims. Both claimants later amended their proofs of claim to assert secured status. The Debtors dispute the existence and amount of the obligations those deeds of trust purport to secure. The Debtor expects a consensual resolution with these alleged claimholders that will release any alleged secured claim. *Rubin Decl.* ¶ 21.

Because Fu Bang and DLC2 are separate estates and not every lien encumbers both parcels, the Debtors propose to allocate the Purchase Price to the Fu Bang Parcel and to the DLC2 Parcel, based on a fair valuation of the separate parcels as part of the Debtors' plan process, and to account for each estate's net proceeds separately. *Rubin Decl.* ¶ 22. FCB asserts a single claim in both Cases, secured by first-position deeds of trust on both parcels. POC 13; DLC2 POC 4. It will be paid once at closing, and the allocation will determine each estate's share of that payment.

**D. The Property Has Been Thoroughly Exposed to the Market**

Prepetition exposure. The Property was exposed to the market for years before these Cases. Those efforts did not produce a transaction that would have paid the Debtors' obligations. *Rubin Decl.* ¶ 6.

Force 10's marketing process. Beginning in the first quarter of 2026 through September 2026, Force 10 ran a marketing process designed to identify both buyers and potential stalking-horse bidders. Force 10 contacted at least twenty-five prospective buyers, investors, or lenders,

[2] This tax is an unsecured supplemental tax assessed against prior property owner Pacific Homes VI for 2005 and 2006 taxes. This tax is not recorded as a lien and is not a liability for the Debtors but could cloud title as it appears on the County tax rolls. Debtors request that the sale order specify the a sale free and clear of these supplemental taxes assessed against Pacific Homes VI.



WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

executed at least six nondisclosure agreements, opened a data room, and facilitated at least six site tours. *Rubin Decl.* ¶¶ 7–8.

That process generated serious interest from three buyers, each of which delivered written proposals and negotiated terms with the Debtors: REIF, Blue Spring,[3] and Citivest. Only REIF signed a binding purchase agreement and delivered a deposit. *Rubin Decl.* ¶¶ 9, 18.

**E. The Offers**

Citivest. Citivest offered $19,500,000 plus a 25% participation in future profits after Citivest first achieved a 25% internal rate of return. Its offer required a 60-day diligence period exercisable in Citivest's sole discretion, deposits of $500,000 that were refundable in nearly all circumstances, a $390,000 break-up fee, expense reimbursement up to $195,000, and exposure to an auction. The Debtors executed a letter of intent with Citivest to negotiate a stalking-horse agreement. *Rubin Decl.* ¶ 10.

Blue Spring. Blue Spring's proposals changed repeatedly. In early August 2026, its predecessor, Dino Properties, LLC, offered $23,100,000 on California Association of Realtors forms, with $19,000,000 of the price to be financed, an investigation contingency, and loan, appraisal, title, and other contingencies. After further negotiation, Blue Spring proposed to serve as stalking horse at $23,100,000 with a 17-day diligence period, a $700,000 deposit refundable during diligence, a 2% break-up fee ($462,000), and expense reimbursement up to $175,000. On September 1, 2026, Debtors' counsel asked for bank statements demonstrating proof of funds and for a call with Blue Spring's prospective lender regarding the loan needed to close. On September 3, 2026, after touring five vacant units, Blue Spring reduced its price to $21,000,000, citing the units' condition, the unknown condition of tenant-occupied units, and the cost of tenant turnover, while keeping its diligence period and bid protections. *Rubin Decl.* ¶¶ 11–14.

---

[3] Blue Spring Assets LLC ("**Blue Spring**") is the acquisition entity designated by the prospective buyer that first approached the Debtors through Dino Properties, LLC. Blue Spring's representative advised on August 31, 2026 that Blue Spring would be named directly as buyer in place of Dino Properties, LLC. *Rubin Decl.* ¶ 15.

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

Stalking-horse decision. The Debtors considered which of the three bidders should be awarded stalking-horse status. Ultimately, at the direction of Bo Don, Fu Bang's Chief Executive Officer, and with the CRO's concurrence, the Debtors decided to proceed without a stalking horse in order to give all three bidders an equal opportunity to acquire the Property. When Citivest was informed that it would not be the stalking horse, it dropped out of the process. *Rubin Decl.* ¶ 18.

On September 23, 2026, Debtors' counsel informed Blue Spring's representative that the Debtors had accepted an offer of $20,750,000 with no contingencies other than Court approval. Blue Spring responded the same day that it would proceed at $21,000,000 "subject to the same terms and conditions previously discussed." On September 28, 2026, Blue Spring's broker sent an email stating that Blue Spring would purchase for $22,000,000 with no contingencies, a $300,000 non-refundable deposit, and closing on the timeline approved or ordered by the Court, and asked the Debtors to confirm so that the parties could proceed to a purchase and sale agreement. *Rubin Decl.* ¶¶ 15–16.

REIF. REIF's initial offer, made in July 2026 in a non-binding letter of intent, was $19,750,000. REIF subsequently increased its offer to $20,750,000 to support the no-overbid structure of the PSA, eliminated all diligence and financing conditions, and funded its $300,000 Deposit before signing. The PSA was executed on September 17, 2026. *Rubin Decl.* ¶ 17; *Cardoso Decl. & Ex. 1*.

**F. The PSA**

The material terms of the PSA are summarized in items (B) through (H) of the Notice of Motion. In addition, REIF may modify the schedules of Assumed Leases and Assumed Contracts up to five business days before the hearing, in which case the Debtors will serve any required supplemental cure notice. REIF has waived the PSA's requirement that the Debtors file this Motion within ten business days after the PSA's effective date. *Cardoso Decl.* REIF releases the Debtors and their estates from claims relating to the condition of the Property. The Debtors' sole remedy for REIF's failure to close after entry of the Sale Order is retention of the Deposit as liquidated damages, and REIF's remedies for a Seller default are return of the Deposit or specific performance. *Cardoso Decl. Ex. 1* §§ 1, 4(b), 8(c)–(d).

