Derrick Talerico (State Bar No. 223763)
dtalerico@wztslaw.com
Paige T. Rolfe (State Bar No. 331096)
prolfe@wztslaw.com
WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 Wilshire Boulevard, Suite 730
Los Angeles, CA 90025
Telephone: (424) 500-8552

Attorneys for Fu Bang Group Corp, USA and
Dos Lagos Center 2, LLC
Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA – RIVERSIDE DIVISION**

| | |
|---|---|
| In re:<br><br>FU BANG GROUP CORP (USA),<br><br>Debtor. | Lead Case No. 6:25-bk-13004-SY<br><br>Chapter 11<br><br>Jointly Administered with:<br>Case No. 6:25-bk-13642-SY |
| In re:<br><br>DOS LAGOS CENTER 2, LLC,<br><br>Debtor. | **DECLARATIONS OF BERNARDO D. CARDOSO II AND BRAD J. DOMITROVITSCH IN SUPPORT OF MOTION FOR ORDER (1) AUTHORIZING PRIVATE SALE OF REAL PROPERTY TO REAL ESTATE INCOME FUND I LLC, NOT SUBJECT TO OVERBID, FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS; (2) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF LEASES AND CONTRACTS; (3) AUTHORIZING ENTRY INTO PLAN SUPPORT AND SUBORDINATION AGREEMENT AND ACCEPTANCE OF BACKSTOP COMMITMENT; (4) FINDING GOOD FAITH UNDER 11 U.S.C. § 363(m); AND (5) WAIVING 14-DAY STAYS [DKT. 186]** |
| ☒ Affects All Debtors.<br>☐ Affects Fu Bang Group Corp (USA) Case No. 6:25-bk-13004-SY.<br>☐ Affects Dos Lagos Center 2, LLC Case No. 6:25-bk-13642-SY.<br><br>Debtors. | <u>Hearing</u>:<br>Date: November 5, 2026<br>Time: 1:30 p.m.<br>Crtrm: 302<br>3420 Twelfth Street<br>Riverside, CA 92501 |



WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

**DECLARATION OF BERNARDO D. CARDOSO II**

I, Bernardo D. Cardoso II, declare as follows:

1. I am a Managing Member of Real Estate Income Fund I LLC ("**REIF**"), a Delaware limited liability company. I make this declaration in support of the motion of Fu Bang Group Corp, USA and Dos Lagos Center 2, LLC (the "**Debtors**") for an order authorizing the private sale of real property to Real Estate Income Fund I LLC and granting related relief [Dkt. 186] (the "**Motion**"). Capitalized terms not defined here have the meanings given in the Motion. I have personal knowledge of the facts stated in this declaration and, if called as a witness, could and would testify competently to them.

2. <u>Ownership.</u> REIF was formed in Delaware on January 13, 2026 (Delaware File No. 10471158). Its registered office is 8 The Green, Suite A, Dover, Delaware 19901. Anthony Pirrello and I are REIF's Managing Members. REIF and Real Estate Income Fund III LLC ("**REIF III**") are affiliates.

3. I am authorized to execute the PSA and this declaration on behalf of REIF and to cause REIF to perform its obligations under the PSA. No further consent or approval of any member, manager, investor, lender, or other third party is required for REIF to close.

4. I signed the PSA on behalf of REIF. A true and correct copy of the executed PSA is attached as Exhibit 1. REIF has waived the requirement in section 4(a) of the PSA that the Sellers file the Sale Motion within ten (10) Business Days after the Effective Date.

5. REIF's initial offer, made in July 2026 in a non-binding letter of intent, was $19,750,000, following an extensive period of consideration and analysis on the potential acquisition. I first met Bo Don and viewed the property in the first quarter of 2025.

6. In the months following the July 2026 offer, REIF negotiated with the Debtors and their representatives at arm's length. During those negotiations, REIF increased its price to $20,750,000 to support the no-overbid structure of the PSA, and eliminated all financing, diligence, and inspection conditions.

7. REIF made its offer on the condition that it would not be exposed to overbids or an auction. REIF would not have agreed to serve as a stalking horse or to be subject to overbid on these terms.

8. Before the PSA was signed, REIF delivered the $300,000 Deposit to escrow, where it is held under the PSA. REIF understands that the Deposit becomes non-refundable upon entry of the Sale Order, except in the event of a Seller default.

9. Ability to close. REIF represents that it will have at closing, from cash on hand, its senior debt facility and equity, funds sufficient to pay the Purchase Price. REIF's obligation to close is not conditioned on financing.

10. Funding of the Purchase Price. REIF will fund the Purchase Price from the Deposit and additional cash, totaling approximately $1,000,000, with the balance from equity investment and debt financing provided by a private equity fund that has conditionally approved the financing, subject to entry of an order of this Court approving the sale and customary closing conditions. The lender's conditions are not conditions to REIF's obligation to close under the PSA. The $300,000 Deposit will be credited against the Purchase Price at closing. REIF expects to pay its closing costs, and to fund any payment under the Backstop Commitment, from the sources described herein.

11. REIF intends to close on or before December 31, 2026, and may close sooner. REIF is also prepared to waive the finality requirement and close sooner if the Court waives the stays under Rules 6004(h) and 6006(d).

12. REIF will pay all closing costs required by the PSA, including title premiums, escrow fees, documentary transfer taxes, recording fees, and survey costs.

13. Good faith. REIF is not an insider of either Debtor. Neither REIF, I, Mr. Pirrello, nor, to my knowledge, any of REIF's members or affiliates holds any claim against or equity interest in either Debtor, except that REIF III owns Dos Lagos Regional Center, LLC ("**DLRC**"), the general partner of the five Partnerships that hold the Partnership Claims. No officer, director, manager, member, or equity holder of REIF or REIF III is related to any officer, director, manager, member, or equity holder of either Debtor.

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

14. Other than the PSA and the Backstop Commitment, neither REIF nor its affiliates or principals has any agreement or understanding with the Debtors, Bo Don, or any other insider of the Debtors concerning the Property, the Debtors, or these Cases, including any agreement concerning payment, equity, employment, management, a loan, or any other post-closing role or benefit, although REIF may consult with Bo Don in the future on certain aspects of the EB5 program as it may require. DLRC is a party to the Support Agreement as general partner of the Partnerships. The only agreement between any REIF entity and Ms. Don is the October MIPA, under which REIF III acquired DLRC from Ms. Don, DLRC's sole member, for $1.00 and which provides that Ms. Don receives no other consideration or benefit.

15. REIF has not entered into any agreement with any other prospective purchaser of the Property, including Blue Spring Assets LLC, Dino Properties, LLC, or Citivest Commercial Investments, LLC, concerning the sale, the price, or whether any party would bid. REIF has not engaged in any collusion or attempted to control the sale price.

16. Adequate assurance. REIF intends to continue operating the Fu Bang Parcel as a residential rental community, pending the renovation and individual sale of the units, and to honor the Assumed Leases in accordance with their terms, including tenants' rights to the return of security deposits transferred to REIF at closing. REIF will take assignment at closing of Fu Bang's post-petition property management agreement with Sares-Regis and will continue professional management of the Property.

17. The funding sources described above will enable REIF to perform the Assumed Leases and Assumed Contracts after closing.

18. REIF has engaged a broker whose commission is not payable by the Debtors or their estates. REIF is responsible for any and all of its broker fees separate and apart from the Purchase Price.

19. REIF is purchasing the Property for its own account, has independently evaluated the Property, and is relying solely on its own investigation and not on any representation of the Debtors other than those expressly stated in the PSA.

20. Backstop Commitment. REIF has signed the Backstop Commitment, a true and correct copy of which is attached as Exhibit 3. Under it, if the sale closes, REIF will fund for the holders of Backstopped Claims against both Debtors, which are the Non-EB-5 Unsecured Claims and the portions of EB-5 Claims whose investors make a Pro Rata Election with the backstop option, any amount by which their distributions fall short of their Benchmark Recoveries, up to an aggregate of $1,250,000.

21. REIF's obligation under the Backstop Commitment survives closing, is not part of the Purchase Price, and may be enforced by the Debtors and any successor, including a plan administrator or liquidating trustee. REIF will pay any required amount when distributions are made on Backstopped Claims under a confirmed plan.

22. REIF expects to fund any payment under the Backstop Commitment from the sources described herein.

23. When the Debtors informed REIF of Blue Spring's September 28, 2026 email proposing $22,000,000, REIF agreed to backstop the recovery of allowed general unsecured claims against both Debtors, other than EB-5 Claims, so that those claims would receive at least what a $22,000,000 sale would have produced. REIF later agreed to extend the backstop to the portions of EB-5 Claims whose investors elect to withdraw from the EB-5 program, share pro rata with general unsecured creditors, and accept the backstop option. REIF is not backstopping any portion of an EB-5 Claim subject to a Program Retention Election, any portion whose investor makes no election or declines the backstop option, or Claim 6. The Backstop Commitment documents REIF's agreement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 16, 2026, at Coral Gables, Florida.



____________________________________

Bernardo D. Cardoso II

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

## DECLARATION OF BRAD J. DOMITROVITSCH

I, Brad J. Domitrovitsch, declare as follows:

1. I am the Manager of Real Estate Income Fund III LLC ("**REIF III**"), a Delaware limited liability company. I make this declaration in support of the motion of Fu Bang Group Corp, USA and Dos Lagos Center 2, LLC (the "**Debtors**") for an order authorizing the private sale of real property to Real Estate Income Fund I LLC and granting related relief [Dkt. 186] (the "**Motion**"). Capitalized terms not defined here have the meanings given in the Motion. I have personal knowledge of the facts stated in this declaration and, if called as a witness, could and would testify competently to them.

2. Ownership. REIF III is a Delaware limited liability company. I am its Manager.

3. Relationship to REIF. REIF III and Real Estate Income Fund I LLC ("**REIF**") are affiliates. REIF III is not an insider of either Debtor, and to my knowledge none of its members holds a claim against or an equity interest in either Debtor.

4. Acquisition of DLRC. On October 14, 2026, REIF III acquired 100% of the membership interests of Dos Lagos Regional Center, LLC ("**DLRC**") from Bo Chen (also known as Bo Don), DLRC's sole member, under a Membership Interest Purchase Agreement dated as of October 14, 2026 (the "**October MIPA**"), a true and correct copy of which is attached as Exhibit 5. The acquisition was effective that day, and the total purchase price was $1.00. Since then, REIF III has controlled DLRC as its sole member and has been authorized to act and to execute documents on DLRC's behalf.

5. DLRC and the Partnerships. DLRC is the general partner of Dos Lagos Center 1, LP; Dos Lagos Center 2, LP; Dos Lagos Center 3, LP; Dos Lagos Center 4, LP; and Dos Lagos Center 5, LP (the "**Partnerships**"), whose limited partners are approximately 78 foreign investors who invested under the EB-5 Immigrant Investor Program. DLRC also holds a regional center designation issued by U.S. Citizenship and Immigration Services ("**USCIS**").

6. REIF III's intentions. If the sale to REIF closes, REIF intends to redevelop the Property (free and clear of all liens and claims), including the units that have not been built, and may seek to finance a future phase in part with EB-5 capital through DLRC. REIF III intends to cause

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

DLRC to (a) maintain its regional center designation in good standing and make all required USCIS filings; (b) pay the costs of doing so; and (c) provide existing investors that make a Program Retention Election, and their immigration counsel, with the documentation USCIS requires for their petitions.

7. These are statements of REIF III's present intentions. REIF III does not guarantee any immigration outcome. Neither this declaration nor the Support Agreement creates any obligation of DLRC or REIF III to the investors beyond those that already exist under the Partnerships' agreements and applicable law, and nothing in either changes the investors' rights under those agreements. Neither REIF III nor DLRC assumes or guarantees any Partnership Claim, any obligation of any Partnership to its investors, or any liability of DLRC arising before October 14, 2026, all of which remain with DLRC's prior member as provided in the October MIPA.

8. <u>The Support Agreement.</u> On October 14, 2026, DLRC, as general partner of each Partnership and acting through REIF III, executed the Plan Support and Subordination Agreement (the "**Support Agreement**") with the Debtors. A true and correct copy is attached as Exhibit 4. By this declaration, REIF III confirms on behalf of DLRC and each Partnership the commitments in the Support Agreement.

9. Under the Support Agreement, and only if the sale to REIF closes, each Partnership (a) consents to separate classification of its Partnership Claim; (b) divides its Partnership Claim among its investors in proportion to their capital accounts and, for each investor's portion, makes only the election that the investor affirmatively makes in writing: a Pro Rata Election, under which the portion shares pro rata with general unsecured creditors and the investor withdraws from the EB-5 program and is redeemed, with or without the Backstop Option, under which the portion is also backstopped and the investor gives a release; or a Program Retention Election, under which the portion receives no distribution from the estates, the investor remains a limited partner and in the program, and the investor gives a release; (c) for an investor that makes no election, holds the distributions on its portion for the investor's account until the investor signs a statement withdrawing from the EB-5 program, without any release and without treating the investor as having withdrawn; (d) will vote to accept a plan whose treatment of the Partnership Claims conforms to the Support

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

Agreement, after the Court approves a disclosure statement; and (e) accepts that treatment in light of REIF III's intended support of the existing investors. Neither DLRC nor any Partnership makes any election or gives any release on behalf of any investor. A release given by an investor does not extend to any person who was a member, manager, officer, or agent of DLRC or any Partnership before October 14, 2026, including Ms. Don.

10. Authority. Under section 9.3 of the Dos Lagos Center 2 limited partnership agreement, the general partner may execute documents, compromise claims, and take related actions on behalf of the partnership without the consent of the limited partners. No limited partner consent is required for the Support Agreement, although each investor's own election determines whether its portion receives pro rata treatment.

11. Affiliate determination. Because REIF is an affiliate of DLRC, DLRC considered section 9.11 of each partnership agreement, which permits agreements with the general partner's affiliates if made in good faith and on terms the general partner deems reasonable and in the best interests of the partnership. DLRC determined in good faith that the Support Agreement meets that standard for each Partnership, and documented that determination in a written consent.

12. DLRC's reasons were these: (a) with the project stalled and no payments from Fu Bang, the status quo offers the investors no path to continue their immigration petitions and only a small economic recovery on the Partnership Claims; (b) each investor decides for itself whether to take a pro rata recovery, with or without the Backstop Commitment, or to remain in the EB-5 program, and an investor that makes no choice keeps both its pro rata recovery, which is held for it until it chooses to withdraw, and its place in the program; (c) a sale to REIF, together with REIF III's ownership of DLRC and its intentions described above, offers the investors the only identified path to continuing their petitions; and (d) the Partnership Claims are otherwise unaffected, and the Support Agreement releases no claim other than through releases that individual investors choose to give.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 16, 2026, at Northampton, Pennsylvania.

Brad J. Domitrovitsch

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

# EXHIBIT 1

# Executed Purchase and Sale Agreement dated September 17, 2026

# PURCHASE AND SALE AGREEMENT

This **Purchase and Sale Agreement** (this "Agreement") is entered into as of the 17th day of September 17, 2026 (the "Effective Date"), by and among **Fu Bang Group Corp, USA**, a California corporation ("Fu Bang"), and **Dos Lagos Center 2, LLC**, a California limited liability company ("DLC2"; and together with Fu Bang, the "Debtors" or "Sellers"), on the one hand, and **Real Estate Income Fund I LLC**, a Delaware limited liability company ("Purchaser"), on the other hand. Sellers and Purchaser are referred to herein collectively as the "Parties" and each individually as a "Party."