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

In the PSA, REIF represents that it has, or will have as of the closing date, sufficient unrestricted cash on hand to pay the Purchase Price, and that no third-party consent is required for its performance. *Cardoso Decl. Ex.* 1 § 7(b)(iii)–(iv). REIF's obligation to close is not conditioned on financing. REIF will pay the Purchase Price from the Deposit and additional cash totaling approximately $1,000,000, with the balance from debt financing provided by a private equity fund that has conditionally approved the financing, subject to entry of an order of this Court approving the sale and customary closing conditions. The lender's conditions are not conditions to REIF's obligation to close under the PSA. REIF intends to close on or before December 31, 2026. *Cardoso Decl.* & *Ex.* 2. REIF's affiliates and REIF III's acquisition of DLRC are described in Part II.G. *Cardoso Decl.*; *Domitrovitsch Decl.*

**G. REIF's Affiliates, DLRC, and the Partnerships**

<u>DLRC and the Partnerships.</u> DLRC is the general partner of five limited partnerships: Dos Lagos Center 1, LP; Dos Lagos Center 2, LP; Dos Lagos Center 3, LP; Dos Lagos Center 4, LP; and Dos Lagos Center 5, LP (the "**Partnerships**"). The Partnerships raised capital from approximately 78 foreign investors under the EB-5 Immigrant Investor Program and lent those funds to Fu Bang to develop the Fu Bang Parcel. Fu Bang scheduled the Partnerships' claims as general unsecured claims totaling $33,653,750 (the "**Partnership Claims**"): Dos Lagos Center 1, LP, $5,511,250; Dos Lagos Center 2, LP, $10,500,000; Dos Lagos Center 3, LP, $5,000,000; Dos Lagos Center 4, LP, $10,500,000; and Dos Lagos Center 5, LP, $2,142,500. [Dkt. 25, Sched. E/F.] DLRC also holds a regional center designation issued by U.S. Citizenship and Immigration Services ("**USCIS**"). The Partnership Claims belong to the Partnerships; they do not include the separate claims of individual investors, such as the judgment creditors that filed Claim 6, which is asserted against Fu Bang only. *Domitrovitsch Decl.*

<u>The October MIPA.</u> On October 14, 2026, REIF III acquired DLRC from Bo Chen (also known as Bo Don) and Kairong Yin, then DLRC's members, under a membership interest purchase agreement among REIF III, DLRC, Ms. Don, and Ms. Yin (the "**October MIPA**"). *Domitrovitsch Decl. Ex. 5*. The October MIPA is not conditioned on, or cross-defaulted with, the sale, and it provides that no seller, and no affiliate or agent of a seller, receives any consideration or benefit

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

other than its share of the $1.00 price. *Id.* §§ 3.01, 5.10. REIF III has controlled DLRC since the acquisition. *Domitrovitsch Decl.*; *Rubin Decl.* ¶ 31.

The REIF entities. REIF and REIF III are affiliates. Mr. Cardoso is a Managing Member of REIF and Brad J. Domitrovitsch is the Manager of REIF III. Because REIF III owns DLRC, DLRC and the Partnerships it manages are affiliates of REIF. None of the REIF entities is an insider of either Debtor. *Cardoso Decl.*; *Domitrovitsch Decl.*

Ms. Don. Ms. Don, Fu Bang's Chief Executive Officer, was a selling member of DLRC under the October MIPA and receives nothing from any REIF entity other than her share of the $1.00 purchase price. The CRO made the Debtors' decisions concerning the sale, the Support Agreement, and the Backstop Commitment in consultation with Ms. Don. Neither Ms. Don nor any other insider of the Debtors will receive any payment, equity, employment, or other benefit from any REIF entity. *Rubin Decl.* ¶¶ 3, 30, 31; *Cardoso Decl.*; *Domitrovitsch Decl.*

**H. The Support Agreement and the Backstop Commitment**

The Support Agreement. The Partnerships, acting through DLRC as general partner, have entered into the Support Agreement with the Debtors. *Domitrovitsch Decl. Ex. 4*. It becomes effective only if the sale to REIF closes. Its principal terms are as follows. *Domitrovitsch Decl.*

(a) Separate classification. The Partnerships consent to classification of the Partnership Claims in a class separate from other general unsecured claims and from the separate claims of individual investors, including Claim 6, in any chapter 11 plan. The Support Agreement does not address the classification or treatment of Claim 6, which the Debtors intend to seek to subordinate under § 510(b). *Domitrovitsch Decl. Ex.* 4 § 3.

(b) Investor elections. Each Partnership Claim is divided among the Partnership's investors in proportion to their capital accounts. Each investor makes one election for its entire investment, and the Partnership makes for each investor's portion only the election that investor has made in writing. Under a "**Pro Rata Election**," the investor's portion shares pro rata with general unsecured creditors, the investor withdraws from the EB-5 program, and its limited partnership interest is redeemed

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

when its distribution is paid. An investor making a Pro Rata Election may also elect the "**Backstop Option**," under which its portion is backstopped and the investor gives the release described in item (d). Under a "**Program Retention Election**," the investor's portion receives no distribution from either estate, the investor remains a limited partner and in the EB-5 program, with DLRC's support, and the investor gives the same release. *Id.* §§ 1, 4(a)–(d), 4(f); *Domitrovitsch Decl.*

(c) No default election. An investor that makes no election by the election deadline is not treated as making any election. Its portion (a "**Default Portion**") shares pro rata with general unsecured creditors, is not backstopped, and carries no release. Distributions on a Default Portion are paid to the Partnership and held for the investor's account, and they are paid over to the investor, and its interest redeemed, only after the investor signs a statement withdrawing from the EB-5 program. No investor is treated as withdrawing from the program unless it signs that statement. *Id.* § 4(c), (e).

(d) Investor releases. An investor gives a release only by electing the Backstop Option or a Program Retention Election and personally signing the release, which appears on a separate page of the election form with its own signature line (an "**Investor Release**"). The Investor Release releases REIF, REIF III, DLRC, the Partnerships, and their members, managers, officers, and agents serving on or after October 14, 2026, from the investor's claims relating to its EB-5 investment that arose before closing. It does not release Ms. Don, Ms. Yin, Richard Don, any other person who was a member, manager, officer, or agent of DLRC or a Partnership before October 14, 2026, or any insider of the Debtors, and it does not reduce their liability or any indemnity obligation they owe. The election form must state that an investor need not give the release to share pro rata. No Partnership, DLRC, or other person may make an election or give a release on an investor's behalf. *Id.* §§ 1, 4(c), 4(g).

(e) Benchmark Recovery. The "**Backstopped Claims**" are the "**Non-EB-5 Unsecured Claims**" and the portions of Partnership Claims whose investors make a Pro Rata

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

Election with the Backstop Option. Non-EB-5 Unsecured Claims are allowed general unsecured claims against either Debtor other than (i) the Partnership Claims, which will be separately classified as LP regional center claims, and related EB-5 claims of investors arising from their investments, including Claim 6 (together, "**EB-5 Claims**"); (ii) claims of insiders of the Debtors and of REIF and its affiliates; (iii) claims between the Debtors; and (iv) claims subordinated under § 510. Each Backstopped Claim's "**Benchmark Recovery**" is the distribution it would have received had the Property been sold for $22,000,000, with the additional $1,250,000 allocated between the estates in the same proportion as the Purchase Price and with all other facts, including allowed claims, elections, administrative expenses, and priorities, held constant. *Id.* §§ 1, 4(j).

(f) Plan support. If REIF is the buyer, each Partnership will vote to accept a chapter 11 plan whose treatment of the Partnership Claims conforms to the Support Agreement, and will make the elections described above, but only after the Court approves a disclosure statement and the Partnership receives it. The Support Agreement does not bind any other creditor. *Id.* § 5.