## RECITALS

A. On May 7, 2025, Fu Bang filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Central District of California, Riverside Division (the "Court"). On May 30, 2025, DLC2 filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Court. The Debtors' chapter 11 cases are being jointly administered under Case No. 6:25-bk-13004 (the "Bankruptcy Case").

B. Fu Bang owns fee simple title to the real property located in Corona, California and identified as Assessor's Parcel Number 279-460-064, as more particularly described on Exhibit A attached hereto (the "Fu Bang Parcel"). DLC2 owns fee simple title to the adjacent real property located in Corona, California and identified as Assessor's Parcel Number 279-460-063, as more particularly described on Exhibit B attached hereto (the "DLC2 Parcel," and together with the Fu Bang Parcel, the "Land").

C. Sellers desire to sell to Purchaser, and Purchaser desires to purchase from Sellers, the Property (as defined below) on the terms and conditions set forth in this Agreement, subject to approval by the Court under sections 105, 363, and 365 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**1. <u>Sale of Property.</u>**

Subject to the terms and conditions of this Agreement, and subject to entry of the Approval Order (as defined below), at Closing (as defined below) Sellers shall sell, convey, transfer, and assign to Purchaser, and Purchaser shall purchase from Sellers, all of Sellers' right, title, and interest in and to the following (collectively, the "**Property**"):

**(a)** the Land, together with all buildings, structures, improvements, and fixtures now situated thereon, and all rights, privileges, easements, appurtenances, development rights, air rights, water rights, mineral rights, and rights-of-way pertaining thereto, and all right, title, and

interest of Sellers in and to any land lying in the bed of any street, road, avenue, or alley, open or closed, adjoining the Land (collectively, the "**Real Property**");

**(b)** all tangible personal property owned by Sellers, if any, that is located on and used exclusively in connection with the ownership, operation, or maintenance of the Real Property (the "**Personal Property**");

**(c)** the leases, subleases, licenses, and other occupancy agreements affecting the Real Property that are identified on **Schedule 1** attached hereto (the "**Assumed Leases**"), together with any security deposits, prepaid rents, and other amounts held by Sellers thereunder;

**(d)** the service contracts, maintenance agreements, and other contracts relating to the Real Property that are identified on **Schedule 2** attached hereto (the "**Assumed Contracts**" and, together with the Assumed Leases, the "**Assumed Executory Contracts**"); and

**(e)** to the extent transferable, all licenses, permits, certificates of occupancy, approvals, entitlements, warranties, plans, specifications, and intangible property held by Sellers and relating exclusively to the Real Property (the "**Intangible Property**").

Purchaser may, by written notice to Sellers delivered no later than five (5) Business Days prior to the hearing on the Sale Motion (as defined below), modify Schedule 1 or Schedule 2 to add or remove leases or contracts, in which event Sellers shall serve any supplemental cure notice required by the Bankruptcy Code and the Local Bankruptcy Rules of the Court.

**2. <u>Purchase Price and Deposit.</u>**

**(a) <u>Purchase Price</u>**. The purchase price for the Property (the "**Purchase Price**") is Twenty Million Seven Hundred Fifty Thousand Dollars ($20,750,000.00), payable in immediately available funds in accordance with this Section 2.

**(b) <u>Deposit</u>**. Purchaser has previously delivered to the Escrow Agent (as defined below), by wire transfer of immediately available funds, a cash deposit in the amount of Three Hundred Thousand Dollars ($300,000.00) (the "**Deposit**"), the receipt of which is hereby acknowledged. The Deposit shall be held by the Escrow Agent in a non-interest-bearing account pending Closing or the earlier termination of this Agreement. Prior to entry of the Approval Order, the Deposit shall be refundable only in the event this Agreement is terminated for the reasons expressly set forth in Section 8 below. Upon entry of the Approval Order, the **Deposit shall become fully non-refundable to Purchaser** (except in the event of a default by Sellers or a failure of Sellers to convey the Property in accordance with this Agreement), shall be released from escrow, and shall be delivered to Sellers to be applied against the Purchase Price at Closing.

**(c) <u>Balance at Closing</u>**. On or before the Closing Date, Purchaser shall deliver to the Escrow Agent, by wire transfer of immediately available funds, the balance of the Purchase Price (as adjusted for prorations and closing costs as provided herein), which balance the Escrow Agent

shall disburse to Sellers at Closing in accordance with the Approval Order and joint written closing instructions of the Parties.

**(d)** **Escrow Agent**. The escrow for this transaction shall be opened with a title company mutually acceptable to the Parties (the "**Escrow Agent**" or "**Title Company**"). The Parties shall execute such supplemental escrow instructions as the Escrow Agent may reasonably require; provided, however, that in the event of any conflict between such instructions and this Agreement, this Agreement shall control.

**3.** **Bankruptcy Court Approval; Sole Contingency.**

**(a)** **Sale Motion**. Within ten (10) Business Days after the Effective Date, Sellers shall file with the Court a motion (the "**Sale Motion**") seeking entry of an order (the "**Approval Order**"), in form and substance reasonably acceptable to Purchaser, authorizing and approving, among other things: (i) the sale of the Property to Purchaser pursuant to the terms of this Agreement, free and clear of all liens, claims, encumbrances, and other interests to the extent permitted by section 363(f) of the Bankruptcy Code; (ii) the assumption and assignment of the Assumed Executory Contracts pursuant to section 365 of the Bankruptcy Code, with all cure amounts, if any, being the responsibility of Sellers; (iii) a finding that Purchaser is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code; and (iv) such other and further relief as is customary for a sale of this type.

**(b)** **Sole Contingency**. Purchaser's obligation to consummate the Closing is subject to the single condition precedent that the Court shall have entered the Approval Order. **Except for entry of the Approval Order, there are no conditions, contingencies, or diligence periods of any kind in favor of Purchaser, and Purchaser's obligation to close is not conditioned on financing, inspections, title review, environmental review, appraisal, market conditions, or any other matter.**

**(c)** **Cooperation**. Sellers shall use commercially reasonable efforts to prosecute the Sale Motion and to obtain entry of the Approval Order as promptly as practicable. Purchaser shall cooperate with Sellers and shall provide such information regarding Purchaser and its principals as is reasonably necessary to support entry of the Approval Order, including any showing of good faith under section 363(m) of the Bankruptcy Code and adequate assurance of future performance under section 365 of the Bankruptcy Code.

**4.** **"As-Is, Where-Is" Sale; Property Information.**

**(a)** **As-Is, Where-Is**. **PURCHASER EXPRESSLY ACKNOWLEDGES AND AGREES THAT THE PROPERTY IS BEING SOLD, AND PURCHASER IS PURCHASING THE PROPERTY, ON AN "AS-IS, WHERE-IS, WITH ALL FAULTS" BASIS, WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND OR NATURE WHATSOEVER, WHETHER EXPRESS, IMPLIED, OR ARISING BY**

**OPERATION OF LAW. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, REGARDING: (I) THE PHYSICAL CONDITION OF THE PROPERTY, INCLUDING ANY IMPROVEMENTS, SOILS, GEOLOGY, OR GROUNDWATER; (II) THE VALUE, INCOME POTENTIAL, EXPENSES, USES, HABITABILITY, MERCHANTABILITY, OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE PROPERTY; (III) THE ZONING, LAND-USE, SUBDIVISION, ENTITLEMENT, OR DEVELOPMENT STATUS OF THE PROPERTY OR ITS COMPLIANCE WITH ANY APPLICABLE LAWS; (IV) THE ENVIRONMENTAL CONDITION OF THE PROPERTY OR THE PRESENCE OR ABSENCE OF HAZARDOUS SUBSTANCES; (V) THE ACCURACY OR COMPLETENESS OF ANY BOOKS, RECORDS, REPORTS, STUDIES, OR OTHER MATERIALS DELIVERED OR MADE AVAILABLE BY OR ON BEHALF OF SELLERS; OR (VI) THE STATUS OR PERFORMANCE OF THE ASSUMED EXECUTORY CONTRACTS. PURCHASER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY OR ON BEHALF OF SELLERS. ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PROPERTY IS PROVIDED AS A CONVENIENCE ONLY AND SHALL NOT BE RELIED UPON BY PURCHASER.**

**(b)** **Release**. Effective as of the Closing, Purchaser, on behalf of itself and its successors and assigns, releases Sellers and their respective estates, officers, directors, managers, members, employees, agents, and professionals from any and all claims, demands, causes of action, losses, damages, liabilities, costs, and expenses (including attorneys' fees) of every kind or nature, whether known or unknown, foreseen or unforeseen, arising out of or relating to the physical, environmental, economic, or legal condition of the Property. Purchaser expressly waives the benefits of California Civil Code Section 1542, which provides:

> **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

**(c)** **Property Information**. Promptly following the Effective Date, and thereafter from time to time upon Purchaser's reasonable request, Sellers shall deliver or make available to Purchaser, at no cost to Purchaser, copies of all documents, information, reports, studies, plans, surveys, title work, environmental reports, engineering reports, appraisals, rent rolls, operating statements, tax bills, insurance policies, permits, entitlements, and other materials in Sellers' possession or reasonable control that relate to the Property (collectively, the "**Property Information**"). The Property Information is delivered without representation or warranty of any

kind, as set forth in Section 4(a) above, and shall be treated by Purchaser as confidential prior to Closing except to the extent disclosure is required by law, court order, or as reasonably necessary to Purchaser's representatives, lenders, or investors under customary confidentiality obligations.

**(d)** **Conspicuous Disclaimer**. The Parties agree that the disclaimers, releases, and waivers contained in this Section 4 are conspicuous within the meaning of California Commercial Code Section 1201(b)(10) and any other applicable law, and were the subject of negotiation between the Parties, each of whom was represented, or had the opportunity to be represented, by counsel of its own choosing.

**5.** **Title and Conveyance.**

**(a)** **Conveyance**. At Closing, Sellers shall convey title to the Real Property to Purchaser (or its permitted assignee under Section 12) by grant deed substantially in the form attached hereto as Exhibit C (each, a "**Grant Deed**"), free and clear of all liens, claims, encumbrances, and other interests to the extent provided by the Approval Order and section 363(f) of the Bankruptcy Code, subject only to the Permitted Exceptions (as defined below).

**(b)** **Permitted Exceptions**. "**Permitted Exceptions**" means (i) real property taxes and assessments for the current tax year that are not yet due and payable as of the Closing Date; (ii) all matters that would be disclosed by an accurate ALTA survey or physical inspection of the Real Property; (iii) all matters of record other than monetary liens; (iv) the rights of tenants in possession under the Assumed Leases; and (v) such other exceptions as may be approved in writing by Purchaser.

**(c)** **Title Policy**. Purchaser may, at its sole cost and expense, obtain from the Title Company an ALTA extended-coverage owner's policy of title insurance insuring Purchaser's fee title in the Real Property. The issuance of any title policy shall not be a condition to Purchaser's obligation to close.

**6.** **Closing.**

**(a)** **Closing Date**. The closing of the sale contemplated by this Agreement (the "**Closing**") shall occur through the Escrow Agent on the date that is fifteen (15) Business Days after the date on which the Approval Order becomes a Final Order, or such other date as the Parties may mutually agree in writing (the "**Closing Date**"). As used herein, "**Final Order**" means an order of the Court as to which any stay pending appeal has been denied or has expired, and Purchaser may in its sole discretion waive the requirement that the Approval Order be a Final Order and close on any earlier date.

**(b)** **Seller Deliveries**. At Closing, Sellers shall deliver to the Escrow Agent, in each case duly executed and acknowledged where appropriate: (i) the Grant Deeds; (ii) an assignment and assumption of the Assumed Executory Contracts and the Intangible Property in a form reasonably acceptable to the Parties; (iii) a bill of sale for the Personal Property, if any; (iv) a non-

foreign person affidavit for each Seller in the form required by section 1445 of the Internal Revenue Code and California Revenue and Taxation Code Section 18662; (v) any transfer tax declarations required by applicable law; (vi) a customary owner's title affidavit reasonably requested by the Title Company (subject to Sellers' actual knowledge and the terms of this Agreement); (vii) evidence of the authority of Sellers to consummate the transactions contemplated hereby; and (viii) a certified copy of the Approval Order.

**(c)** **<u>Purchaser Deliveries</u>**. At Closing, Purchaser shall deliver to the Escrow Agent: (i) the balance of the Purchase Price as provided in Section 2(c); (ii) executed counterparts of the assignment and assumption of the Assumed Executory Contracts and any other Closing documents to which Purchaser is a party; and (iii) evidence of the authority of Purchaser to consummate the transactions contemplated hereby.

**(d)** **<u>Closing Costs</u>**. Purchaser shall pay all closing costs, including, without limitation: (i) all title insurance premiums, including any extended-coverage or ALTA upgrade and any endorsements to the owner's title policy; (ii) all escrow fees; (iii) all documentary transfer taxes; (iv) all recording fees for the Grant Deeds and any loan documents; and (v) the cost of any survey obtained by Purchaser. Sellers shall not be responsible for any closing costs. Each Party shall pay its own attorneys' fees.

**(e)** **<u>Prorations</u>**. Real property taxes and assessments, rents actually collected under the Assumed Leases, and utility charges and other operating expenses customarily prorated in commercial real estate transactions shall be prorated as of 12:01 a.m. on the Closing Date, with Sellers bearing all such items accruing prior to the Closing Date and Purchaser bearing all such items accruing on and after the Closing Date. Delinquent rents, if any, shall be prorated only if and when collected. The provisions of this Section 6(e) shall survive Closing.

**7.** **<u>Limited Representations.</u>**

**(a)** **<u>Sellers</u>**. Subject in each case to the entry of the Approval Order, each Seller represents and warrants to Purchaser, as of the Effective Date and as of the Closing Date, that: (i) it is duly organized, validly existing, and in good standing under the laws of the State of California; and (ii) subject to the Approval Order, it has the requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. Except as expressly set forth in this Section 7(a), Sellers make no representations or warranties of any kind, all of which are disclaimed pursuant to Section 4.

**(b)** **<u>Purchaser</u>**. Purchaser represents and warrants to Sellers, as of the Effective Date and as of the Closing Date, that: (i) Purchaser is a Delaware limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware; (ii) Purchaser has the full power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby, and this Agreement is a valid and binding obligation of Purchaser enforceable in accordance with its terms; (iii) Purchaser has, or will have

as of the Closing Date, sufficient unrestricted cash on hand to pay the Purchase Price and to perform all of its obligations under this Agreement; (iv) no consent, approval, or authorization of any third party is required for Purchaser's execution and performance of this Agreement other than as expressly provided herein; and (v) Purchaser is acquiring the Property for its own account, has independently evaluated the Property, and is capable of bearing the economic risk of the investment.

**(c)** **Survival**. The representations and warranties in this Section 7 shall survive Closing for a period of six (6) months, after which they shall terminate and be of no further force or effect.