(g) Agreed treatment. The Partnerships accept the treatment of portions subject to a Program Retention Election in light of REIF III's intended support of the existing investors, described below. *Id.* § 5(c).

(h) Limits. The Support Agreement releases no claim other than through Investor Releases that investors choose to give, does not address Claim 6, and does not limit the Debtors' fiduciary duties. *Id.* §§ 4(g), 6–8.

The Backstop Commitment. REIF is backstopping allowed general unsecured claims other than EB-5 Claims, and the portions of Partnership Claims whose investors make a Pro Rata Election with the Backstop Option. It is not backstopping any Default Portion, any portion subject to a Program Retention Election or to a Pro Rata Election without the Backstop Option, or Claim 6. It has committed in writing that, if the sale closes, it will fund for the holders of Backstopped Claims in both estates any amount by which their distributions fall short of their Benchmark

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

Recoveries, up to an aggregate of $1,250,000. *Cardoso Decl. Ex. 3*. The commitment survives closing; may be enforced by the Debtors and any successor, including a plan administrator, or liquidating trustee; is payable when distributions are made on Backstopped Claims under a confirmed plan; is not part of the Purchase Price; and may be paid only to holders of Backstopped Claims. REIF expects to fund the Purchase Price and any amount due under the Backstop Commitment from the sources described in the Cardoso Declaration. No REIF entity, DLRC or any Partnership assumes, guarantees or backstops the Partnership Claims or any claim of an EB-5 investor, other than the backstopped portions within the $1,250,000 cap. *Cardoso Decl.*

REIF III's intentions for the existing investors. Since the Fu Bang project stalled, DLRC has received no interest or principal on the Partnerships' loans and has had no means to pay the costs of maintaining its regional center or supporting the investors' immigration petitions. REIF intends to redevelop the Property (free and clear of all liens and claims) after closing, and may seek to finance a future phase in part with EB-5 capital through DLRC. REIF III intends to cause DLRC to maintain its regional center designation, and to provide existing investors that make a Program Retention Election, with the documentation USCIS requires for their petitions. REIF III does not guarantee any immigration outcome, and neither the Support Agreement nor this Motion create any obligation of DLRC to the investors beyond those it already has. *Domitrovitsch Decl.*

The effect on creditors. The property taxes, FCB, and Sparknest LLC will be paid in full at closing under either the PSA or a $22,000,000 sale. The Debtors expect every other lien asserted against the Property to be subordinated, by agreement or order, to general unsecured claims. Any additional sale proceeds will therefore flow to administrative, priority, and general unsecured creditors. The Support Agreement and the Backstop Commitment ensure, by contract, that holders of Backstopped Claims receive at least what a $22,000,000 sale would have produced, whatever the ultimate amount of allowed claims and administrative expenses. *Rubin Decl.* ¶¶ 32–34; *Cardoso Decl.*

## I. The Debtors' Business Judgment

Mr. Rubin compared the three offers on price, certainty, timing, and risk, and concluded that REIF's offer is the highest and best available. He also concluded that running an auction would

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

require the Debtors to forgo REIF's offer, because REIF will not participate in an auction and requires the certainty of a private sale, and that REIF has offered a fair price for the Property. Nevertheless, the Backstop Commitment addresses any concern that the opportunity for a higher offer to close was not fairly provided. *Rubin Decl.* ¶¶ 23–29, 32.

## III. ARGUMENT

### A. The Court May Approve a Private Sale Without Bidding Procedures or an Auction

Section 363(b)(1) authorizes a debtor in possession, "after notice and a hearing," to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); *see* 11 U.S.C. § 1107(a). Nothing in § 363 requires an auction. To the contrary, "[a]ll sales not in the ordinary course of business may be by private sale or by public auction." Fed. R. Bankr. P. 6004(f)(1). A debtor "has ample discretion to administer the estate, including authority to conduct public or private sales of estate property." *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) (citation omitted).

Courts approve private sales where the debtor articulates a sound reason for proceeding privately, and they have done so even after a debtor abandons auction procedures to accept a buyer's private offer. In *In re 160 Royal Palm, LLC*, 600 B.R. 119 (S.D. Fla. 2019), the debtor withdrew a pending motion to approve public sale procedures and sought approval of a private sale to a new buyer whose agreement was conditioned on a private sale. The district court affirmed, observing that private sales "are in fact expressly contemplated by the bankruptcy rules," that the choice of a private sale "was subject to the Debtor's business judgment," and that the bankruptcy court "did not abuse its discretion in granting the Debtor's motions to withdraw the public sale procedures and approve the private sale procedure." *Id.* at 127–28. The same course is appropriate here.

In the Ninth Circuit, "[t]he court's obligation in § 363(b) sales is to assure that optimal value is realized by the estate under the circumstances." *Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282, 288–89 (B.A.P. 9th Cir. 2005). The standard is optimal value under the circumstances, not adherence to a particular sale format. Where, as here, the asset has been exposed

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

to the market at length and the buyer that emerged will not submit to an auction, a private sale is the means of realizing that value.

**B. The Sale Is a Sound Exercise of the Debtors' Business Judgment**

A debtor seeking to sell property outside the ordinary course must show a valid business justification and that the sale is proposed in good faith. *240 N. Brand Partners, Ltd. v. Colony GFP Partners, L.P. (In re 240 N. Brand Partners, Ltd.)*, 200 B.R. 653, 659 (B.A.P. 9th Cir. 1996); *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19–20 (B.A.P. 9th Cir. 1988) (requiring "some articulated business justification for using, selling, or leasing the property outside the ordinary course of business"). Courts in this district also consider whether the sale is fair and reasonable, whether the property has been adequately marketed, whether the sale was negotiated and proposed in good faith, and whether the transaction is at arm's length. *In re Wilde Horse Enters., Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991). Each consideration supports approval.

**1. The sale has a sound business purpose**

The relevant factors include "the proportionate value of the asset to the estate as a whole," the time elapsed since filing, the likelihood of a plan in the near future, and "whether the asset is increasing or decreasing in value." *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *accord Walter*, 83 B.R. at 19–20. The Property is effectively the Debtors' only asset. The Cases have been pending for more than 16 months. FCB's claim alone exceeded $11.05 million on DLC2's petition date, and interest, taxes, and administrative costs continue to accrue against the Property, so each month of delay reduces what is left for junior lienholders and unsecured creditors. *Rubin Decl.* ¶¶ 23–25. A prompt cash sale converts the Property into a fund that can be distributed to creditors according to their rights, through a plan or further order of the Court.