**8.** **Termination.**

**(a)** **Termination Events**. This Agreement may be terminated prior to Closing only as follows: (i) by mutual written agreement of the Parties; (ii) by either Party if the Court enters an order denying approval of the sale to Purchaser or approving a sale of the Property to a party other than Purchaser; (iii) by either Party if the Approval Order has not been entered on or before the date that is sixty (60) days after the Effective Date, as such date may be extended by mutual written agreement of the Parties (the "**Outside Approval Date**"); (iv) by Purchaser if Sellers are in material breach of this Agreement and such breach is not cured within ten (10) Business Days after written notice thereof from Purchaser; or (v) by Sellers if Purchaser is in material breach of this Agreement, including any failure to timely deliver the Deposit or the balance of the Purchase Price, and such breach is not cured within ten (10) Business Days after written notice thereof from Sellers.

**(b)** **Effect of Termination**. Upon a termination pursuant to Section 8(a)(i), (ii), (iii), or (iv), the Deposit (to the extent not yet released to Sellers pursuant to Section 2(b)) shall be returned to Purchaser, and neither Party shall have any further obligation to the other under this Agreement except for obligations that expressly survive termination. Upon a termination pursuant to Section 8(a)(v), Sellers shall retain the Deposit as liquidated damages as provided in Section 8(c) below, and neither Party shall have any further obligation to the other under this Agreement except for obligations that expressly survive termination.

**(c)** **Liquidated Damages**. **THE PARTIES ACKNOWLEDGE THAT SELLERS' DAMAGES IN THE EVENT OF A DEFAULT BY PURCHASER WOULD BE EXTREMELY DIFFICULT TO ASCERTAIN AND THAT THE AMOUNT OF THE DEPOSIT REPRESENTS A REASONABLE ESTIMATE OF SUCH DAMAGES. ACCORDINGLY, IN THE EVENT OF A TERMINATION OF THIS AGREEMENT PURSUANT TO SECTION 8(a)(v), OR IF PURCHASER OTHERWISE FAILS TO CLOSE AFTER ENTRY OF THE APPROVAL ORDER FOR ANY REASON OTHER THAN A DEFAULT BY SELLERS, SELLERS' SOLE AND EXCLUSIVE REMEDY SHALL BE TO RETAIN THE DEPOSIT AS LIQUIDATED DAMAGES. THE PARTIES HAVE INITIALED THIS PROVISION TO INDICATE THEIR AGREEMENT TO THIS**

**LIQUIDATED-DAMAGES PROVISION IN ACCORDANCE WITH CALIFORNIA CIVIL CODE SECTIONS 1671, 1676, AND 1677.**

Sellers' Initials: __________ Purchaser's Initials: __________

**(d)** **Sellers' Default**. In the event of a default by Sellers that is not cured within the applicable cure period, Purchaser's sole and exclusive remedies shall be, at Purchaser's election, to (i) terminate this Agreement and receive a return of the Deposit, or (ii) seek specific performance of this Agreement. Purchaser expressly waives any right to seek monetary damages, whether direct, consequential, incidental, or otherwise.

**9. Casualty and Condemnation.**

If, prior to Closing, all or any material portion of the Real Property is damaged or destroyed by fire or other casualty, or becomes the subject of condemnation proceedings, Sellers shall promptly notify Purchaser. Purchaser shall have no right to terminate this Agreement on account of such casualty or condemnation, but shall be entitled to receive at Closing an assignment of all insurance proceeds and condemnation awards (net of Sellers' reasonable collection costs) payable in connection therewith, together with a credit against the Purchase Price in the amount of any deductible under the applicable insurance policy.

**10. Notices.**

All notices, requests, consents, and other communications under this Agreement shall be in writing and shall be deemed given (a) when personally delivered; (b) one (1) Business Day after being sent by reputable overnight courier; (c) upon confirmed transmission by email with a copy sent by one of the other methods listed herein; or (d) three (3) Business Days after being deposited in the United States mail, certified or registered, return receipt requested, postage prepaid, in each case addressed to the Parties at the addresses set forth on the signature page hereto (or such other address as a Party may designate by notice given in accordance with this Section).

**11. Miscellaneous.**

**(a)** **Governing Law; Jurisdiction**. This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to conflict-of-laws principles, except to the extent superseded by the Bankruptcy Code. The Parties consent to the exclusive jurisdiction of the Court to hear and determine any dispute arising out of or relating to this Agreement or the transactions contemplated hereby.

**(b)** **Waiver of Jury Trial**. **EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

**(c)** **Entire Agreement**. This Agreement (including the exhibits and schedules attached hereto) constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior negotiations, discussions, and agreements, whether written or oral, between the Parties concerning such subject matter. This Agreement may be amended only by a written instrument signed by both Parties.

**(d)** **Assignment**. Purchaser may, upon written notice to Sellers, assign this Agreement to an entity that is wholly owned or controlled by, or under common control with, Purchaser or its principals, provided that (i) no such assignment shall relieve Purchaser of its obligations hereunder, and (ii) the assignee shall assume in writing all obligations of Purchaser hereunder. Otherwise, neither Party may assign this Agreement without the prior written consent of the other Party.

**(e)** **Brokers**. Each Party represents to the other that it has not engaged any broker, finder, or similar agent in connection with this transaction whose commission or fee would be payable by the other Party. Each Party shall indemnify the other against any claim for a commission or fee asserted through the indemnifying Party in breach of the foregoing representation. This Section 11(e) shall survive Closing or any earlier termination of this Agreement.

**(f)** **Counterparts; Electronic Signatures**. This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Signatures delivered by facsimile, email, or electronic signature platform (including DocuSign) shall have the same force and effect as original signatures.

**(g)** **Business Day**. "**Business Day**" means any day other than a Saturday, Sunday, or federal or California state holiday on which banking institutions in Los Angeles, California are authorized or required to be closed. If any deadline hereunder falls on a day that is not a Business Day, such deadline shall be extended to the next succeeding Business Day.

**(h)** **Severability**. If any provision of this Agreement is held to be invalid or unenforceable, the remaining provisions shall continue in full force and effect to the fullest extent permitted by law.

**(i)** **No Recording**. Neither Party shall record this Agreement or any memorandum hereof against the Real Property.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have executed this Purchase and Sale Agreement as of the Effective Date.

**SELLERS:**

**FU BANG GROUP CORP, USA,**

a California corporation

By: ____________________________________

Name: Bo Don,
Title: Managing Member

**DOS LAGOS CENTER 2, LLC,**

a California limited liability company

By: ____________________________________

Name: Bo Don,
Title: Managing Member

**PURCHASER:**

**REAL ESTATE INCOME FUND I LLC,**

a Delaware limited liability company

By: ____________________________________

Name: Bernardo D. Cardoso II

Title: Managing Member

**Notice Addresses:**

**If to Sellers:**

Fu Bang Group Corp, USA

Dos Lagos Center 2, LLC

c/o 17700 Castleton Street, Suite 378, City of Industry, California 91748,
Attention: Bo Man Don,
Email:

with a copy (which shall not constitute notice) to:
Weintraub Zolkin Talerico & Selth LLP
11766 Wilshire Boulevard, Suite 730
Los Angeles, California 90025
Attention: Derrick Talerico, Esq.
Email: dtalerico@wztslaw.com

**If to Purchaser:**
Real Estate Income Fund I LLC
8 The Green, Suite A
Dover, Delaware 19901
Attention: Bernardo D. Cardoso II, Managing Members
Email: Bc@kdhfund.com

# EXHIBIT A

## Legal Description of Fu Bang Parcel

(APN 279-460-064, Corona, California)

[To be inserted]

# EXHIBIT B

## Legal Description of DLC2 Parcel

(APN 279-460-063, Corona, California)

[To be inserted]

# EXHIBIT C

## Form of Grant Deed

[To be attached]

## SCHEDULE 1

### Assumed Leases

| # | Tenant | Premises / Parcel | Lease Document(s) and Date |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

[To be completed by Purchaser prior to the hearing on the Sale Motion, subject to Section 1 of the Agreement.]

**SCHEDULE 2**

**Assumed Contracts**

| # | **Counterparty** | **Description of Contract** | **Date** |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

[To be completed by Purchaser prior to the hearing on the Sale Motion, subject to Section 1 of the Agreement.]

# EXHIBIT 3

# REIF I Backstop Commitment

# BACKSTOP COMMITMENT
# of
# REAL ESTATE INCOME FUND I LLC

October 15, 2026

To: Fu Bang Group Corp, USA and Dos Lagos Center 2, LLC (the "**Debtors**"), debtors and debtors in possession in Lead Case No. 6:25-bk-13004-SY pending in the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**")

Real Estate Income Fund I LLC, a Delaware limited liability company ("**REIF I**"), is the purchaser of the Debtors' real property under the Purchase and Sale Agreement dated September 17, 2026 (as amended, the "**PSA**"). Concurrently with this commitment, Dos Lagos Center 1, LP through Dos Lagos Center 5, LP (the "**Partnerships**") and the Debtors are entering into a Plan Support and Subordination Agreement (the "**Support Agreement**"). Capitalized terms used but not defined here have the meanings given in the Support Agreement. When the Debtors informed REIF I of another prospective purchaser's emailed proposal of $22,000,000, REIF I agreed to backstop the recovery of Allowed general unsecured claims against the Debtors other than EB-5 Claims. REIF I has also agreed to extend that backstop to the Backstopped Pro Rata Portions of the Partnership Claims, whose Investors elect under the Support Agreement to withdraw from the EB-5 Program, share pro rata with general unsecured creditors, and accept the Backstop Option. To document that agreement and to induce the Debtors to proceed with the sale under the PSA, REIF I commits as follows (this "**Backstop Commitment**"):

## 1. Commitment.

If the Closing occurs, REIF I irrevocably commits to backstop the recovery of the Backstopped Claims against both Debtors, consisting of (a) Allowed general unsecured claims, other than claims separately classified as LP regional center claims or related EB-5 claims (the EB-5 Claims) and the other claims excluded from the definition of Non-EB-5 Unsecured Claims in the Support Agreement; and (b) the Backstopped Pro Rata Portions, by paying, for the benefit of the holders of Backstopped Claims, the aggregate Benchmark Shortfall (the "**Backstop Amount**"), up to an aggregate maximum of $1,250,000 for both estates combined (the "**Cap**"). REIF I is not backstopping the recovery of any Program Portion, any Default Portion, any Pro Rata Portion other than a Backstopped Pro Rata Portion, or any Related EB-5 Claim, including Claim 6. REIF I's aggregate obligation under this Backstop Commitment shall not exceed the Cap. Nothing in this Backstop Commitment, the Support Agreement, the PSA or the Sale Order obligates REIF I, Real Estate Income Fund III LLC, Dos Lagos Regional Center, LLC, any Partnership, or any of their members or managers to pay, assume, guarantee or backstop any Partnership Claim, any EB-5 Claim, or any claim of any current or former limited partner or investor, other than the Backstopped Pro Rata Portions to the extent of the Cap.

## 2. Payment.

REIF I shall pay the Backstop Amount then due within ten (10) Business Days after written notice from the Debtors or their successor stating the amount due and showing its calculation, given in connection with each distribution on Backstopped Claims under a confirmed plan. Payment shall be made to the disbursing agent designated in the notice.

Aggregate payments shall not exceed the Cap. "Business Day" means any day other than a Saturday, Sunday, or legal holiday in California.

**3. Use of Funds; Not Purchase Price.**

The Backstop Commitment is not part of the Purchase Price and is not consideration for the Property. Amounts paid under it shall be held in trust by the disbursing agent for the exclusive benefit of the holders of Backstopped Claims, shall be distributed only to them, pro rata according to their Benchmark Shortfalls, and are not available to pay any other claim or expense of either estate. Amounts distributed on a Backstopped Pro Rata Portion shall be paid to the Partnership, for payment to the Investor under Section 4(d) of the Support Agreement. The Backstop Commitment does not create any lien or alter the priority of any claim.

**4. No Setoff; No Other Conditions.**

REIF I's obligations under this Backstop Commitment are subject to no condition other than the Closing. REIF I shall not set off or recoup against any amount due under this Backstop Commitment any claim it may have against either Debtor, under the PSA or otherwise.

**5. Survival; Enforcement.**

This Backstop Commitment survives the Closing and the confirmation of any plan. It binds REIF I and its successors and assigns. REIF I may not assign or delegate its obligations without the Debtors' written consent and the approval of the Bankruptcy Court, and any assignment of the PSA to a designee does not release REIF I. This Backstop Commitment may be enforced by the Debtors and any successor, including a plan administrator or liquidating trustee, on behalf of the holders of Backstopped Claims. The prevailing party in any action to enforce it shall recover its reasonable attorneys' fees and costs.

**6. Disputes.**

Any dispute concerning the calculation of the Backstop Amount shall be determined by the Bankruptcy Court, and REIF I shall have standing to be heard. Pending determination, REIF I shall pay any undisputed portion when due.

**7. Representations.**

REIF I represents that (a) it has full power and authority to make and perform this Backstop Commitment, which has been duly authorized and is its legal, valid, and binding obligation; (b) no consent of any other person is required; and (c) it expects to have, from cash on hand, its senior debt facility and equity, funds sufficient to pay the Purchase Price and the Cap.

**8. Termination.**

This Backstop Commitment terminates automatically, without liability, if the PSA terminates before the Closing. This Backstop Commitment also terminates automatically, without liability, if no notice under Section 2 has been given by December 31, 2028. REIF I may at any time pay the unpaid balance of the Cap to a disbursing agent designated by the Debtors, to be held in reserve for the holders of Backstopped Claims, whereupon REIF I shall have no further obligation under this Backstop Commitment.

**9. Governing Law; Jurisdiction.**

This Backstop Commitment is governed by the laws of the State of California, without regard to conflict-of-law rules. The Bankruptcy Court has exclusive jurisdiction over any dispute arising under it, and REIF I consents to that jurisdiction.

**REAL ESTATE INCOME FUND I LLC**

By: ______________________________
Bernardo D. Cardoso II, Managing Member

By: *Anthony V. Pirrello*
______________________________
Anthony Pirrello, Managing Member

Acknowledged and accepted, subject to Bankruptcy Court approval:

**FU BANG GROUP CORP, USA**
By: ______________________________
Nicholas Rubin, Chief Restructuring Officer

**DOS LAGOS CENTER 2, LLC**
By: ______________________________
Nicholas Rubin, Chief Restructuring Officer

# EXHIBIT 4

## Plan Support and Subordination Agreement

# PLAN SUPPORT AND SUBORDINATION AGREEMENT

This Plan Support and Subordination Agreement (this "**Agreement**"), dated as of October 14, 2026, is entered into by and among (a) Dos Lagos Center 1, LP; Dos Lagos Center 2, LP; Dos Lagos Center 3, LP; Dos Lagos Center 4, LP; and Dos Lagos Center 5, LP, each a California limited partnership (each, a "**Partnership**," and together, the "**Partnerships**"), each acting by its general partner, Dos Lagos Regional Center, LLC, a California limited liability company ("**DLRC**"); (b) DLRC, in its own capacity, solely for purposes of Section 4(c); and (c) Fu Bang Group Corp, USA ("**Fu Bang**") and Dos Lagos Center 2, LLC ("**DLC2**," and together with Fu Bang, the "**Debtors**"), each acting by its Chief Restructuring Officer, Nicholas Rubin.