**2. The price is fair and reasonable because the Property has been tested by the market**

"[T]he best way to determine the market value of property is to expose the property to the marketplace." *In re Mama's Original Foods, Inc.*, 234 B.R. 500, 503–04 (Bankr. C.D. Cal. 1999). The Property has been exposed to the market for years, including focused outreach by Force 10

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

since the first quarter of 2026 directed specifically at buyers and stalking-horse bidders. *Rubin Decl.* ¶¶ 6–9. That process yielded three proposals that bracket the REIF price: Citivest at $19.5 million plus a contingent profit participation, REIF at $20.75 million, and Blue Spring at figures ranging from $21 million to $23.1 million, each subject to diligence, financing, bid protections, or other conditions until its most recent email. *Id.* ¶¶ 10–17. A sale price "approximately equal to the fair market value of the properties 'as is'" is value. *Ewell v. Diebert (In re Ewell)*, 958 F.2d 276, 281 (9th Cir. 1992). Mr. Rubin believes that the REIF price is at or above the fair market value of the Property in its current "as is" condition. *Rubin Decl.* ¶ 19.

**3. REIF's offer is the highest and best offer, notwithstanding Blue Spring's higher emailed figure**

A debtor's duty to maximize value does not require it to accept the largest number on the page. "[A] 'highest' bid is not always the 'highest and best' bid. The inclusion of 'best' in that conjunction is not mere surplusage." *Bakalis*, 220 B.R. at 534. A fiduciary "must, to the extent possible, be risk averse," and may decline to jeopardize "virtually assured benefits" by supporting a bid that exposes the estate to "a much greater risk of, among other things, a failed closing and the associated chance of being left with a devalued asset." *Bakalis*, 220 B.R. at 533.

The Debtors weighed Blue Spring's $22 million figure carefully, and it is not comparable to REIF's offer in the respects that matter most. REIF has spent considerable time and resources to understand the Property and create a program for a successful development and has identified the sources of capital needed to execute that plan. REIF's offer is a signed, binding agreement. REIF's $300,000 Deposit is already in escrow and becomes non-refundable when the Sale Order is entered. REIF's obligation to close is not conditioned on financing, and REIF has identified the sources of its funding. *Rubin Decl.* ¶¶ 11–16, 26; *Cardoso Decl.* & *Ex. 2*.

The cost of pursuing Blue Spring's figure is also concrete. REIF will not participate in an auction or serve as a stalking horse; it requires the certainty of a private sale. Testing Blue Spring's proposal through an auction would therefore cost the estates REIF's signed $20.75 million agreement, a fair price for a Property tested by years of marketing. If Blue Spring then failed to close at the suggested price, the estates could be left with no buyer, continuing carrying costs, and a

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

Property that has been publicly shopped and abandoned. *Rubin Decl.* ¶¶ 26–29; *Cardoso Decl.* REIF has also addressed any concern for creditors' best interests by backstopping the recovery of allowed non-EB-5 general unsecured claims, and of EB-5 investors that elect to share pro rata with them with the backstop, as discussed below. The $1.25 million difference does not justify those risks. The Debtors' judgment that REIF's offer is the highest and best offer is precisely the kind of decision entitled to deference. *See Bakalis*, 220 B.R. at 532 (trustee's business judgment "enjoys 'great judicial deference'"); *Lahijani*, 325 B.R. at 288–89.

Whatever weight the difference might otherwise carry, the Support Agreement and the Backstop Commitment remove it for the creditors whose recovery depends on price. The property taxes, FCB, and Sparknest are paid in full at either price. Every holder of a Backstopped Claim, including every Non-EB-5 Unsecured Claim, is assured by contract, up to REIF's $1,250,000 commitment, at least the distribution a $22,000,000 sale would have produced. Part II.H. That guarantee assumes that Blue Spring would have closed at $22,000,000 with no delay and no added carrying costs, an assumption far more favorable to Blue Spring than the record supports. The agreements reduce the recovery only of EB-5 Claims whose investors remain in the EB-5 program (an invaluable component of a REIF purchase) as a result of the investors' own elections and their general partner's agreement. Investors that share pro rata without electing the backstop, including those that make no election, receive the same pro rata treatment as general unsecured creditors. The REIF sale therefore delivers to holders of Backstopped Claims at least the value of Blue Spring's figure, the option for EB5 Claims to choose a monetary recovery or the possibility to realize the benefits of the EB5 green card program, together with the certainty of a signed agreement and a Deposit already in escrow.

**4. The sale is proposed in good faith, at arm's length, and on adequate notice**

"'Good faith' encompasses fair value, and further speaks to the integrity of the transaction." *240 N. Brand Partners*, 200 B.R. at 659 (quoting *Wilde Horse*, 136 B.R. at 842). The PSA was negotiated at arm's length over several months, and REIF is not an insider. The Debtors have disclosed every relationship between the REIF entities and Fu Bang, and the CRO made the

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

decision to proceed. Part II.G; *Rubin Decl.* ¶¶ 3, 17, 30, 31; *Cardoso Decl.*; *Domitrovitsch Decl.* Notice of the Motion is being given to all creditors and parties in interest under Rules 2002(a)(2) and (c)(1) and LBR 6004-1(c)(3), including each prospective purchaser that expressed interest in the Property and each limited partner of the Partnerships, and the Debtors are submitting the Court's Notice of Sale of Estate Property (Form F 6004-2.NOTICE.SALE) for publication on the Court's website under LBR 6004-1(f). The Debtors have also disclosed the competing proposals, including Blue Spring's higher emailed figure, so that the Court and creditors can evaluate the Debtors' judgment on a complete record. *See Wilde Horse*, 136 B.R. at 841.

**C. LBR 6004-1(c)(2)(B) Is Satisfied or Should Be Waived**

When a proposed sale is not subject to overbid, LBR 6004-1(c)(2)(B) requires a certification that "the movant has not been contacted by any potential over-bidder and that, in the movant's business judgment, there are no viable alternative purchasers." The Debtors cannot certify the first clause: Blue Spring has contacted the Debtors since the PSA was signed. Instead, the Debtors disclose each contact. In the Debtors' business judgment, none of the other prospective purchasers is a viable alternative to REIF on the terms of the PSA. *Rubin Decl.* ¶¶ 15–16, 23–29. The purpose of the rule, to ensure that the Court approves a sale without overbid only on a full record of competing interest, is served by that disclosure. To the extent the rule requires more, the Debtors request that the Court waive it under LBR 1001-1(d), which permits the Court to "waive the application of any Local Bankruptcy Rule in any case or proceeding . . . in the interest of justice."

**D. The Sale Should Be Free and Clear of Liens, Claims, and Interests Under § 363(f)**

Section 363(f) permits a sale free and clear of any interest in the property if any one of five conditions is satisfied: (1) applicable nonbankruptcy law permits a free-and-clear sale; (2) the entity consents; (3) the interest is a lien and the price exceeds the aggregate value of all liens; (4) the interest is in bona fide dispute; or (5) the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction. 11 U.S.C. § 363(f). The statute is disjunctive, so the

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

Debtors need satisfy only one subsection as to each interest.[4] Each lien will attach to the proceeds with the same validity, extent, and priority it held against the Property, which provides adequate protection under § 363(e). *See In re Gulf States Steel, Inc. of Ala.*, 285 B.R. 497, 507 (Bankr. N.D. Ala. 2002) (in a § 363 sale, "the lien attaches to the proceeds to the same extent and with the same priority that the lien attached to the collateral").