**RECITALS**

A. The Debtors are the debtors and debtors in possession in jointly administered chapter 11 cases pending in the United States Bankruptcy Court for the Central District of California, Riverside Division (the "**Bankruptcy Court**"), under Lead Case No. 6:25-bk-13004-SY (the "**Cases**").

B. The Debtors have moved (the "**Sale Motion**") for authority to sell their real property in Corona, California (the "**Property**") to Real Estate Income Fund I LLC ("**REIF I**") under a Purchase and Sale Agreement dated September 17, 2026 (as amended, the "**PSA**"), for $20,750,000 (the "**Purchase Price**"). Another prospective purchaser proposed by email a price of $22,000,000.

C. The Partnerships hold claims against Fu Bang that Fu Bang scheduled as general unsecured claims in the aggregate amount of $33,653,750, and may hold claims against DLC2 (all claims of the Partnerships against either Debtor, the "**Partnership Claims**"). Each Partnership raised its capital from investors under the EB-5 Immigrant Investor Program, and each Partnership Claim is attributable to those investors.

D. Eleven investors who are or were limited partners of certain Partnerships assert against Fu Bang only, in Claim No. 6 in the Cases, claims and a judgment lien based on a judgment arising from their EB-5 investments. Claim 6 is not subject to the Elections or any other provision of this Agreement, and the Debtors reserve all rights with respect to it, including to seek its subordination under section 510(b) of the Bankruptcy Code.

E. Since October 14, 2026, DLRC has been wholly owned and controlled by Real Estate Income Fund III LLC ("**REIF III**"), an affiliate of REIF I. REIF III intends, if the sale to REIF I closes, to cause DLRC to maintain its EB-5 regional center designation and to support the existing investors in the Partnerships in their pending and future immigration petitions, as described in the Declaration of Brad J. Domitrovitsch filed with the Sale Motion (the "**Intended Investor Support**").

F. When REIF I was informed of the $22,000,000 proposal, it agreed to backstop the recovery of Allowed general unsecured claims against the Debtors other than EB-5 Claims. REIF I has also agreed to extend that backstop to the portions of the Partnership Claims attributable to investors who elect to withdraw from the EB-5 Immigrant Investor Program, share pro rata with general unsecured creditors, and accept the backstop option described in Section 4. Concurrently with this Agreement, REIF I is documenting that

agreement in a backstop commitment of up to $1,250,000 (the "**Backstop Commitment**").

G. The Parties enter into this Agreement so that, if the sale to REIF I closes, (i) each EB-5 investor in the Partnerships may choose, for its own investment, to share pro rata with general unsecured creditors and withdraw from the EB-5 Immigrant Investor Program, with or without the backstop option, or to forgo any recovery from the Debtors' estates and remain in the program with DLRC's support; (ii) the portion of an investor that makes no choice shares pro rata with general unsecured creditors, and its distributions are held for the investor until it withdraws from the program; (iii) no investor releases any claim against any person other than the Debtors unless it personally elects the backstop option or program retention and signs the release; and (iv) the holders of Backstopped Claims receive at least the recovery they would have received from a sale of the Property for $22,000,000.

NOW, THEREFORE, the Parties agree as follows:

**Section 1. Definitions.**

Capitalized terms used but not defined in this Agreement have the meanings given in title 11 of the United States Code (the "**Bankruptcy Code**"). In this Agreement:

"**Allowed**" means allowed under section 502 of the Bankruptcy Code, a confirmed chapter 11 plan, or a final order of the Bankruptcy Court.

"**Backstop Option**" has the meaning given in Section 4(a)(ii).

"**Backstopped Claim**" means (a) each Non-EB-5 Unsecured Claim; and (b) each Backstopped Pro Rata Portion, to the extent Allowed and not subordinated under section 510(b) or (c) of the Bankruptcy Code or by order.

"**Backstopped Pro Rata Portion**" means each Pro Rata Portion whose Investor has made an effective Backstop Option.

"**Benchmark Recovery**" means, for each Backstopped Claim, the aggregate distribution its holder would have received on that claim had the Property been sold for $22,000,000 rather than the Purchase Price, calculated (a) by allocating the $1,250,000 difference between the Debtors' estates in the same proportion as the Purchase Price is allocated under the order approving the sale or a confirmed plan; (b) holding constant all Allowed claims, Elections, administrative expenses, priorities, liens, and other facts; (c) without deduction for any cost of delay; and (d) treating each Pro Rata Portion and each Default Portion as sharing pro rata with the Non-EB-5 Unsecured Claims and each Program Portion as receiving no distribution.

"**Benchmark Shortfall**" means, for each Backstopped Claim at any time, the amount by which its Benchmark Recovery exceeds the distributions its holder has received from the Debtors' estates on that claim, excluding payments under the Backstop Commitment.

"**Claim 6**" means the claims asserted against Fu Bang in Claim No. 6 in the Cases, and any other claim against Fu Bang or its property based on the judgment described in that proof of claim, including any judgment lien. Claim 6 is a Related EB-5 Claim.

"**Closing**" means the closing of the sale of the Property to REIF I (or its permitted designee) under the PSA.

"**Conforming Plan**" means a chapter 11 plan for either or both Debtors that (a) classifies the Partnership Claims in one or more classes separate from the Non-EB-5 Unsecured Claims and from any Related EB-5 Claims; (b) offers every Investor the Elections described in Section 4 on identical terms; (c) treats Pro Rata Portions, Default Portions, and Program Portions as provided in Section 4; and (d) does not otherwise impair the Partnership Claims, and does not release or enjoin any claim of a Partnership or of any Investor against any person other than the Debtors and their estates, except through an Investor Release.

"**Default Portion**" means each Investor Portion for which no effective Election has been made by the Election Deadline.

"**EB-5 Claim**" means (a) a Partnership Claim, which shall be separately classified as an LP regional center claim; and (b) a Related EB-5 Claim.

"**EB-5 Investment**" means the capital an Investor contributed to a Partnership, or otherwise invested in the Fu Bang project, under the EB-5 Program.

"**EB-5 Program**" means the EB-5 Immigrant Investor Program under section 203(b)(5) of the Immigration and Nationality Act, 8 U.S.C. § 1153(b)(5), and related provisions of law.

"**Election**" means a Pro Rata Election, with or without the Backstop Option, or a Program Retention Election under Section 4.

"**Election Deadline**" means the deadline for Elections set by the order of the Bankruptcy Court approving the disclosure statement and solicitation procedures for a Conforming Plan, or by another order of the Bankruptcy Court.

"**Excluded Party**" means (a) Bo Chen, also known as Bo Don; (b) Richard Don (deceased); (c) each other person that was a member, manager, officer, employee, or agent of DLRC or of any Partnership at any time before October 14, 2026; (d) each insider of either Debtor; and (e) each affiliate, family member, successor, and assign of any of them, other than REIF III, DLRC, and the Partnerships.

"**Investor**" means each person that made an EB-5 Investment in a Partnership, including each current or former limited partner of a Partnership.

"**Investor Portion**" means the portion of an Allowed Partnership Claim equal to its Allowed amount multiplied by a fraction, the numerator of which is the Investor's capital account in that Partnership and the denominator of which is the aggregate capital accounts of all limited partners of that Partnership, each as maintained and adjusted under the Partnership's limited partnership agreement as of the date of this Agreement.

"**Investor Release**" has the meaning given in Section 4(g).

"**Non-EB-5 Unsecured Claim**" means an Allowed general unsecured claim against either Debtor, other than (a) an EB-5 Claim; (b) a claim held by an insider of either Debtor, or by REIF I or any of its affiliates; (c) a claim of one Debtor against the other; and (d) a claim subordinated under section 510(b) or (c) of the Bankruptcy Code or by agreement or order.

"**Partnership Distribution**" means any distribution from either Debtor's estate on account of a Partnership Claim, under a plan or under any other order.

"**Pro Rata Portion**" means each Investor Portion that is subject to an effective Pro Rata Election.

"**Program Portion**" means each Investor Portion that is subject to an effective Program Retention Election.

"**Related EB-5 Claim**" means any claim, other than a Partnership Claim, held by a current or former limited partner of a Partnership, or by any other investor in the Fu Bang project under the EB-5 Program, in its own name, arising from or relating to its EB-5 investment, including Claim 6. Related EB-5 Claims are not subject to the Elections.

"**Released Parties**" means REIF I, REIF III, DLRC, each Partnership, and each person that is a member, manager, officer, or agent of any of them on or after October 14, 2026, solely in that capacity, other than any Excluded Party.

"**Withdrawal Statement**" means an Investor's signed statement, on the approved election form, that (a) the Investor withdraws from the EB-5 Program with respect to its EB-5 Investment and will withdraw, or will not file, any petition or application based on it; (b) acknowledges that the withdrawal may cause the denial or loss of the Investor's immigration status and that of its family members, that no Party has made any representation about the immigration consequences of any Election or of making no Election, and that the Investor has had the opportunity to consult its own immigration counsel; and (c) consents to the redemption of its limited partnership interest in exchange for the distributions on its Investor Portions, effective upon payment.

**Section 2. Effectiveness.**

(a) This Agreement binds the Parties when executed, subject to entry of an order of the Bankruptcy Court authorizing the Debtors to enter into it. The obligations of the Partnerships under Sections 3, 4, and 5 become effective only upon the Closing.

(b) If the PSA terminates before the Closing, or the Closing has not occurred by January 31, 2027, this Agreement terminates automatically and is of no further force or effect, and no Party shall have any liability under it.

**Section 3. Classification.**

(a) Each Partnership consents to the classification of its Partnership Claims in a class separate from the Non-EB-5 Unsecured Claims and from any Related EB-5 Claims in any Conforming Plan, and agrees not to object to any Conforming Plan on the ground of that separate classification.

(b) Claim 6 and the other Related EB-5 Claims are not subject to the Elections. Nothing in this Agreement fixes their classification or treatment, and the Debtors reserve all rights with respect to them, including to object to them and to seek their subordination under section 510(b) of the Bankruptcy Code.

**Section 4. Investor Elections and Treatment.**

(a) Elections. Each Investor may make one of the following Elections for its entire EB-5 Investment, which shall apply to all of its Investor Portions, or may make no Election:

(i) Pro Rata Election. The Investor's Investor Portions shall receive the same treatment as Allowed general unsecured claims against the same Debtor, sharing pro rata with the Non-EB-5 Unsecured Claims, and the Investor withdraws from the EB-5 Program with respect to its EB-5 Investment (a "**Pro Rata Election**"). A Pro Rata Election does not include any release of any person other than the Debtors and their estates, and its Pro Rata Portions are not backstopped unless the Investor also makes the Backstop Option;

(ii) Backstop Option. An Investor that makes a Pro Rata Election may also elect, on the same form, to have its Pro Rata Portions backstopped under the Backstop Commitment, in exchange for its Investor Release (the "**Backstop Option**"); or

(iii) Program Retention Election. The Investor's Investor Portions shall receive no distribution from either Debtor's estate; the Investor remains in the EB-5 Program with respect to its EB-5 Investment, supported by DLRC as part of the Intended Investor Support; and the Investor gives its Investor Release (a "**Program Retention Election**").

(b) Split treatment of Partnership Claims. Each Partnership Claim is attributable to more than one Investor. Each shall therefore be divided into Pro Rata Portions, Default Portions, and Program Portions according to the Elections of the Investors to which it is attributable, and each portion shall receive the treatment provided in this Section 4. An Investor may not divide its own EB-5 Investment among Elections.

(c) Making Elections.

(i) Each Partnership is the holder of its Partnership Claims. DLRC, as general partner, shall deliver the approved election form to each limited partner of each Partnership, and each Partnership shall make, for each Investor Portion of its Partnership Claims, the Election of which its Investor has affirmatively notified DLRC in writing, on that form and by the Election Deadline.

(ii) A Pro Rata Election is effective only if the Investor's election form includes its Withdrawal Statement. A Backstop Option or a Program Retention Election is effective only if the Investor has personally signed its Investor Release on the election form. A Backstop Option without a signed Investor Release leaves the Investor's Pro Rata Election in effect without the Backstop Option, and a Program Retention Election without a signed Investor Release is not effective.

(iii) There is no default Election. Each Investor Portion for which no effective Election is made by the Election Deadline is a Default Portion and receives the treatment in Section 4(e). No Partnership, DLRC, counsel, or other person may make an Election or give an Investor Release on behalf of an Investor, and no Election, vote, or form delivered by a Partnership or DLRC releases any claim of any Investor or any Partnership against any person other than the Debtors and their estates.

(iv) Elections are irrevocable after the Election Deadline, except with the consent of the Debtors and DLRC, or as the Bankruptcy Court orders, but an Investor holding a Default Portion may deliver its Withdrawal Statement at any time under Section 4(e).

(d) Treatment of Pro Rata Portions. Each Pro Rata Portion shall share pro rata with the Non-EB-5 Unsecured Claims against the same Debtor in every distribution. Each Backstopped Pro Rata Portion, and no other Pro Rata Portion, is a Backstopped Claim. Each Partnership shall pay over to the Investor, within ten (10) business days after receipt, all distributions and Backstop Commitment payments it receives on the Investor's Pro Rata Portion, and, upon that payment, the Investor's limited partnership interest shall be redeemed under sections 9.3 and 15.2 of the applicable limited partnership agreement. Under a confirmed Conforming Plan, the Debtors shall not seek to subordinate any Pro Rata Portion or Default Portion under section 510(b) of the Bankruptcy Code.

(e) Treatment of Default Portions. Each Default Portion shall share pro rata with the Non-EB-5 Unsecured Claims against the same Debtor in every distribution, is not a Backstopped Claim, and includes no release of any person other than the Debtors and their estates. All distributions on a Default Portion shall be paid to the Partnership and held by it in a segregated account for the account of the Investor. The Partnership shall pay those distributions over to the Investor within ten (10) business days after the Investor delivers its Withdrawal Statement on the form approved by the Bankruptcy Court, and, upon that payment, the Investor's limited partnership interest shall be redeemed as provided in Section 4(d). No Investor is treated as withdrawing from the EB-5 Program, and no Default Portion affects the Investor's limited partnership interest, capital account, or rights under the applicable limited partnership agreement, unless and until the Investor delivers its Withdrawal Statement. Any amounts held for an Investor that has not delivered a Withdrawal Statement within one year after the effective date of the Conforming Plan shall be held or applied as provided in the applicable limited partnership agreement and applicable law.

(f) Treatment of Program Portions. No Program Portion shall receive or retain any distribution or property from either Debtor's estate. The holder of each Program Portion waives its right to those distributions, and this Agreement and each Program Retention Election constitute a subordination agreement under section 510(a) of the Bankruptcy Code, enforceable in any case or proceeding, subordinating each Program Portion to all other Allowed claims. Any distribution received on a Program Portion shall be held in trust and promptly paid over to the disbursing agent for distribution to the holders of Backstopped Claims, pro rata according to their Allowed amounts. A Program Retention Election does not (i) affect the Investor's limited partnership interest, capital account, or rights under the applicable limited partnership agreement; or (ii) release any claim against any person other than the Debtors and their estates, except through the Investor's Investor Release.