Liens paid at closing (§ 363(f)(2) and (5)). The Riverside County property tax liens on both parcels and FCB's claim will be paid at closing, as will Sparknest LLC's claim. FCB's claim, though asserted in both Cases, will be paid once. The Debtors expect these creditors to consent, and their failure to object after notice should be treated as consent. Independently, a lienholder can be compelled under California law to accept full payment of its secured obligation and reconvey, so § 363(f)(5) is satisfied for any lien paid in full. Any portion of a claim the Debtors dispute, such as default interest or fees, will be held in escrow pending resolution.

The SZ and USDC deeds of trust (§ 363(f)(4)). A bona fide dispute exists when "there is an objective basis for either a factual or legal dispute as to the validity of the debt"; the Court need not resolve the dispute, "just . . . determine its existence." *Union Planters Bank, N.A. v. Burns (In re Gaylord Grain L.L.C.)*, 306 B.R. 624, 627 (B.A.P. 8th Cir. 2004); *accord In re Robotic Vision Sys., Inc.*, 322 B.R. 502, 506 (Bankr. D.N.H. 2005). The purpose of § 363(f)(4) is to allow estate property to be sold "so that liquidation of the estate's assets need not be delayed while such disputes are being litigated." *Gulf States Steel*, 285 B.R. at 507. Fu Bang scheduled both claims as unsecured; both claimants reclassified their claims as secured only by amendment; and the Debtors dispute whether the obligations those deeds of trust purport to secure were ever funded. The Debtors' review of their bank records has not identified deposits supporting SZ's $8,730,000 claim, and the loan agreement that USDC's deed of trust references was never signed. *Rubin Decl.* ¶ 21. The Debtors will object to these claims if they are not consensually resolved. Furthermore, the

[4] The Bankruptcy Appellate Panel has held that § 363(f)(3) requires a sale price greater than the aggregate amount of all claims secured by the property. *Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25, 41 (B.A.P. 9th Cir. 2008). Because the claims asserted against the Property exceed the Purchase Price in the aggregate, the Debtors do not rely on § 363(f)(3).

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

deeds of trust were signed by Lang Zhang, Fu Bang's Chief Executive Officer at the time, in favor of entities he owns (SZ and USDC) without the consent of Fu Bang's board of directors. *Rubin Decl.* ¶ 21. These liens, if valid, will attach to the held proceeds.

The judgment lien (§ 363(f)(4) and (5)). The eleven judgment creditors' lien will attach to the held proceeds in its existing priority. Section 363(f)(5) is satisfied. Courts have held that § 363(f)(5) is met where state law provides a proceeding, such as a senior lienholder's foreclosure, in which junior lienholders are paid from the proceeds in order of priority. *In re Jolan, Inc.*, 403 B.R. 866, 869–70 (Bankr. W.D. Wash. 2009). California law works the same way: on a foreclosure sale under a senior deed of trust, the surplus is distributed to junior lienholders in order of priority. Cal. Civ. Code § 2924k(a). A junior judgment lienholder can therefore be compelled to accept a money satisfaction of its lien from foreclosure proceeds, even if that satisfaction is less than full. In addition, the judgment creditors are EB-5 investors whose claim, asserted against Fu Bang only, arises from their investments in the Dos Lagos limited partnership in which they invested. The Debtors are commencing an adversary proceeding to subordinate the claim under § 510(b), which, if successful, will subordinate the judgment lien to all general unsecured claims. That is a bona fide dispute as to the extent of their interest in the proceeds under § 363(f)(4).

Anticipated subordination. The Debtors expect the holders of the SZ and USDC deeds of trust to agree to subordinate those liens to general unsecured claims, or the Debtors will seek that relief by separate motion or complaint. The Debtors will address the judgment lien in that adversary proceeding. Until then, those liens attach to the held proceeds as described above.

**E. Assumption and Assignment of the Assumed Leases and Assumed Contracts Should Be Approved**

A debtor in possession may assume an unexpired lease or executory contract and assign it if it cures, or provides adequate assurance that it will promptly cure, any default and adequate assurance of future performance by the assignee is provided. 11 U.S.C. § 365(a), (b)(1), (f)(2). The decision to assume or reject is reviewed under the business-judgment standard. *See Agarwal v. Pomona Valley Med. Grp., Inc. (In re Pomona Valley Med. Grp., Inc.)*, 476 F.3d 665, 670 (9th Cir. 2007) (rejection). The Assumed Leases are the residential and other occupancy agreements for the

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

Fu Bang Parcel, and assigning them preserves the tenants' occupancy and the Property's income for the Purchaser. There are no cure costs required to assume the Assumed Leases. Fu Bang holds no prepetition tenant security deposits, and at closing it will transfer to REIF the tenant security deposits it received post-petition. *Cardoso Decl. Ex. 1* §§ 1(c), 3(a)(ii). REIF intends to continue operating the Property as a residential rental community with professional management, which is adequate assurance of future performance. *Cardoso Decl.* To this end, REIF is also taking assignment of Fu Bang's post-petition management agreement with Sares-Regis. Here again, no cure payments are required and Fu Bang will pay all that is owed to Sares-Regis on its contract through the closing date, when REIF will take over the Sares-Regis contract. The Debtors will serve each counterparty with notice of the Motion, which states that no cure amount is owed, and any supplemental cure notice required by a change to Schedules 1 or 2 under section 1 of the PSA.

**F. REIF Is a Good-Faith Purchaser Entitled to the Protections of § 363(m)**

Section 363(m) protects a sale to "an entity that purchased . . . such property in good faith" from reversal or modification on appeal absent a stay. 11 U.S.C. § 363(m). A good-faith purchaser is one who buys "in good faith" and "for value," and lack of good faith "is shown by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" *Ewell*, 958 F.2d at 281 (citation omitted); *see Thomas v. Namba (In re Thomas)*, 287 B.R. 782, 785 (B.A.P. 9th Cir. 2002); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (good faith "speaks to the integrity of [the purchaser's] conduct in the course of the sale proceedings" (citation omitted)).

REIF is paying value: $20,750,000 in cash, with REIF paying all closing costs, after extensive market exposure. The PSA was negotiated at arm's length, over several rounds in which REIF increased its price and removed its conditions. REIF is not an insider of either Debtor. Its affiliate REIF III bought DLRC from Ms. Don and Ms. Yin, but the October MIPA is not conditioned on the sale, pays the sellers $1.00 in total, and provides that no seller receives any other consideration or benefit. The CRO has consulted with Ms. Don on matters concerning the sale, and the CRO decided to proceed. Part II.G. A purchaser's relationship to insiders does not by itself defeat good faith; the question remains whether the record shows fraud, collusion, or an attempt to

take grossly unfair advantage of other bidders. *In re Filtercorp, Inc.*, 163 F.3d 570, 577 (9th Cir. 1998) (affirming good-faith finding for purchasers that "comprised insiders" where the allegations of bad faith were unsupported). Nothing of the kind is present here. REIF has not colluded with any other prospective purchaser or engaged in any conduct described in § 363(n), and the Debtors have disclosed the competing proposals and every REIF relationship so that the Court and creditors can evaluate the transaction on a complete record. *Cardoso Decl.*; *Domitrovitsch Decl.*; *Rubin Decl.* ¶¶ 3, 30, 31. The Court should find that REIF is a good-faith purchaser.