(g) Investor Release. An "**Investor Release**" is a release, personally signed by an Investor on the approved election form, of the Released Parties from all claims of the Investor arising out of or relating to its EB-5 Investment or the Partnerships, to the extent based on facts, acts, or omissions occurring before the Closing. An Investor Release is given only by an Investor that makes the Backstop Option or a Program Retention Election, and only by the Investor that signs it. An Investor Release does not (i) release any Excluded Party, or any claim against an

Excluded Party, including any such claim based on an act or omission of DLRC or any Partnership before October 14, 2026; (ii) reduce or impair any obligation of an Excluded Party to indemnify, or contribute to, any person, and no Excluded Party may assert an Investor Release as a defense or in reduction of any liability; (iii) release any obligation under this Agreement, the Backstop Commitment, or a confirmed Conforming Plan; or (iv) for an Investor that makes a Program Retention Election, release its limited partnership interest, its capital account, or its rights under the applicable limited partnership agreement arising after the Closing. The Investor Release shall appear on a separate page of the approved election form, in conspicuous type and with its own signature line, and that page shall state (A) the Released Parties and the Excluded Parties; (B) that the Investor is not required to give an Investor Release to share pro rata with general unsecured creditors, which it may do by making a Pro Rata Election without the Backstop Option or by making no Election; and (C) that the Investor has had the opportunity to consult its own counsel.

(h) DLRC support. As part of the Intended Investor Support, DLRC intends to continue to serve as general partner of each Partnership and as an EB-5 regional center, and to support each Investor that makes a Program Retention Election in its pending and future immigration petitions, including by providing the documentation that U.S. Citizenship and Immigration Services requires. This Section 4(h) does not create any obligation of DLRC, any Partnership, or REIF III beyond those under the applicable limited partnership agreement, and no Party guarantees the outcome of any petition.

(i) Equal terms. The Elections, and the treatment of Default Portions, shall be offered to every Investor on identical terms, and the same formula shall apply to every Pro Rata Portion and Default Portion. Each Program Retention Election made by a Partnership at the direction of an Investor constitutes the Partnership's agreement, as holder, to less favorable treatment of its Program Portions under section 1123(a)(4) of the Bankruptcy Code.

(j) Backstop. Any Benchmark Shortfall shall be paid only from the Backstop Commitment. The Backstop Commitment backstops only Backstopped Claims, and no Default Portion, Program Portion, or Pro Rata Portion other than a Backstopped Pro Rata Portion is entitled to any payment under it. No Partnership has any obligation under this Agreement beyond its Partnership Distributions and the pay-over and holding obligations in Sections 4(d), 4(e), and 4(f). No Party other than the Debtors' estates, and REIF I solely to the extent of the Backstop Commitment, shall have any obligation to make any payment on account of any Partnership Claim or EB-5 Claim, and neither DLRC nor REIF III assumes or guarantees any obligation of any Partnership to any Investor.

(k) Calculation. The Debtors, or any plan administrator or liquidating trustee, shall calculate the Pro Rata Portions, Backstopped Pro Rata Portions, Default Portions, Program Portions, Benchmark Recoveries, and Benchmark Shortfalls and give notice of the calculation to the Partnerships and REIF I. Any dispute shall be determined by the Bankruptcy Court.

**Section 5. Plan Support.**

(a) Vote. If the Closing has occurred, then after the Bankruptcy Court approves a disclosure statement for a Conforming Plan and the Partnership receives the solicitation materials, each Partnership shall timely vote all of its Partnership Claims to accept the

Conforming Plan, shall make the Elections required by Section 4(c), and shall not change or withdraw that vote or those Elections.

(b) No inconsistent action. No Partnership shall object to, or support any objection to, a Conforming Plan or its disclosure statement on any ground inconsistent with this Agreement, or propose or support any plan that is inconsistent with this Agreement.

(c) Agreed treatment. Each Partnership accepts the treatment described in Section 4, including the treatment of Program Portions, in light of, among other things, the Intended Investor Support. The Parties agree that no separate monetary value need be assigned to the Intended Investor Support, that it is not consideration provided by either Debtor's estate, and that it is not an obligation of the Debtors under any plan.

(d) No solicitation. This Agreement is not a solicitation of acceptances or rejections of any plan or of any Election. The Partnerships' votes, and the Investors' Elections, will be solicited only in accordance with section 1125 of the Bankruptcy Code and the orders of the Bankruptcy Court.

**Section 6. Releases; Individual Investor Claims; Immigration Matters.**

(a) Except for the Investor Releases and as provided in Section 4 and a confirmed Conforming Plan, nothing in this Agreement (i) releases any claim of any person; (ii) affects the allowance, amount, or priority of any claim held by an individual limited partner or investor in its own name, including Claim 6, or limits the Debtors' right to object to any Related EB-5 Claim, including as duplicative of a Partnership Claim, or to seek its subordination under section 510(b) of the Bankruptcy Code, whether or not a Conforming Plan is confirmed; (iii) modifies the obligations of DLRC to the limited partners under any Partnership's limited partnership agreement, other than to implement Section 4; (iv) creates any new obligation of DLRC, any Partnership, or REIF III to any limited partner or investor, other than the pay-over and holding obligations in Sections 4(d) and 4(e); or (v) obligates DLRC, any Partnership, REIF I, REIF III, or any of their members or managers to pay, assume, guarantee or backstop any Partnership Claim, EB-5 Claim, or claim of any Investor, other than REIF I's obligations under the Backstop Commitment.

(b) No Party makes any representation about the immigration consequences of any Election or of making no Election. Each Investor is responsible for obtaining its own immigration advice.

**Section 7. Debtors' Fiduciary Duties.**

Nothing in this Agreement requires the Debtors or their Chief Restructuring Officer to take, or refrain from taking, any action inconsistent with their fiduciary duties, or obligates the Debtors to propose any plan. If the Debtors take any such action, or do not file a Conforming Plan, the obligations of the Partnerships under Sections 3, 4 and 5 shall terminate upon written notice from DLRC to the Debtors.

**Section 8. Survival; Successors and Transferees.**

(a) This Agreement, including Section 4, survives the confirmation of any plan and the dismissal of either Case, and applies to any distribution on an EB-5 Claim under any order. This Agreement does not survive the conversion of either Case. If either Case is converted, this

Agreement terminates automatically as of the conversion and is of no further force or effect, and no Party shall have any further right or obligation under it.

(b) This Agreement binds and benefits the Parties and their successors and assigns, including any plan administrator or liquidating trustee. No Partnership shall transfer any Partnership Claim unless the transferee agrees in writing to be bound by this Agreement, and any transferred Partnership Claim remains subject to this Agreement. The Debtors may file this Agreement or notice of it in the Cases.

**Section 9. Third-Party Beneficiaries.**

The holders of Backstopped Claims are intended third-party beneficiaries of Section 4, each Investor is an intended third-party beneficiary of Sections 4(c) through 4(g), and each Released Party is an intended third-party beneficiary of each Investor Release. Section 4 may be enforced on behalf of the holders of Backstopped Claims by the Debtors or any plan administrator or liquidating trustee. There are no other third-party beneficiaries of this Agreement.

**Section 10. Representations.**

(a) Each Partnership represents that (i) DLRC is its sole general partner; (ii) DLRC is authorized to execute and perform this Agreement on its behalf, including to make Elections for the Partnership at the direction of its Investors and to redeem the interests of limited partners that deliver Withdrawal Statements, under sections 9.3, 9.11, 11.10, and 15.2 of its limited partnership agreement without the consent of its limited partners; (iii) DLRC has determined in good faith that this Agreement is on terms that are reasonable and in the best interests of the Partnership; and (iv) the Partnership holds its Partnership Claims and has not transferred any of them.

(b) Each Debtor represents that, subject to approval by the Bankruptcy Court, it is authorized to execute and perform this Agreement.

**Section 11. Miscellaneous.**

(a) Governing law. This Agreement is governed by the Bankruptcy Code and, to the extent not inconsistent with it, the laws of the State of California, without regard to conflict-of-law rules.

(b) Jurisdiction. The Bankruptcy Court has exclusive jurisdiction over any dispute arising under this Agreement. If the Bankruptcy Court does not have or declines jurisdiction, the state and federal courts located in Riverside County, California have exclusive jurisdiction.

(c) Specific performance. Each Party agrees that monetary damages would be an inadequate remedy for a breach of this Agreement and that this Agreement may be specifically enforced.

(d) Amendment. After the Closing, this Agreement may be amended or waived only by a writing signed by all Parties and approved by the Bankruptcy Court.

(e) Entire agreement; counterparts. This Agreement is the entire agreement of the Parties on its subject matter. It may be executed in counterparts and by electronic signature.

(f) Notices. Notices shall be in writing and delivered to the Partnerships at c/o Dos Lagos Regional Center, LLC, at c/o Real Estate Income Fund III LLC, 8 The Green, Suite A, Dover, Delaware 19901, Attention: Brad J. Domitrovitsch; and to the Debtors at c/o Force Ten Partners, LLC, 5271 California Ave., Suite 270 Irvine, CA 92617, Attention: Nicholas Rubin, with a copy to Weintraub Zolkin Talerico & Selth LLP, 11766 Wilshire Blvd., Suite 730, Los Angeles, California 90025, Attention: Derrick Talerico.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**DOS LAGOS CENTER 1, LP**
By: Dos Lagos Regional Center, LLC, its general partner
By: Real Estate Income Fund III LLC, its sole member and manager

By: ______________________________
Brad J. Domitrovitsch, Manager

**DOS LAGOS CENTER 2, LP**
By: Dos Lagos Regional Center, LLC, its general partner
By: Real Estate Income Fund III LLC, its sole member and manager

By: ______________________________
Brad J. Domitrovitsch, Manager

**DOS LAGOS CENTER 3, LP**
By: Dos Lagos Regional Center, LLC, its general partner
By: Real Estate Income Fund III LLC, its sole member and manager

By: ______________________________
Brad J. Domitrovitsch, Manager

**DOS LAGOS CENTER 4, LP**
By: Dos Lagos Regional Center, LLC, its general partner
By: Real Estate Income Fund III LLC, its sole member and manager

By: ______________________________
Brad J. Domitrovitsch, Manager

**DOS LAGOS CENTER 5, LP**
By: Dos Lagos Regional Center, LLC, its general partner
By: Real Estate Income Fund III LLC, its sole member and manager

By: ______________________________
Brad J. Domitrovitsch, Manager

**DOS LAGOS REGIONAL CENTER, LLC**, in its own capacity, solely for purposes of Section 4(c)
By: Real Estate Income Fund III LLC, its sole member and manager

By: ______________________________

Brad J. Domitrovitsch, Manager

**FU BANG GROUP CORP, USA**

By: ________________________________
Nicholas Rubin, Chief Restructuring Officer

**DOS LAGOS CENTER 2, LLC**

By: ________________________________
Nicholas Rubin, Chief Restructuring Officer

# EXHIBIT 5

## Membership Interest Purchase Agreement dated as of October 14, 2026 (October MIPA)

# MEMBERSHIP INTEREST PURCHASE AGREEMENT

*dated as of October 14, 2026*

*by and among*

**REAL ESTATE INCOME FUND III LLC**

*a Delaware Limited Liability Company*

("Buyer")

and

**DOS LAGOS REGIONAL CENTER, LLC**

*a California Limited Liability Company*

("Company")

and

**BO CHEN (AKA BO DON)**

*Sole Member*

("Selling Member")

**THIS MEMBERSHIP INTEREST PURCHASE AGREEMENT** (this **"Agreement"**), dated and effective as of October 14, 2026 (the **"Effective Date"**), is entered into by and among:

**(i) REAL ESTATE INCOME FUND III LLC**, a Delaware limited liability company, with its registered office at 8 The Green, Suite A, Dover, Delaware 19901, represented by its Manager, Brad J. Domitrovitsch (**"Buyer"**);

**(ii) DOS LAGOS REGIONAL CENTER**, LLC, a California limited liability company (EIN: 27-3242403; CA SOS File No. 201022410250; formed August 12, 2010), with its principal place of business at 4261 Odyssey Drive, Unit 116, Corona, California 92883, acting by and through Bo Chen (AKA Bo Don), its Manager (**"Company"**); and

**(iii)** BO CHEN (AKA BO DON), an individual and the sole member of the Company, holding one hundred percent (100%) of the outstanding membership interests of the Company ("Selling Member" and, together with the Company, the "Seller Parties").

Buyer and the Seller Parties are each referred to herein individually as a **"Party"** and collectively as the **"Parties."**

## RECITALS

**A.** The Company is a California limited liability company originally organized on August 12, 2010 by Chuan Dong (also known as Richard Dong). Pursuant to an Amendment to Operating Agreement dated August 2, 2020, the Company's Operating Agreement was amended to designate two Class A Managers: Richard Don and Bo Chen (AKA Bo Don). Bo Chen is the sole member of the Company and holds one hundred percent (100%) of its outstanding membership interests. Bo Chen serves as the registered agent for service of process.

**B.** The Company is the holder of an EB-5 Regional Center designation (the **"Regional Center Designation"**) issued by the United States Citizenship and Immigration Services (**"USCIS"**) pursuant to the EB-5 Immigrant Investor Program, as authorized under Section 610 of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993, as amended, and the EB-5 Reform and Integrity Act of 2022 (collectively, the **"EB-5 Program"**). The Regional Center Designation authorizes the Company to sponsor and administer EB-5 investment projects within its approved geographic area.

C. The Selling Member desire to sell, transfer, and assign to Buyer, and Buyer desires to purchase and acquire from the Selling Member, one hundred percent (100%) of the outstanding membership interests of the Company (the **"Membership Interests"**), for the nominal consideration of One Dollar ($1.00), it being acknowledged that the primary value of this transaction to Buyer is the Regional Center Designation and the Company's EB-5 Program infrastructure.

**D.** This Agreement is a stand-alone transaction. It is not part of or conditioned upon any other agreement or transaction to which Buyer, any Affiliate of Buyer, or any Seller Party is a party. The Parties acknowledge that (i) Real Estate Income Fund I LLC ("REIF I"), an Affiliate of Buyer, is the proposed purchaser of certain real property in the City of Corona, California from Fu Bang Group Corp, USA and Dos Lagos Center 2, LLC (together, the "Debtors"), the debtors in jointly administered chapter 11 cases pending in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") under Lead Case No. 6:25-bk-13004-SY (the "Bankruptcy Cases"), under a Purchase and Sale Agreement dated September 17, 2026 (as amended, the "Sale Agreement"); and (ii) the Company is the general partner of the Partnerships, which hold claims against Fu Bang Group Corp, USA.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants, representations, warranties, agreements, and conditions contained herein, and for other good and valuable consideration, including, without limitation, One Dollar ($1.00) in hand paid by Buyer to the Selling Member, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I DEFINITIONS

**Section 1.01.** ***Defined Terms.***

As used in this Agreement, the following terms shall have the meanings ascribed to them below:

**"Affiliate"** with respect to any Person, means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with such first Person.