**G. The Court Should Authorize the Debtors to Enter Into the Support Agreement and Accept the Backstop Commitment**

The Debtors' entry into the Support Agreement and acceptance of the Backstop Commitment are outside the ordinary course, and the Court may authorize them under § 363(b) on a showing of a sound business justification. *Walter*, 83 B.R. at 19–20. That justification is plain. The agreements cost the estates nothing, reduce the recovery only of EB-5 Claims whose investors remain in the EB-5 program – at their option, and ensure that the difference between REIF's price and Blue Spring's figure does not fall on holders of Backstopped Claims. *Rubin Decl.* ¶¶ 32–34; *Cardoso Decl.*

Although neither the Debtors nor the Partnerships consider the plan treatment proposed by the Support Agreement to be a subordination of claims considering the options afforded to the EB5 investors and the invaluable nature of remaining in a viable EB5 program, if the Support Agreement is considered to be a subordination, it is enforceable. "A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a). The Partnerships may subordinate their own claims, including by waiving distributions on portions subject to a Program Retention Election, and DLRC, as their general partner, has authority under the Partnerships' agreements to bind them and to make those elections. *Domitrovitsch Decl.*

The Support Agreement also does not establish the terms of a plan *sub rosa*. In *Braniff*, the court refused to approve under § 363(b) a transaction that dictated how plan consideration would be allocated, required secured creditors to vote a portion of their claims for a future plan, and released

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

claims against the debtor, its secured creditors, and its officers and directors. *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983). The Support Agreement does none of those things. It binds only the Partnerships, DLRC, and the Debtors. It does not fix any non-party's treatment or require any vote from a non-party, and it releases no claim against the Debtors' officers, directors, or other insiders. The only releases it contemplates are Investor Releases, which an investor gives only by electing the Backstop Option or program retention and personally signing a separate release. No release is given by default, by a Partnership or DLRC on an investor's behalf, or in favor of Ms. Don or any other prior principal of DLRC. Releases of that kind are consensual. The Supreme Court's decision in *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024), addressed only releases imposed without the affected claimants' consent. The Support Agreement also does not address Claim 6. The Debtors do not ask the Court to approve any plan term, classification, or vote in the Sale Order. Each will be tested under §§ 1122, 1123, 1125, 1126, and 1129 when a plan is proposed.

The Partnerships' agreement to vote for a conforming plan is consistent with § 1125(b). It applies only after the Court approves a disclosure statement and only to a plan that conforms to the Support Agreement. Courts read "solicitation" narrowly and have declined to designate the votes of parties to a support agreement negotiated in good faith, memorialized in writing, and promptly disclosed. *In re Indianapolis Downs, LLC*, 486 B.R. 286, 295–97 (Bankr. D. Del. 2013).

Finally, the Backstop Commitment does not divert sale value from any lienholder or alter any priority. It is not part of the Purchase Price and is not estate property until paid. It is plan funding from a third party, payable only to holders of Backstopped Claims. The Debtors ask only that the Sale Order provide that the Backstop Commitment is a binding obligation of REIF that survives closing and is enforceable in this Court by the Debtors and any successor.

**H. The Court Should Waive the Stays Under Rules 6004(h) and 6006(d)**

Rule 6004(h) stays an order authorizing a sale for 14 days "unless the court orders otherwise," and Rule 6006(d) does the same for an order authorizing assignment of a lease or executory contract. Waiver is appropriate here. The PSA's closing is keyed to finality of the Sale Order, REIF may waive finality and close sooner, and every day of delay increases the carrying

costs borne by the estates. *If an objection is filed and overruled, the Debtors request in the alternative that the stays be reduced to the time necessary for the objecting party to seek a stay pending appeal.*

**IV. CONCLUSION**

The Debtors respectfully request that the Court grant the Motion, enter the Sale Order providing the relief described in the Notice of Motion, and grant such further relief as is just.

Dated: October 15, 2026 **WEINTRAUB ZOLKIN TALERICO & SELTH LLP**

By *_/s/ Derrick Talerico_*

Derrick Talerico

Attorneys for Fu Bang Group Corp, USA and
Dos Lagos Center 2, LLC
Debtors and Debtors in Possession

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

**DECLARATION OF NICHOLAS RUBIN**

I, Nicholas Rubin, declare as follows:

1. I am a partner of Force Ten Partners, LLC ("**Force 10**") and the Chief Restructuring Officer ("**CRO**") of Fu Bang Group Corp, USA ("**Fu Bang**") and Dos Lagos Center 2, LLC ("**DLC2**," and together with Fu Bang, the "**Debtors**"). I make this declaration in support of the Debtors' Motion for Order Authorizing Sale of Real Property to Real Estate Income Fund I LLC (the "**Motion**"). Capitalized terms not defined here have the meanings given in the Motion. I have personal knowledge of the facts stated in this declaration, except where stated on information and belief, and if called as a witness I could and would testify competently to them. My knowledge is based on my work as CRO, my review of the Debtors' books and records, and my communications with the Debtors' management, counsel, and prospective purchasers.

2. Fu Bang filed its chapter 11 petition on May 7, 2025, and DLC2 filed its petition on May 30, 2025. The Court approved the retention of Force 10 and me as CRO effective as of the petition dates by order entered August 5, 2025 [Dkt. 86]. I began managing the Debtors in July 2025.

3. In my role as CRO, I am responsible for the Debtors' business decisions in these Cases. I have made the Debtors' decisions concerning the sale, including the decision to sell the Property to REIF, in consultation with Bo Don, Fu Bang's Chief Executive Officer and DLC2's authorized representative.

4. Fu Bang owns the Fu Bang Parcel, APN 279-460-064, in Corona, California. The Fu Bang Parcel was planned for 94 mixed-use residential units. The first 50 units and a common-area pool were completed between 2016 and 2018. The 43 units planned for phase 3 have not been built.

5. DLC2 owns the adjacent DLC2 Parcel, APN 279-460-063, which is undeveloped.

6. <u>Prepetition marketing.</u> Based on my review of the Debtors' records and discussions with Ms. Don, I am informed and believe that the Property was exposed to the market for years before these Cases. Those efforts did not produce a transaction that would have paid the Debtors' obligations.

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

7. Force 10's marketing process. Beginning in the first quarter of 2026 through September 2026, Force 10 marketed the Property to identify both buyers and potential stalking-horse bidders.