**"Alternative Transaction"** means any merger, consolidation, reorganization, sale of assets, sale or transfer of membership interests, recapitalization, financing, or other transaction involving the Company or the Membership Interests that is competitive with or an alternative to the transactions contemplated by this Agreement.

**"Applicable Law"** means any applicable federal, state, or local statute, law, ordinance, regulation, rule, code, executive order, injunction, judgment, decree, or other requirement enacted by any Governmental Authority, including without limitation the California Revised Uniform Limited Liability Company Act (California Corporations Code Sections 17701.01 et seq.), the California Civil Code, the EB-5 Program statutes and regulations (8 C.F.R. Part 204), USCIS policy guidance, and all applicable tax and securities laws.

**"Business Day"** means any day other than a Saturday, Sunday, or a day on which commercial banks in Los Angeles, California or New York, New York are authorized or required to be closed.

**"Closing"** means the consummation of the transfer of the Membership Interests to Buyer in accordance with Article IV of this Agreement.

**"Closing Date"** means the date on which the Closing occurs, as determined in accordance with Section 4.01.

**"Company"** means Dos Lagos Regional Center, LLC, a California limited liability company (EIN: 27-3242403; CA SOS File No. 201022410250).

**"EB-5 Program"** means the EB-5 Immigrant Investor Program administered by USCIS, as authorized under Section 610 of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993, as amended, and the EB-5 Reform and Integrity Act of 2022, together with all implementing regulations at 8 C.F.R. Part 204 and all USCIS policy guidance, as amended from time to time.

**"Effective Date"** means the date first written above.

**"Encumbrance"** means any lien, pledge, security interest, encumbrance, restriction, right of first refusal, option, or other adverse claim or restriction of any kind or nature affecting the Membership Interests or the assets of the Company.

**"Excluded Agreements"** means (a) the Sale Agreement, each order of the Bankruptcy Court in the Bankruptcy Cases, and each agreement or instrument entered into or approved in connection with them, including the backstop commitment of REIF I for the benefit of certain creditors of the

Debtors; (b) the Plan Support and Subordination Agreement among the Partnerships, the Company, and the Debtors; and (c) the limited partnership agreement of each Partnership, and each loan agreement, note, or other agreement between any Partnership and either Debtor.

**"Excluded Persons"** means the Company, in its capacity as general partner of the Partnerships; the Partnerships; and the Debtors.

**"Governmental Authority"** means any federal, state, local, or foreign government, court, administrative agency, commission, regulatory body, or other governmental or quasi-governmental authority, including without limitation USCIS.

**"Knowledge"** when used with respect to any Seller Party, means the actual knowledge of Bo Chen after reasonable inquiry; and when used with respect to Buyer, means the actual knowledge of Brad J. Domitrovitsch after reasonable inquiry.

**"Losses"** means any and all losses, damages, liabilities, deficiencies, claims, costs, and expenses (including reasonable attorneys' fees and other professional fees).

**"Material Adverse Effect"** means any change, event, or effect that has had or would reasonably be expected to have a material and adverse effect on (i) the business, financial condition, assets, liabilities, or prospects of the Company, taken as a whole, including without limitation the status or validity of the Regional Center Designation; or (ii) the ability of any Seller Party to perform its obligations under this Agreement.

**"Membership Interests"** means one hundred percent (100%) of the outstanding membership interests of the Company, representing the entirety of the economic interests, voting interests, management rights, and all other rights and interests of any kind in the Company held by the Selling Member in the aggregate, as more particularly set forth on Schedule 1.01(a) hereto.

**"Operating Agreement"** means the Operating Agreement of Dos Lagos Regional Center, LLC as originally executed and as amended by the Amendment to LLC Operating Agreement dated August 2, 2020, executed by Richard Don and Bo Chen.

**"Partnerships"** means Dos Lagos Center 1, LP; Dos Lagos Center 2, LP; Dos Lagos Center 3, LP; Dos Lagos Center 4, LP; and Dos Lagos Center 5, LP, each a California limited partnership of which the Company is the general partner. [Confirm legal names.]

**"Permitted Encumbrances"** means: (i) any restrictions imposed by the EB-5 Program or USCIS conditions applicable to the Regional Center Designation; (ii) restrictions on transfer imposed by Applicable Law; and (iii) such other Encumbrances as Buyer may approve in writing prior to Closing.

**"Person"** means any individual, corporation, limited liability company, partnership, joint venture, trust, estate, Governmental Authority, or other entity.

**"Pre-Closing Liability"** means any liability or obligation of the Company, whenever asserted, to the extent arising out of facts, acts or omissions occurring on or before the Closing Date, including (i) the judgment entered March 29, 2023 in Riverside Superior Court Case No. CVRI2104945 and any claim based on it; (ii) any claim of any current or former limited partner or investor of any Partnership arising out of the offering or sale of partnership interests, the use of investor funds, or the management of the Company or any Partnership before the Closing; and (iii) any liability of the Company as general partner for any obligation of any Partnership arising before the Closing, including any obligation to return or redeem investor capital and any obligation with respect to the claims of the Partnerships against Fu Bang Group Corp, USA.

**"Purchase Price"** means One Dollar ($1.00) in lawful money of the United States.

**"Regional Center Designation"** means the EB-5 Regional Center designation issued by USCIS to the Company authorizing the Company to operate as an EB-5 Regional Center, together with all related USCIS approvals, I-924 applications, I-956 applications, investor subscriptions, NCE/JCE structures, Form I-526E and I-829 petition pipelines, compliance records, and all other rights, attributes, and infrastructure of the Company's EB-5 Program activities.

**"Seller Parties"** means, collectively, the Company and the Selling Member.

**"Transaction Documents"** means, collectively, this Agreement, all Schedules and Exhibits hereto, the Assignment of Membership Interests in the form attached as Exhibit B, the Amended and Restated Operating Agreement (or joinder thereto), the USCIS Notification Materials described in Section 8.05, and all other agreements, instruments, certificates, and documents executed or delivered in connection with the transactions contemplated hereby.

**"USCIS"** means the United States Citizenship and Immigration Services, or any successor agency.

**Section 1.02.** ***Rules of Construction.***

In this Agreement, unless the context otherwise requires: (a) references to "including" mean "including without limitation"; (b) references to a "Section," "Article," "Schedule," or "Exhibit" refer to a section or article of, or a schedule or exhibit attached to, this Agreement; (c) any reference to a statute includes all rules and regulations promulgated thereunder and all amendments; (d) this Agreement shall be construed without regard to any presumption or rule requiring construction against the Party causing this Agreement to be drafted; and (e) defined terms shall have the same meanings whether used in the singular or plural form.

## ARTICLE II PURCHASE AND SALE OF MEMBERSHIP INTERESTS

**Section 2.01.** ***Agreement to Purchase and Sell.***

Subject to the terms and conditions of this Agreement, at the Closing, the Selling Member hereby agrees to sell, transfer, convey, assign, and deliver to Buyer, and Buyer hereby agrees to purchase and acquire from the Selling Member, all right, title, and interest in and to the Membership Interests, free and clear of all Encumbrances (other than Permitted Encumbrances), for the Purchase Price. The Membership Interests shall be transferred to Buyer with full warranty of title.

**Section 2.02.** ***Structure.***

The Parties acknowledge and agree that: (a) this transaction is structured as a purchase of one hundred percent (100%) of the outstanding membership interests of Dos Lagos Regional Center, LLC, a California limited liability company, and does not constitute a merger, consolidation, or asset acquisition; (b) the Company shall, following the Closing, continue to exist as a California limited liability company wholly owned by Buyer, subject to any post-Closing restructuring elected by Buyer in its sole discretion; and (c) Buyer shall succeed to all rights, assets, contracts, licenses, the Regional Center Designation, and all other attributes of the Company as of the Closing Date.

**Section 2.03.** ***Stand-Alone Transaction.***

This Agreement is a stand-alone agreement. The execution, delivery and performance of this Agreement and the Closing are not conditioned upon, contingent on, or cross-defaulted with any other agreement or transaction, including any transaction involving Fu Bang Group Corp, USA, Dos Lagos Center 2, LLC, Real Estate Income Fund I LLC, or any real property in the City of Corona, California. The Closing may

occur whether or not any such other transaction is consummated. Nothing in this Section 2.03 limits or affects any Excluded Agreement.

**Section 2.04.** ***Delivery of Membership Interests.***

At the Closing, the Selling Member shall deliver or cause to be delivered to Buyer: (a) a duly executed Assignment of Membership Interests in the form attached hereto as Exhibit B, transferring all right, title, and interest in the Membership Interests from the Selling Member to Buyer; (b) executed resignations of all current managers, officers, and authorized signatories of the Company, effective as of the Closing Date; (c) all minute books, membership ledgers, operating agreement (as amended), books of account, financial records, material contracts, USCIS correspondence, I-924 and I-956 application files, investor subscription materials, and all other records and property of the Company; and (d) all other instruments of transfer and conveyance as Buyer's counsel may reasonably require to vest in Buyer good and valid title to the Membership Interests.

## ARTICLE III PURCHASE PRICE AND CONSIDERATION

**Section 3.01.** ***Purchase Price.***

The aggregate consideration payable by Buyer to the Selling Member for the Membership Interests shall be the Purchase Price of One Dollar ($1.00) in lawful money of the United States, payable at Closing by wire transfer or cash delivery. The Parties acknowledge that the nominal Purchase Price reflects the mutual agreement of the Parties that the strategic value of the Regional Center Designation to Buyer constitutes the primary economic benefit of this transaction to Buyer. No Seller Party, and no Affiliate, manager, member, officer, employee or agent of any Seller Party, shall receive any consideration, compensation, fee, commission, revenue share, equity interest, property or other benefit of any kind in connection with this Agreement or the transactions contemplated hereby other than the Selling Member's receipt of the Purchase Price. The preceding sentence does not apply to any right or benefit of an Excluded Person under an Excluded Agreement.

**Section 3.02.** ***Payment to Selling Member.***

The entire Purchase Price shall be paid to the Selling Member.

## ARTICLE IV CLOSING

**Section 4.01.** ***Closing Date and Location.***

The Closing shall take place on the Effective Date, simultaneously with the execution and delivery of this Agreement, by electronic exchange of duly executed Transaction Documents and delivery of the Purchase Price, and the Effective Date shall also be the Closing Date and the "Outside Date." Any deliverable under Section 4.02 or 4.03 not delivered at the Closing shall be delivered promptly after the Closing, and its late delivery shall not affect the effectiveness of the Closing. From and after the Closing on the Effective Date, Buyer shall control the Company and may act and execute documents on its behalf.

**Section 4.02.** ***Deliveries by Seller Parties at Closing.***

At or prior to the Closing, the Seller Parties shall deliver, or cause to be delivered, to Buyer each of the following:

**(a)** The executed Assignment of Membership Interests in the form attached as Exhibit B, duly executed by the Selling Member;

**(b)** Executed resignations of all current managers, officers, and authorized signatories of the Company, effective as of the Closing Date, in form and substance satisfactory to Buyer;

**(c)** All minute books, membership ledgers, operating agreement (as amended), books of account, financial records, material contracts, all USCIS correspondence, I-924 application files, I-956 application files (if applicable), Form I-526E and I-829 petition records and pipelines, investor subscription materials, NCE/JCE organizational documents, compliance reports, and all other records, materials, and property of the Company relating to the EB-5 Program and the Regional Center Designation;

**(d)** A certificate of the Selling Member, dated as of the Closing Date, certifying that: (i) each of the representations and warranties in Article V is true and correct in all material respects as of the Closing Date; and (ii) each covenant required to be performed at or prior to Closing has been performed;

**(e)** A Certificate of Good Standing for the Company issued by the California Secretary of State, dated not more than ten (10) days prior to the Closing Date;

**(f)** A FIRPTA non-foreign person certificate from the Selling Member, satisfying the requirements of Treasury Regulation Section 1.1445-2(b)(2); and

**(g)** Such other documents, instruments, and certificates as Buyer's counsel may reasonably require.

**Section 4.03.** ***Deliveries by Buyer at Closing.***

At or prior to the Closing, Buyer shall deliver, or cause to be delivered, to the Selling Member each of the following:

**(a)** The Purchase Price of One Dollar ($1.00), payable to the Selling Member as provided in Section 3.02, by wire transfer or cash;

**(b)** A certificate of an authorized Manager of Buyer, dated as of the Closing Date, certifying that: (i) each of Buyer's representations and warranties in Article VI is true and correct in all material respects; and (ii) each covenant required to be performed by Buyer has been performed; and

**(c)** Such other documents, instruments, and certificates as the Selling Member' counsel may reasonably require.

**Section 4.04.** ***Transfer Taxes.***

Any documentary transfer taxes, recording fees, and other transfer charges incurred in connection with the assignment and transfer of the Membership Interests shall be borne by the Selling Member. The Parties shall cooperate in the timely filing of all required transfer tax returns.

## ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLER PARTIES

Each of the Seller Parties, jointly and severally, represents and warrants to Buyer as of the Effective Date and as of the Closing Date as follows:

**Section 5.01.** ***Organization; Power.***

The Company is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of California. The Company has all requisite limited liability company power and

authority to own, lease, and operate its assets and to carry on its business as currently conducted. True and correct copies of the Company's Articles of Organization and Operating Agreement (as amended) have been provided to Buyer.

**Section 5.02.** ***Authorization; Enforceability.***

The Selling Member has all requisite power, authority, and capacity to execute and deliver this Agreement and the Transaction Documents and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action of the Selling Member and the Company. This Agreement constitutes the legal, valid, and binding obligation of each Seller Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, and similar laws and general principles of equity.

**Section 5.03.** ***Membership Interests; Title.***

Schedule 1.01(a) sets forth a true and complete schedule of all outstanding membership interests of the Company as of the Effective Date, including the name of each holder, the percentage interest held, and the nature of such interest. The Selling Member is the sole record and beneficial owner of one hundred percent (100%) of the Membership Interests, free and clear of all Encumbrances. There are no outstanding options, rights of first refusal, conversion rights, or other contracts obligating the Company to issue, transfer, or sell any additional membership interests.

**Section 5.04.** ***No Conflicts; Consents.***

The execution, delivery, and performance of this Agreement by the Seller Parties do not and will not: (a) conflict with or violate any provision of the Company's Articles of Organization or Operating Agreement; (b) conflict with or violate any Applicable Law, including any USCIS regulation or condition of the Regional Center Designation; (c) result in any breach of or constitute a default under any material contract of the Company; (d) result in the creation of any Encumbrance (other than Permitted Encumbrances) on the Membership Interests or any assets of the Company; or (e) require any consent, approval, authorization, or filing that has not been obtained or made, except for the USCIS notification required under the EB-5 Program as described in Section 8.05.

**Section 5.05.** ***Regional Center Designation; EB-5 Compliance.***

(a) The Regional Center Designation is valid and in full force and effect as of the Effective Date and has not been revoked, suspended, terminated, or conditioned in any adverse material respect by USCIS. (b) To the Knowledge of the Seller Parties, the Company is in material compliance with all requirements, conditions, and obligations of the EB-5 Program applicable to Regional Centers, including without limitation any annual statements, I-956G filings (or applicable predecessors), integrity measures, and investor reporting obligations. (c) The Company has not received any written notice from USCIS of any intent to revoke, suspend, or terminate the Regional Center Designation, or of any material non-compliance with EB-5 Program requirements. (d) Schedule 5.05 sets forth a true and complete list of all material USCIS filings made by or on behalf of the Company with respect to the Regional Center Designation, including all I-924, I-956, I-526E, and I-829 applications filed, pending, or approved, together with their current status as of the Effective Date. (e) There are no outstanding investor claims, complaints, or SEC/DOJ/USCIS investigations directed at the Company or the Selling Member with respect to the EB-5 Program, except as disclosed on Schedule 5.06.