8. During that process, Force 10 contacted at least twenty-five prospective buyers, investors, or lenders; executed at least six nondisclosure agreements; provided access to a data room containing the Debtors' available property, financial, and environmental information; and facilitated at least six site tours.

9. The process produced written proposals and negotiations with three prospective purchasers: REIF, Blue Spring Assets LLC ("**Blue Spring**"), and Citivest Commercial Investments, LLC ("**Citivest**"). No other party submitted a written proposal.

10. Citivest. Citivest offered $19,500,000 plus a 25% participation in future profits after Citivest first achieved a 25% internal rate of return. Its proposal required a 60-day diligence period exercisable in Citivest's sole discretion, deposits totaling $500,000 that were refundable in nearly all circumstances, a $390,000 break-up fee, expense reimbursement up to $195,000, and exposure to overbids at an auction. The Debtors executed a letter of intent with Citivest to negotiate a stalking-horse agreement.

11. Blue Spring. Blue Spring's predecessor, Dino Properties, LLC, delivered two California Association of Realtors purchase agreements dated August 5, 2026, offering a combined $23,100,000 for both parcels. Under those agreements, $19,000,000 of the price was to be financed, and the offers were subject to investigation, loan, appraisal, title, and other contingencies.

12. On August 31, 2026, Blue Spring's representative proposed that Blue Spring serve as stalking horse at $23,100,000, with a 17-day diligence period, a $700,000 deposit refundable during diligence, an additional $800,000 deposit after diligence, a 2% break-up fee ($462,000), and expense reimbursement up to $175,000.

13. On August 31, 2026, Blue Spring's representative also advised that Blue Spring Assets LLC, rather than Dino Properties, LLC, would be the named buyer. On September 1, 2026, the Debtors' counsel asked Blue Spring for bank statements demonstrating proof of funds and for a call with Blue Spring's prospective lender to discuss the loan needed to close.

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

14. On September 1, 2026, Blue Spring's team visited the Property and viewed five vacant units. On September 3, 2026, Blue Spring reduced its price from $23,100,000 to $21,000,000, citing the condition of the vacant units, the unknown condition of the occupied units, and the potential cost of tenant turnover, while keeping its diligence period, deposit structure, and bid protections. On September 11, 2026, Blue Spring confirmed those terms.

15. On September 23, 2026, the Debtors' counsel informed Blue Spring's representative that the Debtors had accepted a purchase offer of $20,750,000 with no contingencies other than Court approval and would file a motion to approve that sale. Blue Spring responded the same day that it would proceed at $21,000,000, "subject to the same terms and conditions previously discussed and any requirements of the bankruptcy court's approval."

16. On September 28, 2026, Blue Spring's broker, Jenny Ma of Sunny Realty Group Inc., sent the Debtors' counsel an email, which counsel provided to me, stating that Blue Spring Assets LLC would purchase the Property for $22,000,000, with no contingencies, a $300,000 non-refundable deposit, and closing in accordance with the timeline and requirements approved or ordered by the Court. The email asked the Debtors to confirm by email so that the parties could proceed with a purchase and sale agreement. It did not include a signed purchase agreement or proof of funds.

17. <u>REIF.</u> REIF made its initial offer in July 2026, in a non-binding letter of intent, at $19,750,000. Through negotiations with the Debtors over the following weeks, REIF increased its price to $20,750,000 to support the no-overbid structure of the PSA, eliminated all diligence and financing conditions, and delivered its $300,000 Deposit to escrow before the PSA was signed. REIF informed the Debtors that it would not serve as a stalking horse or agree to have its offer exposed to overbids. The PSA was executed on September 17, 2026. The executed PSA is attached as Exhibit 1 to the Declaration of Bernardo D. Cardoso II.

18. <u>Stalking-horse decision.</u> The Debtors negotiated terms with each of the three prospective purchasers. After receiving Citivest's letter of intent, the Dino Properties and Blue Spring proposals, and REIF's letter of intent, the Debtors considered which bidder should be awarded stalking-horse status. Ultimately, at Ms. Don's direction, with my concurrence, the

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

Debtors decided to proceed without a stalking horse in order to give all three bidders an equal opportunity to acquire the Property. When Citivest was informed that it would not be the stalking horse, it dropped out of the process. Only REIF signed a binding purchase agreement and delivered a deposit.

19. Value. Based on the marketing history and the proposals received, I believe that $20,750,000 in cash, on the terms of the PSA, is at or above the fair market value of the Property in its current "as is" condition.

20. Liens and claims. The secured claims asserted against the Property are listed in the table in Part II.C of the Memorandum. The amounts in that table are the amounts asserted in the listed proofs of claim, and the scheduled positions are those in Fu Bang's schedules [Dkt. 25]. Entries marked "DLC2" refer to the claims register and schedules in DLC2's case [Case No. 6:25-bk-13642-SY, Dkt. 16].

21. Fu Bang scheduled the SZ Properties LLC and US Discount Center Corp claims as general unsecured claims (Sched. E/F 3.23, 3.25). Each claimant later amended its proof of claim to assert secured status. The Debtors dispute those claims. Based on my review of the Debtors' bank records, I have not identified any deposit into the Debtors' accounts supporting SZ Properties LLC's $8,730,000 claim, and the loan agreement referenced in US Discount Center Corp's deed of trust was never signed. I am informed and believe that both deeds of trust were signed on Fu Bang's behalf by Lang Zhang, Fu Bang's Chief Executive Officer at the time, in favor of SZ Properties LLC and US Discount Center Corp, entities he owns, without the consent of Fu Bang's board of directors. The Debtors expect a consensual resolution with SZ Properties LLC and US Discount Center Corp that will release any alleged secured claim. If those claims are not consensually resolved, the Debtors will object to them.

22. Because not every lien encumbers both parcels, and Fu Bang and DLC2 are separate estates, the Debtors propose to allocate the Purchase Price between the Fu Bang Parcel and the DLC2 Parcel based on a fair valuation of the separate parcels as part of the Debtors' plan process, and to account for each estate's net proceeds separately.

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

23. Business judgment. I compared the proposals on price, certainty of closing, timing, conditions, and risk to the estates. I concluded that REIF's offer is the highest and best offer available to the estates.

24. The Property is effectively the Debtors' only significant asset. First Credit Bank's asserted claim alone exceeded $11.05 million as of May 30, 2025, DLC2's petition date, and interest, property taxes, insurance, and administrative expenses continue to accrue against the Property.

25. A prompt cash sale will convert the Property into a fund that can be distributed to creditors according to their rights, and will stop the accrual of costs that reduce recoveries for junior lienholders and unsecured creditors.

26. REIF's offer is a signed agreement backed by a deposit already in escrow, and identified sources of funding.

27. REIF has stated that it will not serve as a stalking horse or participate in an auction, and that it requires the certainty of a private sale. If the Debtors set aside the PSA to pursue Blue Spring's figure through an auction, they would lose REIF's committed transaction. In my judgment, REIF has offered a fair price for the Property, as the marketing history described above shows.