**Section 5.06.** ***Litigation; Regulatory Proceedings.***

Except as disclosed on Schedule 5.06, there is no action, suit, proceeding, investigation, claim, arbitration, or regulatory inquiry pending or, to the Knowledge of the Seller Parties, threatened against the Company or the Selling Member with respect to the Membership Interests, the Company, the Regional Center Designation, or any EB-5 investor matters that would reasonably be expected to result in a Material Adverse Effect.

**Section 5.07.** ***Tax Matters.***

(a) The Company has duly filed all material Tax Returns required to be filed by it, and all such Tax Returns are true and complete in all material respects. (b) All Taxes shown as due have been timely paid. (c) There are no pending or, to the Knowledge of the Seller Parties, threatened tax audits, assessments, or proceedings with respect to any Taxes of the Company. (d) The Company has not waived any statute of limitations with respect to Taxes.

**Section 5.08.** ***Absence of Certain Changes.***

Since December 31, 2025, the Company has operated its business in the ordinary course, and there has been no Material Adverse Effect. Without limiting the foregoing, the Company has not: (a) amended its Articles of Organization or Operating Agreement; (b) made any material filing with USCIS other than in the ordinary course of its EB-5 Program activities; (c) entered into or terminated any material contract; or (d) taken any action that would reasonably be expected to jeopardize or impair the Regional Center Designation.

**Section 5.09.** ***No Brokers.***

No broker, finder, placement agent, or investment banker is entitled to any brokerage, finder's, or other fee or commission payable by the Seller Parties in connection with the transactions contemplated hereby.

**Section 5.10.** ***No Side Agreements or Retained Benefits.***

No Seller Party, and no Affiliate, manager, member, officer, employee or agent of any Seller Party, is a party to or entitled to the benefit of any agreement, arrangement or understanding with Buyer, any Affiliate of Buyer, or the Company that provides for any consulting, advisory, employment, management or other role, or for any fee, commission, revenue share, profit participation, equity interest, transfer of land or other property, or other compensation or benefit of any kind, following the Closing. Any such agreement, arrangement or understanding that may or may not exist, whether written or oral, is hereby terminated as of the Effective Date and is of no further force or effect, without cost or liability to Buyer or the Company. This Section 5.10 does not apply to, and does not terminate or impair, any Excluded Agreement or any right or obligation of an Excluded Person under it. For purposes of Sections 3.01, 5.10, and 11.07, no Excluded Person shall be treated as an Affiliate of any Seller Party.

## ARTICLE VI REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to the Seller Parties as of the Effective Date and as of the Closing Date as follows:

**Section 6.01.** ***Organization; Power.***

Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware. Buyer has all requisite limited liability company power and authority to execute

and deliver this Agreement and the Transaction Documents and to consummate the transactions contemplated hereby.

**Section 6.02.** ***Authorization; Enforceability.***

The execution, delivery, and performance of this Agreement by Buyer have been duly authorized by all requisite limited liability company action, including authorization by Brad J. Domitrovitsch in his capacity as Manager. This Agreement constitutes the legal, valid, and binding obligation of Buyer, enforceable against it in accordance with its terms.

**Section 6.03.** ***No Conflicts.***

The execution, delivery, and performance of this Agreement by Buyer do not and will not: (a) conflict with or violate the organizational documents of Buyer; (b) conflict with or violate any Applicable Law; or (c) result in any breach of or default under any material agreement to which Buyer is a party.

**Section 6.04.** ***EB-5 Program Acknowledgment.***

Buyer acknowledges that: (a) the Regional Center Designation is subject to USCIS oversight and ongoing compliance requirements under the EB-5 Program; (b) the transfer of control of an EB-5 Regional Center is subject to USCIS notification and may be subject to USCIS review as provided under 8 C.F.R. Part 204 and applicable USCIS policy guidance; (c) Buyer has conducted its own due diligence with respect to the Regional Center Designation and the Company's EB-5 Program compliance; and (d) Buyer intends to operate the Regional Center in compliance with all applicable EB-5 Program requirements following the Closing.

**Section 6.05.** ***Investment Intent.***

Buyer is acquiring the Membership Interests for its own account, for investment purposes only, and not with a view to any distribution thereof in violation of the Securities Act of 1933, as amended, the California Corporate Securities Law of 1968, or any other applicable securities law.

**Section 6.06.** ***No Brokers.***

No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission payable by Buyer in connection with the transactions contemplated hereby.

## ARTICLE VII CONDITIONS TO CLOSING

**Section 7.01.** ***Conditions to Buyer's Obligation to Close.***

The obligation of Buyer to consummate the Closing is subject to the satisfaction (or written waiver by Buyer) of each of the following conditions on or prior to the Closing Date:

**(a)** Representations and Warranties. Each of the representations and warranties of the Seller Parties set forth in Article V shall be true and correct in all material respects as of the Closing Date;

**(b)** Covenants. The Seller Parties shall have performed and complied in all material respects with all covenants and obligations required to be performed on or prior to the Closing Date;

**(c)** No Material Adverse Effect. No Material Adverse Effect shall have occurred and be continuing, including without limitation any revocation, suspension, or material adverse conditioning of the Regional Center Designation by USCIS;

**(d)** Regional Center Designation Status. The Regional Center Designation shall be in full force and effect and not subject to any pending USCIS revocation, termination notice, or material adverse condition as of the Closing Date;

**(e)** Good Standing. The Company's Certificate of Good Standing shall have been delivered as required by Section 4.02(e); and

(f) Closing Deliveries. The Seller Parties shall have delivered all documents required pursuant to Section 4.02.

**Section 7.02.** ***Conditions to Seller Parties' Obligation to Close.***

The obligation of the Seller Parties to consummate the Closing is subject to the satisfaction (or written waiver by the Selling Member) of each of the following conditions on or prior to the Closing Date:

**(a)** Representations and Warranties. Each of the representations and warranties of Buyer set forth in Article VI shall be true and correct in all material respects as of the Closing Date;

**(b)** Covenants. Buyer shall have performed and complied in all material respects with all covenants and obligations required to be performed on or prior to the Closing Date;

**(c)** Purchase Price. Buyer shall have delivered or caused to be delivered the Purchase Price of $1.00 in accordance with Section 3.02; and

**(d)** Closing Deliveries. Buyer shall have delivered all documents required pursuant to Section 4.03.

## ARTICLE VIII COVENANTS

**Section 8.01.** ***Pre-Closing Conduct of Business.***

From the Effective Date until the Closing, except as otherwise expressly contemplated by this Agreement or consented to in writing by Buyer, the Seller Parties shall cause the Company to: (a) operate its business in the ordinary course consistent with past practice and in compliance with all Applicable Law, including all EB-5 Program requirements; (b) preserve intact the Regional Center Designation and not take any action, or fail to take any action, that would reasonably be expected to result in a revocation, suspension, or material adverse conditioning of the Regional Center Designation; (c) maintain all required USCIS filings and obligations, including any I-956G annual statements or other compliance filings due during the pre-Closing period; (d) not amend the Articles of Organization or Operating Agreement without Buyer's prior written consent; (e) not enter into, amend, or terminate any material contract without Buyer's prior written consent; and (f) promptly notify Buyer in writing of any communication received from USCIS relating to the Regional Center Designation or the Company's EB-5 Program compliance.

**Section 8.02.** ***Access; Information.***

From and after the Effective Date, the Seller Parties shall afford Buyer and its representatives full access to all books, records, financial statements, Tax Returns, USCIS correspondence, I-924 and I-956 application files, investor records, compliance reports, contracts, and all other documents and information pertaining to the Company and the Regional Center Designation as Buyer may reasonably request, subject to applicable confidentiality obligations to EB-5 investors.

**Section 8.03.** ***No-Shop; Exclusivity.***

From the Effective Date until the earlier of the Closing or the termination of this Agreement (the **"Exclusivity Period"**), the Seller Parties shall not, and shall cause the Company and each of their respective representatives not to, directly or indirectly: (a) solicit, initiate, encourage, or facilitate any

inquiry, proposal, or offer from any Person relating to any Alternative Transaction; (b) engage in any discussions or negotiations with, or provide any information to, any Person concerning any Alternative Transaction; (c) enter into any letter of intent, term sheet, or agreement relating to any Alternative Transaction; or (d) approve or recommend any Alternative Transaction. The Seller Parties shall promptly notify Buyer in writing of any inquiry or proposal relating to an Alternative Transaction. Any breach of this Section 8.03 would cause irreparable harm to Buyer, entitling Buyer to seek injunctive relief and other equitable remedies without the requirement of posting bond.

**Section 8.04.** ***Post-Closing Cooperation; Transition.***

Following the Closing, the Selling Member shall cooperate fully with Buyer and the Company in connection with: (a) the orderly transition of the Company's management, operations, and EB-5 Program activities to Buyer; (b) all post-Closing Tax Returns, audits, and proceedings relating to pre-Closing periods; (c) the execution and delivery of such additional documents, instruments, and authorizations as may be reasonably requested by Buyer to evidence and effectuate the transfer of the Membership Interests; and (d) any USCIS reviews, inquiries, or proceedings relating to the transfer of control of the Regional Center, the Selling Member agreeing to provide such cooperation, statements, and documentation as USCIS may require in connection with such review.

**Section 8.05.** ***USCIS Notification; Regulatory Compliance.***

(a) The Parties acknowledge that the transfer of control of an EB-5 Regional Center may require notification to USCIS pursuant to 8 C.F.R. § 204.6(m)(6) and applicable USCIS policy guidance, and may require the filing of an amendment to the Company's Regional Center application (Form I-956F or applicable form) disclosing the change of ownership and control. (b) Promptly following the Closing, Buyer shall, at its sole expense, prepare and file (or cause to be prepared and filed) all required USCIS notifications, amendments, and compliance filings in connection with the change of control of the Company (collectively, the **"USCIS Notification Materials"**). (c) The Selling Member shall cooperate fully with Buyer and its counsel in the preparation, execution, and submission of the USCIS Notification Materials, including by providing all information, representations, and certifications regarding the Selling Member's prior management and ownership of the Company as USCIS may require. (d) The Parties shall use commercially reasonable efforts to minimize any disruption to the Company's ongoing EB-5 Program activities and investor obligations during the USCIS review process.

**Section 8.06.** ***Confidentiality.***

Each Party agrees to maintain in strict confidence all non-public information received from or relating to any other Party in connection with the transactions contemplated hereby, and shall not disclose any such information to any third party without prior written consent, except: (a) to representatives on a need-to-know basis; (b) as required by Applicable Law, USCIS, or any Governmental Authority; or (c) for legitimate due diligence purposes under appropriate non-disclosure agreements. These obligations shall survive the Closing or any termination for a period of three (3) years.

**Section 8.07.** ***[Reserved.]***

## ARTICLE IX INDEMNIFICATION

**Section 9.01.** ***Indemnification by Seller Parties.***

From and after the Closing, the Selling Member shall indemnify, defend, and hold harmless Buyer and its affiliates, members, managers, officers, employees, agents, successors, and assigns from and against any

and all Losses arising out of or resulting from: (a) any inaccuracy in or breach of any representation or warranty of the Seller Parties set forth in Article V; (b) any breach or non-performance of any covenant or obligation of the Seller Parties; (c) any Encumbrance on the Membership Interests existing as of the Closing Date that was not disclosed in this Agreement or the Schedules; (d) any USCIS enforcement action, Regional Center revocation proceeding, or investor claim arising from the pre-Closing operation of the Company's EB-5 Program activities; (e) any Taxes of the Company attributable to any period ending on or before the Closing Date; (f) any fraud or intentional misrepresentation by any Seller Party; or (g) any Pre-Closing Liability. Each Pre-Closing Liability is retained by the Selling Member notwithstanding any disclosure in this Agreement or the Schedules, and the Selling Member's obligations under clauses (d) and (g) are not subject to the survival periods in Section 9.03.

**Section 9.02.** ***[Reserved.]***

**Section 9.03.** ***Survival.***

All representations and warranties shall survive the Closing as follows: (a) representations and warranties relating to the Regional Center Designation and EB-5 Program compliance (Section 5.05) shall survive for five (5) years following the Closing Date; (b) representations and warranties relating to organizational matters and title to Membership Interests shall survive indefinitely; (c) Tax matters (Section 5.07) shall survive until the expiration of the applicable statute of limitations plus ninety (90) days; and (d) all other representations and warranties shall survive for eighteen (18) months following the Closing Date. All post-Closing covenants shall survive in accordance with their respective terms.

**Section 9.04.** ***Indemnification Procedures.***

(a) An Indemnified Party shall provide prompt written notice (within thirty (30) days of obtaining actual knowledge) to the Indemnifying Party of any claim for which indemnification is sought; provided that failure to provide timely notice shall not relieve the Indemnifying Party of its obligations except to the extent of actual prejudice. (b) The Indemnifying Party shall have the right, upon written notice within twenty (20) days, to assume control of the defense of any third-party claim using counsel reasonably acceptable to the Indemnified Party. (c) The Indemnifying Party shall not settle any third-party claim without the prior written consent of the Indemnified Party (not to be unreasonably withheld) if such settlement imposes any obligation upon or does not include a full release of the Indemnified Party.

## ARTICLE X TERMINATION

**Section 10.01.** ***Termination Events.***

This Agreement may be terminated prior to the Closing:

**(a)** By mutual written consent of all Parties;

**(b)** By Buyer, upon written notice to the Seller Parties, if: (i) any representation or warranty of the Seller Parties shall have become materially inaccurate and such inaccuracy is not cured within ten (10) Business Days following written notice from Buyer; (ii) any Seller Party has materially breached any covenant and such breach is not cured within ten (10) Business Days following written notice; (iii) the Regional Center Designation has been revoked, suspended, or materially adversely conditioned by USCIS; or (iv) the Closing has not occurred by the Outside Date;

**(c)** By the Selling Member, upon written notice to Buyer, if: (i) Buyer has materially breached any covenant and such breach is not cured within ten (10) Business Days following written notice; or (ii) the Closing has not occurred by the Outside Date and such failure is attributable to Buyer; or

**(d)** By either Party, if any Governmental Authority has issued a final, non-appealable order permanently enjoining or prohibiting the consummation of the transactions contemplated hereby.

**Section 10.02.** ***Effect of Termination.***

In the event of any termination pursuant to Section 10.01, this Agreement shall become null and void and no Party shall have any further liability or obligation hereunder, except that: (a) Sections 8.03, 8.06, 10.02, and all of Article XI shall survive any termination; and (b) no termination shall relieve any Party from any liability for fraud or willful and material breach of this Agreement occurring prior to termination.