28. If the Debtors gave up the PSA and Blue Spring then failed to close at its suggested price, the estates could be left without a buyer, with carrying costs and secured debt continuing to accrue against the Property, and with a Property that had been publicly shopped without a closing. REIF has also addressed any concern that the private sale does not serve creditors' best interests: it has agreed to backstop the recovery of allowed general unsecured claims other than EB-5 Claims, and of EB-5 investors that elect to share pro rata with them with the backstop, up to $1,250,000, as described in paragraphs 32 through 34.

29. In my judgment, the $1,250,000 difference between Blue Spring's emailed figure and the REIF Purchase Price does not justify those risks. With the Support Agreement and the Backstop Commitment, that difference also does not reduce the recovery of allowed general unsecured claims other than EB-5 Claims, or of EB-5 Claims whose investors elect to share pro rata with them with the backstop.

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

30. Good faith. The PSA was negotiated at arm's length over several months. To my knowledge, REIF is not an insider of either Debtor, and neither Ms. Don nor any other insider of the Debtors will receive any payment, equity, employment, or other benefit from REIF or any of its affiliates in connection with the sale. REIF III's acquisition of DLRC from Ms. Don and Kairong Yin is described in paragraph 31. I am not aware of any collusion between REIF and any other prospective purchaser.

31. REIF's affiliates and DLRC. I am informed that REIF III acquired DLRC from Ms. Don and Kairong Yin, then its members, under the October MIPA effective October 14, 2026. The October MIPA is attached as Exhibit 5 to the Declaration of Brad J. Domitrovitsch.

32. REIF's agreement to backstop. When the Debtors informed REIF of Blue Spring's September 28, 2026 email proposing $22,000,000, REIF agreed to backstop the recovery of allowed general unsecured claims against both Debtors, other than EB-5 Claims, so that those claims would receive at least what a $22,000,000 sale would have produced. REIF later agreed to extend the backstop to the portions of EB-5 Claims whose investors elect to withdraw from the EB-5 program, share pro rata with general unsecured creditors, and accept the backstop option. Although I had concluded that REIF's offer is the highest and best available, the Backstop Commitment with REIF addresses any concern that the opportunity for a higher offer to close was not fairly provided. The Debtors negotiated the Backstop Commitment and the Support Agreement to document REIF's agreements.

33. Support Agreement and Backstop Commitment. The Support Agreement is attached as Exhibit 4 to the Declaration of Brad J. Domitrovitsch, and the Backstop Commitment is attached as Exhibit 3 to the Declaration of Bernardo D. Cardoso II. The property taxes, First Credit Bank, and Sparknest LLC will be paid in full at closing under either the PSA or a $22,000,000 sale. I expect every other lien asserted against the Property to be subordinated, by agreement or order, to general unsecured claims. Any additional sale proceeds will therefore flow to administrative, priority, and general unsecured creditors. The Support Agreement and the Backstop Commitment ensure that holders of Backstopped Claims in both estates receive at least the distribution a

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

$22,000,000 sale would have produced, calculated as though Blue Spring had closed on the same date with no additional carrying costs.

34. In my business judgment, entering into the Support Agreement and accepting the Backstop Commitment are in the best interests of both estates. They cost the estates nothing, reduce the recovery only of EB-5 Claims whose investors remain in the EB-5 program at their option, and ensure that the price difference between the PSA and Blue Spring's figure does not fall on holders of Backstopped Claims. Neither binds any creditor other than the Partnerships to any plan term. Neither releases any claim, except that an investor that elects the backstop option or program retention, and personally signs a separate release, releases the REIF entities, DLRC, the Partnerships, and their principals serving on or after October 14, 2026. No release extends to Ms. Don, any other prior principal of DLRC, or any other insider of the Debtors.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 15, 2026, at Irvine, California.

Nicholas Rubin

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

11766 Wilshire Blvd, Suite 730, Los Angeles, CA 90025

A true and correct copy of the foregoing document entitled (*specify*): **Notice Of Motion And Motion For Order (1) Authorizing Private Sale Of Real Property To Real Estate Income Fund I LLC, Not Subject To Overbid, Free And Clear Of Liens, Claims, And Interests; (2) Authorizing Assumption And Assignment Of Leases And Contracts; (3) Authorizing Entry Into Plan Support And Subordination Agreement And Acceptance Of Backstop Commitment; (4) Finding Good Faith Under 11 U.S.C. Section 363(m); And (5) Waiving 14-Day Stays; Memorandum Of Points And Authorities; Declaration Of Nicholas Rubin in Support Thereof** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) October 15, 2026, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

See attached NEF service list

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*)_______________, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) October 15, 2026, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

The Honorable Scott Yun (via Priority Mail)
United States Bankruptcy Court
3420 Twelfth St., Suite 345
Riverside, CA 92501-3819

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| October 15, 2026 | Martha E. Araki | /s/ Martha E. Araki |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

In re Fu Bang Group Corp, USA and Dos Lagos Center 2, LLC (Jointly Administered) Lead Case No. 6:25-bk-13004-SY

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- Attorneys for Debtors Fu Bang Group Corp (USA) and Dos Lagos Center 2, LLC: **Derrick Talerico**: dtalerico@wztslaw.com; maraki@wztslaw.com; sfritz@wztslaw.com; admin@wztslaw.com
- Attorneys for Defendants Central Trading Corp., RDD Freight International (LA) Inc., SZ Properties LLC, Sierra Home Material Trade Inc., U.S. Discount Center Corp. and Lang Zhang: **Paul A Beck**: pab@pablaw.org; raychael@pablaw.org
- Attorneys for Creditor Sparknest, LLC, a Delaware limited liability company: **David B Golubchik**: dbg@lnbyg.com
- Attorneys for Creditors Cheukhing Lau, Cong Liu, Dabao Guan, Guangquan Liang, Haifeng Zhang, Haochang Huant, Lijuan Ye, Lin Li, Mingxia Lu, Saiying Xiao, and Yiyi Liang: **Siyao Lin**: lin.silvacy@gmail.com
- Attorneys for Creditor First Credit Bank and Attorney Dennette A Mulvaney: **Dennette A Mulvaney**: dmulvaney@leechtishman.com; lmoya@leechtishman.com; narango@leechtishman.com; dbender@leechtishman.com
- Attorneys for Creditor Na Jiang: **Jeffrey S Shinbrot**: jeffrey@shinbrotfirm.com; sandra@shinbrotfirm.com; tanya@shinbrotfirm.com
- Interested Party/Courtesy NEF: **Xinyuan Zhang**: echozhang@shanzepartners.com; leowang@shanzepartners.com; siyunli@shanzepartners.com
- On behalf of the U.S. Trustee (RS): **Abram Feuerstein, Ali Matin**: abram.s.feuerstein@usdoj.gov; ali.matin@usdoj.gov
- US Trustee's Office (RS): ustpregion16.rs.ecf@usdoj.gov