## ARTICLE XI GENERAL PROVISIONS

**Section 11.01.** ***Governing Law.***

This Agreement shall be governed by and construed in accordance with the laws of the State of California, without giving effect to any conflict of law rules that would cause the application of the laws of any other jurisdiction; provided that matters governed by federal law (including the EB-5 Program and USCIS regulations) shall be governed by applicable federal law.

**Section 11.02.** ***Jurisdiction; Venue.***

Each Party irrevocably submits and consents to the exclusive jurisdiction of the Superior Court of California, County of Riverside, or, if applicable, the United States District Court for the Central District of California, for the resolution of any dispute arising out of or relating to this Agreement, other than matters within the exclusive jurisdiction of USCIS or federal immigration courts.

**Section 11.03.** ***Specific Performance.***

Each Party acknowledges that irreparable harm would result if any provisions of this Agreement were not performed in accordance with their specific terms, and that monetary damages alone would be an inadequate remedy. Accordingly, each Party shall be entitled to seek specific performance and injunctive or other equitable relief, without the necessity of proving actual damages or posting bond.

**Section 11.04.** ***Attorneys' Fees.***

In the event of any legal proceeding arising from or relating to this Agreement, the prevailing Party shall be entitled to recover from the non-prevailing Party all reasonable attorneys' fees, expert fees, court costs, and other litigation expenses.

**Section 11.05.** ***Waiver of Jury Trial.***

EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 11.06.** ***Notices.***

All notices shall be in writing and deemed duly given: (i) upon personal delivery; (ii) upon confirmed electronic mail delivery; (iii) one (1) Business Day after deposit with a nationally recognized overnight courier; or (iv) three (3) Business Days after certified first-class mail. Notices shall be addressed as follows:

If to Buyer: Real Estate Income Fund III LLC, 8 The Green, Suite A, Dover, Delaware 19901; Attention: Brad J. Domitrovitsch, Manager

If to the Company: Dos Lagos Regional Center, LLC, 4261 Odyssey Drive, Unit 116, Corona, California 92883; Attention: Bo Chen (AKA Bo Don), Manager

If to the Selling Member (Bo Chen): 4261 Odyssey Drive, Unit 116, Corona, California 92883

**Section 11.07.** ***Entire Agreement; Supersession.***

This Agreement, together with all Schedules and Exhibits and the other Transaction Documents, constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes and replaces in their entirety all prior negotiations, understandings, representations, and agreements relating hereto. Without limiting the foregoing, this Agreement supersedes, in their entirety, any and all prior or contemporaneous agreements, arrangements, understandings, representations and commitments, whether written or oral, that may or may not exist between or among Buyer or any of its Affiliates and any Seller Party or any of its Affiliates relating to the Company, the Membership Interests, or the Regional Center Designation, and each of them is of no further force or effect. Nothing in this Section 11.07 supersedes, terminates, or impairs any Excluded Agreement.

**Section 11.08.** ***Amendments; Waivers.***

This Agreement may not be amended, modified, or supplemented except by a written instrument duly executed by all Parties. No waiver shall be effective unless in writing and executed by the Party granting such waiver.

**Section 11.09.** ***Severability.***

If any provision of this Agreement is held to be invalid, illegal, or unenforceable, such provision shall be modified to the minimum extent necessary to make it valid, legal, and enforceable, and the remaining provisions shall not be affected or impaired thereby.

**Section 11.10.** ***Counterparts; Electronic Signatures.***

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Delivery by electronic transmission (including PDF or DocuSign) shall be equally effective as delivery of a manually executed counterpart. Electronic signatures shall have the same legal effect as original ink signatures pursuant to California Civil Code Section 1633.7 and the E-SIGN Act.

**Section 11.11.** ***No Third-Party Beneficiaries.***

This Agreement is for the sole and exclusive benefit of the Parties hereto and their respective permitted successors and assigns. Nothing herein is intended to confer upon any other Person any rights, benefits, or liabilities of any nature, except that EB-5 investors in the Company's program shall have no rights under this Agreement and this Agreement shall not constitute a modification of any investor subscription agreement or other commitment of the Company to its EB-5 investors. Nothing in this Section 11.11 limits any right of any Person under an Excluded Agreement.

**Section 11.12.** ***Assignment.***

Neither Party may assign this Agreement without the prior written consent of the other Parties; provided, however, that Buyer may, without consent, assign this Agreement to: (a) any Affiliate of Buyer; or (b) any special purpose entity formed by Buyer for the purpose of holding the Membership Interests, provided that any such assignment shall be subject to USCIS notification and compliance requirements

applicable to the Regional Center Designation, and provided further that Buyer shall remain primarily liable for all of its obligations hereunder.

**Section 11.13.** ***Time of the Essence.***

Time is of the essence with respect to all dates, deadlines, and time periods set forth in this Agreement.

**Section 11.14.** ***Schedules and Exhibits.***

The following Schedules and Exhibits are attached to this Agreement and incorporated herein by reference:

Schedule 1.01(a): Schedule of Membership Interests

Schedule 5.05: USCIS Filings and Regional Center Designation Status

Schedule 5.06: Disclosed Litigation and Regulatory Proceedings [to list the Bankruptcy Cases and any action or judgment by EB-5 investors involving the Company or the Selling Member, including the judgment underlying Claim No. 6 in the Bankruptcy Cases]

Schedule 5.07: Tax Matters Disclosures

Exhibit A: Operating Agreement of Dos Lagos Regional Center, LLC (as amended August 2, 2020)

Exhibit B: Form of Assignment of Membership Interests

**Section 11.15.** ***No Personal Liability; No Assumption of EB-5 Claims.***

No member, manager, officer or agent of Buyer, including Brad J. Domitrovitsch, shall have any personal liability for any obligation of Buyer, the Company or any Partnership, whether arising under this Agreement, any Excluded Agreement, or the operation of the Company before or after the Closing. Neither Buyer nor, by reason of the Closing, the Company assumes, guarantees or becomes liable for any Pre-Closing Liability, any claim of any Partnership against either Debtor, or any claim of any current or former limited partner or investor of any Partnership, all of which remain the responsibility of the Selling Member as provided in Section 9.01(g).

**Section 11.16.** ***Unwind.***

If the Sale Agreement terminates, or the closing under it has not occurred by March 31, 2027, Buyer may, by written notice to the Selling Member, reconvey the Membership Interests to the Selling Member for One Dollar ($1.00), and the Selling Member shall accept the reconveyance, whereupon the Parties shall have no further obligation under this Agreement other than under Article IX.

**SIGNATURE PAGE TO MEMBERSHIP INTEREST PURCHASE AGREEMENT**

IN WITNESS WHEREOF, the Parties have executed this Membership Interest Purchase Agreement as of the Effective Date first written above.

**BUYER:**

**REAL ESTATE INCOME FUND III LLC**, a Delaware Limited Liability Company

**By:** ______________________________

**Name:** Brad J. Domitrovitsch

**Title:** Manager

**Date:** October 14, 2026

**SELLING MEMBER:**

**By:** ______________________________

**Name:** Bo Chen (AKA Bo Don)

**Title:** Sole Member, Dos Lagos Regional Center, LLC

**Date:** October 14, 2026

**COMPANY** (solely for purposes of Sections 2.02, 2.04, 5.01 through 5.10, 8.01, 8.02, and 8.05):

**DOS LAGOS REGIONAL CENTER, LLC**, a California Limited Liability Company

**By:** ______________________________

**Name:** Bo Chen (AKA Bo Don)

**Title:** Manager

**Date:** October 14, 2026

*End of Membership Interest Purchase Agreement. Exhibit B (Form of Assignment of Membership Interests) follows.*

**EXHIBIT B**

**FORM OF ASSIGNMENT OF MEMBERSHIP INTERESTS**

**ASSIGNMENT OF MEMBERSHIP INTERESTS**

*Dos Lagos Regional Center, LLC*

*dated as of October* 14*, 2026*

**THIS ASSIGNMENT OF MEMBERSHIP INTERESTS** (this **"Assignment"**), is entered into as of the date written above, by and among:

**ASSIGNOR: BO CHEN (AKA BO DON), an individual and the sole member of Dos Lagos Regional Center, LLC, holding one hundred percent (100%) of its outstanding membership interests ("Assignor"); and**

**ASSIGNEE: REAL ESTATE INCOME FUND III LLC**, a Delaware limited liability company, represented by its Manager, Brad J. Domitrovitsch (**"Assignee"**).

**RECITALS**

**A.** Assignor is the sole record and beneficial owner of one hundred percent (100%) of the outstanding membership interests of Dos Lagos Regional Center, LLC, a California limited liability company (CA SOS File No. 201022410250; EIN: 27-3242403) (the **"LLC"**).

**B.** Pursuant to that certain Membership Interest Purchase Agreement dated as of October 14, 2026 (the **"MIPA"**), by and among Assignee as Buyer, the LLC as Company, and Assignor as Selling Member, Assignor has agreed to sell, assign, and transfer all of its membership interests in the LLC to Assignee for the Purchase Price of One Dollar ($1.00).

NOW, THEREFORE, for One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

**1. ASSIGNMENT**

Assignor hereby irrevocably sells, assigns, transfers, conveys, and delivers to Assignee all right, title, and interest of Assignor in and to the membership interests of Dos Lagos Regional Center, LLC held by Assignor (representing one hundred percent (100%) of the outstanding membership interests of the LLC) (the **"Membership Interests"**), together with all economic rights, voting rights, management rights, EB-5 Regional Center Designation attributes, and all other rights and interests of any kind associated with the Membership Interests, free and clear of all liens, pledges, encumbrances, and restrictions of any kind, other than Permitted Encumbrances as defined in the MIPA.

**2. ACCEPTANCE**

Assignee hereby accepts the foregoing assignment of the Membership Interests and agrees to be bound by all of the terms, conditions, and obligations of the Operating Agreement of Dos Lagos Regional Center, LLC (as the same may be amended by Assignee following the Effective Date) with respect to the Membership Interests from and after the date hereof. Assignee acknowledges that the LLC is the holder of an EB-5 Regional Center designation issued by USCIS and that Assignee, as the incoming sole member, assumes all obligations of the LLC with respect to the EB-5 Program, including the obligation to file all required USCIS notifications in connection with the change of control.

**3. REPRESENTATIONS OF ASSIGNOR**

Assignor represents and warrants to Assignee that: (a) Assignor is the record and beneficial owner of one hundred percent (100%) of the membership interests in the LLC, free and clear of all encumbrances; (b) Assignor has full power and authority to execute, deliver, and perform this Assignment; (c) the execution and delivery of this Assignment does not violate any agreement to which Assignor is a party; and (d) upon the effectiveness of this Assignment, Assignee will acquire good and valid title to the Membership Interests, free and clear of all encumbrances other than Permitted Encumbrances.

**4. USCIS COMPLIANCE**

Assignor agrees to cooperate fully with Assignee and its counsel in the preparation, execution, and submission of all required USCIS notifications and filings in connection with the change of control of the LLC, including any amendments to the Regional Center application and any disclosures required under the EB-5 Reform and Integrity Act of 2022. Assignor acknowledges that the effectiveness of this Assignment does not excuse compliance with applicable USCIS regulatory requirements.

**5. GENERAL PROVISIONS**

**5.1 Governing Law.** This Assignment shall be governed by the laws of the State of California.

**5.2 Counterparts.** This Assignment may be executed in counterparts. Electronic signatures shall have the same legal force and effect as original ink signatures.

**5.3 Priority.** In the event of any conflict between this Assignment and the MIPA, the MIPA shall control.

IN WITNESS WHEREOF, the parties have executed this Assignment of Membership Interests as of the date first written above.

**ASSIGNOR:**

**By:** ___________________________________

**Name:** Bo Chen (AKA Bo Don)

**Title:** Sole Member, Dos Lagos Regional Center, LLC

**Date:** October 14, 2026

**ASSIGNEE:**

**REAL ESTATE INCOME FUND III LLC**, a Delaware Limited Liability Company

**By:** ___________________________________

**Name:** Brad J. Domitrovitsch

**Title:** Manager

**Date:** October 14, 2026

*End of Exhibit B. End of Document.*

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

11766 Wilshire Blvd, Suite 730, Los Angeles, CA 90025

A true and correct copy of the foregoing document entitled (*specify*): **Declarations Of Bernardo D. Cardoso II and Brad J. Domitrovitsch in Support of Motion For Order (1) Authorizing Private Sale Of Real Property To Real Estate Income Fund I LLC, Not Subject To Overbid, Free And Clear Of Liens, Claims, And Interests; (2) Authorizing Assumption And Assignment Of Leases And Contracts; (3) Authorizing Entry Into Plan Support And Subordination Agreement And Acceptance Of Backstop Commitment; (4) Finding Good Faith Under 11 U.S.C. Section 363(m); And (5) Waiving 14-Day Stays; Memorandum Of Points And Authorities; Declaration Of Nicholas Rubin in Support Thereof** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) October 16, 2026, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

See attached NEF service list

☒ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**:
On (*date*)_______________, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) October 16, 2026, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

The Honorable Scott Yun (via Priority Mail)
United States Bankruptcy Court
3420 Twelfth St., Suite 345
Riverside, CA 92501-3819

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| October 16, 2026 | Martha E. Araki | */s/ Martha E. Araki* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

In re Fu Bang Group Corp, USA and Dos Lagos Center 2, LLC (Jointly Administered) Lead Case No. 6:25-bk-13004-SY

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- Attorneys for Debtors Fu Bang Group Corp (USA) and Dos Lagos Center 2, LLC: **Derrick Talerico, Paige T. Rolfe**: dtalerico@wztslaw.com; prolfe@wztslaw.com; maraki@wztslaw.com; sfritz@wztslaw.com; admin@wztslaw.com
- Attorneys for Defendants Central Trading Corp., RDD Freight International (LA) Inc., SZ Properties LLC, Sierra Home Material Trade Inc., U.S. Discount Center Corp. and Lang Zhang: **Paul A Beck**: pab@pablaw.org; raychael@pablaw.org
- Attorneys for Creditor Sparknest, LLC, a Delaware limited liability company: **David B Golubchik**: dbg@lnbyg.com
- Attorneys for Creditors Cheukhing Lau, Cong Liu, Dabao Guan, Guangquan Liang, Haifeng Zhang, Haochang Huant, Lijuan Ye, Lin Li, Mingxia Lu, Saiying Xiao, and Yiyi Liang: **Siyao Lin**: lin.silvacy@gmail.com
- Attorneys for Creditor First Credit Bank and Attorney Dennette A Mulvaney: **Dennette A Mulvaney**: dmulvaney@leechtishman.com; lmoya@leechtishman.com; narango@leechtishman.com; dbender@leechtishman.com
- Attorneys for Creditor Na Jiang: **Jeffrey S Shinbrot**: jeffrey@shinbrotfirm.com; sandra@shinbrotfirm.com; tanya@shinbrotfirm.com
- Interested Party/Courtesy NEF: **Xinyuan Zhang**: echozhang@shanzepartners.com; leowang@shanzepartners.com; siyunli@shanzepartners.com
- On behalf of the U.S. Trustee (RS): **Abram Feuerstein, Ali Matin**: abram.s.feuerstein@usdoj.gov; ali.matin@usdoj.gov
- US Trustee's Office (RS): ustpregion16.rs.ecf@usdoj.gov